UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAYMOND VARGAS,

                        Plaintiff,

v.                                            6:16-CV-0484
                                            (TWD)

COMM'R OF SOC. SEC.,

                        Defendant.
_____

APPEARANCES:                            OF COUNSEL:

RAYMOND VARGAS
  Plaintiff, *Pro Se*
7700 Stone Road
Whitesboro, NY 13492

U.S. SOCIAL SECURITY ADMIN.              HEETANO SHAMSOONDAR,
OFFICE OF REG'L GEN. COUNSEL – REGION II    ESQ.
  Counsel for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**DECISION and ORDER**</u>

      Currently before the Court, in this Social Security action filed by Raymond Vargas

("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner")

pursuant to 42 U.S.C. §§ 405(g), is Defendant's motion for judgment on the pleadings.  (Dkt.

No. 20.)  For the reasons set forth below, Defendant's motion for judgment on the pleadings is

granted.  The Commissioner's decision denying Plaintiff's disability benefits is affirmed, and

Plaintiff's Complaint is dismissed.

# I.   RELEVANT BACKGROUND

## A.   Factual Background

Plaintiff was born in 1968, making him 43 years old at his alleged onset date and 48 years old at the date of the final Social Security Administration ("SSA") decision.  Plaintiff has an 11th grade education and past relevant work as a construction worker.  Generally, Plaintiff alleges disability consisting of left knee instability, hearing loss, artery damage, and history of three gunshot wounds.

## B.   Procedural History

Plaintiff applied for Disability Insurance Benefits on December 13, 2011.  Plaintiff's application was initially denied on March 7, 2012, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at hearings before ALJ Eric W. Borda on June 27, 2012, and September 12, 2012.  On December 21, 2012, ALJ Borda issued a written decision finding Plaintiff not disabled under the Social Security Act.  (T. 132-141.[1])  On April 8, 2014, the Appeals Council remanded for evaluation of Plaintiff's obesity, to obtain additional evidence related to Plaintiff's knee impairment, to obtain clarification from a medical expert (if necessary), to give further consideration to the RFC, and to obtain evidence from a vocational expert.  (T. 146-47.)  Plaintiff attended subsequent hearings with ALJ Bruce Fein on July 31, 2014, and June 11, 2015.  On August 25, 2015, ALJ Fein issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 14-24.)  On March 18, 2016, the

---

[1]      The Administrative Transcript is found at Dkt. No. 11.  Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-3.)

### C. The ALJ's Decision

Generally, in his decision, the ALJ made the following seven findings of fact and conclusions of law. (T. 13-21.) First, the ALJ found that Plaintiff was insured for disability benefits under Title II of the Social Security Act until December 31, 2016. (T. 16.) Second, the ALJ found that Plaintiff has not engaged in substantial gainful activity since March 16, 2011, the alleged onset date. (T. 17.) Third, the ALJ found that Plaintiff's status post-bilateral knee and left wrist surgery, status-post right ankle fracture, osteoarthritis, intermittent explosive disorder, and mood disorder (not otherwise specified) are severe impairments, while his status-post gunshot wounds, left-sided hearing loss, reported nerve damage, arterial damage, and obesity are non-severe impairments. (T. 17-18.) Fourth, the ALJ found that Plaintiff's severe impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"). (T. 18-19.) More specifically, the ALJ considered Listing 1.02 (major dysfunction of a joint), 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones), 12.02 (organic mental disorders), 12.04 (affective disorders), 12.05 (intellectual disability), and 12.06 (anxiety-related disorders). *Id.* Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to

> lift/carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours out of an 8 hour workday with normal breaks; sit for 6 hours out of an 8 hour workday with normal breaks; occasionally climb (all other), stoop, balance, kneel, crouch, and crawl but never climb ropes, ladders, and scaffolds; should avoid concentrated exposure to excessive vibrations and extreme cold; and is limited to a low stress job defined as involving only occasional decision-making, changes in work setting, judgment required, and interaction with co-workers, supervisors, and the public.

(T. 20.)  Sixth, the ALJ found that Plaintiff has past relevant work as a construction worker, but that the limitations in the RFC assessment prevent him performing this work.  (T. 22.)  Seventh, and finally, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including marker II, small products assembler, and mail clerk.  (T. 23.)

### D.    Defendant's Brief and Plaintiff's Failure to File a Brief

Plaintiff, proceeding *pro se*, did not file a brief in this matter despite being afforded multiple opportunities to do so.  (Dkt. Nos. 12, 14-15, 17.)  The Court is entitled to consider the record without the benefit of any arguments he might have asserted.  (*See* General Order #18 at 7.)

Generally, Defendant asserts three arguments in support of her motion for judgment on the pleadings.  First, Defendant argues that Plaintiff's impairments do not meet or equal an impairment in the Listings.  (Dkt. No. 20 at 16-19.[2])  Second, Defendant argues that the ALJ's RFC assessment is supported by substantial evidence.  *Id*. at 19-24.  More specifically, Defendant argues that the ALJ properly considered and weighed the medical opinion evidence and properly found that Plaintiff's allegations were not entirely credible because the medical evidence and Plaintiff's reported activities were inconsistent with disability.  *Id*.  Third, and last, Defendant argues that the ALJ's Step Five finding that Plaintiff remains able to perform a significant number of jobs in the national economy is supported by substantial evidence, including the vocational expert's testimony.  *Id*. at 24-25.

---

[2]      Page numbers in citations to Defendant's brief refer to the actual page numbers of the brief rather than the page number assigned by the Court's electronic filing system.

## II.     RELEVANT LEGAL STANDARD

### A.     Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see also Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of

the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153

(S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination

considerable deference, and may not substitute "its own judgment for that of the

[Commissioner], even if it might justifiably have reached a different result upon a *de novo*

review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.      Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an

individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920.

The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v.*

*Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is
> afflicted with a "listed" impairment is unable to perform substantial
> gainful activity. Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform. Under the cases
> previously discussed, the claimant bears the burden of proof as to
> the first four steps, while the [Commissioner] must prove the final
> one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), *accord McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

## III.    ANALYSIS

### A.    Whether the ALJ Properly Determined That Plaintiff's Impairments Do Not Meet or Equal a Listed Impairment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (*See* Dkt. No. 20 at 16-19.) To those reasons, the Court adds the following analysis.

A plaintiff will be found disabled if the individual has an impairment or combination of impairments that meets or equals one of the Listings, and meets the duration requirement. 20 C.F.R. § 404.1520(d). The burden is on the plaintiff to present medical findings that his or her impairments match a Listing or are equal in severity to a Listing. *Davis v. Astrue*, 6:09-CV-0186 (LEK/GHL), 2010 WL 2545961, at *3 (N.D.N.Y. June 3, 2010)[3]. A plaintiff must show that his or her impairment meets or equals *all* of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (superceded by statute on other grounds). If a plaintiff's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. *Id.* Additionally, while an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent a court from upholding them so long as we are "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his

---

[3]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

determination was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982).

The ALJ found that Plaintiff's impairments did not meet or equal any of the applicable Listings, discussing specific Listing sections and providing reasons based on the evidence in the record as to why Plaintiff did not meet the criteria of those Listing sections. (T. 18-19.) These explanations are clear and provide this Court with sufficient information to determine the ALJ's rationale.

In this case, the record does not show that Plaintiff meets all the criteria of any of the applicable Listings. In terms of Listing 1.02, there was no evidence that Plaintiff required an assistive device to ambulate other than during the period immediately following the various treatments for his gunshot wounds.[4] Although consultative examiner Sharon Revan, M.D., observed that Plaintiff had a limp to the left, was unable to walk on his heels and toes, and had some warmth and swelling in his right knee with pain on range of motion, she opined only a mild limitation in his ability to walk. (T. 581-83.) Additionally, although consultative examiner Tanya Perkins-Mwantuali, M.D., opined a moderate-to-marked limitation for walking (which she quantified as two hours out of an eight-hour workday) based on her examination findings, this still does not substantiate an inability to ambulate effectively. (T. 834, 838.) While some examinations did reveal diminished strength in Plaintiff's lower extremities related to his knees,

---

[4]     Listing 1.02 defines an "inability to ambulate effectively" as "an extreme limitation of the ability to walk," such as insufficient functioning of the lower extremities that prevents the individual from ambulating without use of a hand-held assistive device that limits the use of both upper extremities. 20 C.F.R. § 404, Subpart P, App. I, 1.00(B)(2)(b)(1). Similarly, the Listing defines the ability to ambulate effectively as being capable of walking at a reasonable pace over a sufficient distance to carry out activities of daily living and to travel without companion assistance to work or school. 20 C.F.R. § 404, Subpart P, App. I, 1.00(B)(2)(b)(2).

these findings do not indicate that he was unable to ambulate effectively. (*See e.g.*, T. 1736, 1741, 1747, 1753, 1757.) Additionally, while some examinations showed an antalgic or limping gait, others revealed no gait abnormalities. (*See, e.g.*, T. 757, 818, 832, 846, 849, 852, 1741, 1886, 1916, 1939.) Consequently, there is substantial evidence to support the ALJ's conclusion that Plaintiff had not demonstrated an inability to ambulate effectively. Likewise, there is very little objective evidence of ongoing limitations in Plaintiff's left hand, and certainly nothing to show he had an "extreme loss of function of both upper extremities." 20 C.F.R. § 404, Subpart P, App. I, 1.00(B)(2)(c). There is substantial evidence to support the ALJ's finding that Plaintiff did not meet Listing 1.02.[5]

In terms of the applicable mental Listings (12.02, 12.04, and 12.06), the ALJ found that Plaintiff had no restrictions in activities of daily living, moderate difficulties in social functioning and maintaining concentration, persistence, and pace, and no episodes of decompensation of extended duration. (T. 19.) These conclusions are supported by the overall record, which, despite a few instances of greater symptoms, includes mental health examinations showing primarily normal concentration, attention, and memory, fluctuating but generally mild mood abnormalities, and good response to medications. (*See, e.g.*, T. 757-58, 796, 800-01, 806, 810, 820, 823, 846, 849, 853, 1802, 1804, 1806, 1854-55, 1857, 1886, 1908, 1911.)

On May 12, 2014, consultative examiner Rebecca Fisher, Psy. D., observed Plaintiff was cooperative with adequate social skills, was well-groomed, and displayed a coherent and goal directed thought process, appropriate affect, neutral mood, and intact attention and concentration,

---

[5]     Listing 1.06 also requires an inability to ambulate effectively, so there is also substantial evidence to support the ALJ's finding on that section for the same reasons. 20 C.F.R. § 404, Subpart P, App. I, 1.06.

though he did also display lethargic motor behavior, poor eye contact, slow but intelligible speech, mildly impaired memory, and below average intellectual functioning.  (T. 823-24.)  Based on these observations, Dr. Fisher opined Plaintiff had the following functional limitations: no limitation in ability to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, and relate adequately with others; a mild limitation in ability to deal appropriately with stress; and a moderate limitation in ability to perform complex tasks independently.  (T. 824.)  In a separate form, Dr. Fisher opined Plaintiff had moderate limitations in understanding and remembering complex instructions and making judgments on complex work-related decisions, as well as mild limitations in carrying out complex instructions and making judgments on simple work-related decisions.  (T. 826-28.)

On December 24, 2014, Nurse Practitioner ("N.P.") Robert Sharpe noted that he told Plaintiff "frankly" that he "did not see any reason from a psychiatric standpoint why [Plaintiff] was not able to work."  (T. 1802.)  The medical evidence therefore does not indicate that Plaintiff experienced the marked limitations or the episodes of decompensation of extended duration needed to meet any of the applicable mental Listings.[6]  (T. 18-20.)

---

[6]     Paragraph B of the mental Listings requires that the individual display at least two of the following as a result of a mental impairment: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpart P, App. I, 12.00.  Paragraph C of the mental Listings requires that the mental impairment cause more than a minimal limitation in the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, as well as one of the following: repeated episodes of decompensation, each of extended duration; a disease process where even a minimal increase in mental demands or change in environment would cause the individual to decompensate; or a current history of one or more years' inability to function outside of a highly supportive living arrangement, with indication of the continued need for such an arrangement.  *Id.*

For all these reasons, the ALJ's Step Three Listing findings are supported by substantial evidence, and remand is not required on this basis.

**B.      Whether the RFC Determination is Supported By Substantial Evidence and Based on a Proper Assessment of the Opinion Evidence**

After carefully considering the matter, the Court answers this question in the negative, but finds that the errors committed are nonetheless harmless based on the vocational expert's testimony from the 2015 hearing.

Residual functional capacity is defined as "what an individual can still do despite his or her limitations[.]  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Id.* (citing 20 C.F.R. § 404.1545(a)).

In terms of weighing opinion evidence, the Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c).  "Thus, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case "the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length,

nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). "Where an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196 (GTS/WBC), 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013)), *adopted by* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017). After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129) (alteration in original). "The failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* (quoting *Burgess*, 537 F.3d at 129-30).

The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant replacing the consideration of the treatment relationship between the source and the claimant. *See* 20 C.F.R. § 404.1527(c)(1)-(6). Additionally, when weighing opinions from sources who are not considered "medically acceptable sources"[7] under the regulations, the ALJ must consider the same factors as used for evaluating opinions from medically acceptable sources. *Saxon v. Astrue*, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011) (citing *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010)); SSR 06-03p, 2006 WL 2329939.

---

[7]     Medically acceptable sources are noted to include the following: licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

"[A]n ALJ is entitled to rely upon the opinions of both examining and nonexamining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability."  *Gamble v. Comm'r of Soc. Sec.*, No. 1:15-CV-0352 (GTS/WBC), 2016 WL 4491710, at *5 (N.D.N.Y. July 25, 2016) (quoting *Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010)), *adopted by* 2016 WL 4487780 (N.D.N.Y. Aug. 25, 2016).

In determining that Plaintiff remained capable of performing a range of light work with additional postural, environmental, and mental limitations, the ALJ afforded great weight to the opinion of consultative examiner Dr. Revan, some weight to the interrogatory and testimony of non-examining medical expert Louis Fuchs, M.D., and little weight to the opinion of consultative examiner Dr. Perkins-Mwantuali in relation to Plaintiff's physical functioning, and great weight to the opinion of consultative examiner Dr. Fisher and some weight to the statement of N.P. Sharpe in relation to Plaintiff's mental functioning.  (T. 21-22.)

Turning first to the mental RFC, this Court agrees with Defendant that the ALJ was entitled to rely on Dr. Fisher's opinion, particularly given the absence of a functional opinion regarding Plaintiff's mental abilities from any treating physician or other source.  (Dkt. No. 20 at 22.)  The ALJ found that Dr. Fisher's opinion was entitled to great weight because she was an acceptable source, had examined Plaintiff, and her finding of at most moderate mental limitations were consistent with Plaintiff's "presentation during exams, positive response to conservative treatment, and varied activities of daily living."  (T. 22.)  As already noted above in Section III.A of this Decision and Order, the mental treatment evidence as a whole did not show ongoing mental health symptoms suggestive of greater limitation, and N.P. Sharpe, who provided mental health care for Plaintiff, went so far as to explicitly indicate that there was no

reason that Plaintiff would be unable to work from a psychiatric standpoint.[8] (T. 1802.) The RFC accounts for evidence showing limitations in dealing with stress and decision-making and even accommodates some of Plaintiff's reports of difficulty dealing with others. Therefore, the ALJ was entitled to rely on Dr. Fisher's opinion and the mental portion of the RFC determination is supported by substantial evidence.

However, the supportability of the physical RFC assessment is not so clear. The ALJ afforded great weight (the most afforded to any physical opinion) to Dr. Revan's February 2012 opinion, noting that Dr. Revan was an acceptable medical source who had the opportunity to examine Plaintiff and that her primarily mild findings were consistent with the medical imaging, Plaintiff's presentation on exams, his surgical history, and his reported activities of daily living. (T. 21.) By contrast, the ALJ afforded only some weight to the opinion from medical expert Dr. Fuchs, noting that while Dr. Fuchs was an acceptable medical source with a specialty in orthopedic surgery, he had not examined Plaintiff and (as particularly relevant to this Court's analysis) his limitations related to Plaintiff's abilities to stand and walk were inconsistent with physical exams that did not show difficulties with these tasks other than the presence of an antalgic gait. (T. 21-22.) The ALJ then afforded little weight to the opinion from consultative examiner Dr. Perkins-Mwantuali, finding that while Dr. Perkins-Mwantuali was an acceptable source who had examined Plaintiff, her findings were inconsistent with claimant's presentation on exams, his positive response to treatment, and his reported activities of daily living. (T. 22.)

---

[8] The ALJ afforded some weight to this opinion because he found it to be consistent with the evidence as a whole, but declined to afford it greater weight due to the lack of a functional assessment of Plaintiff's mental abilities. (T. 22.)

This Court is not convinced that substantial evidence supports the ALJ's finding that Plaintiff remains able to stand and walk for six hours in an eight-hour workday despite his impairments. The ALJ relied on the 2012 opinion from Dr. Revan, who opined in a rather vague manner that Plaintiff had only a mild limitation in walking. (T. 21, 583.) However, it is not clear that this opinion is consistent with Dr. Revan's own examination, which showed that Plaintiff ambulated with a limp, was unable to walk on his toes, displayed pain when walking on his heels, could only squat halfway down while holding onto something, needed help changing for the exam, and had swelling and pain with range of motion of his knee. (T. 581-82.)

Nor does a "mild" limitation appear to be consistent with the other treatment evidence, contrary to the ALJ's assertion. Dr. Perkins-Mwantuali observed in May 2014 that Plaintiff had an antalgic gait, could not walk on his heels or toes due to lower extremity pain, and had a minimal ability to squat; she also found diminished hip range of motion, swelling and decreased flexion in the left knee, diminished ankle range of motion, and diminished sensation in the fourth and fifth toes of the left foot. (T. 832-33.) A left knee arthrogram from November 16, 2012, showed significant osteoarthritic changes with a suspicion of poorly visualized meniscal tears.[9] (T. 678.) A right knee arthrogram showed osteoarthritic changes, and though it did not reveal a definitive tear, it raised suspicions of a tear in the posterior horn of the medial meniscus. (T. 859.) As noted previously, Plaintiff was observed to have an antalgic or otherwise abnormal gait

---

[9]     It is important to note that the ALJ's assertions that the medical imaging supported fairly mild findings ignore the fact that Plaintiff was unable to undergo MRI testing of his knees due to the metal bullet that remained lodged in his skull. (*See e.g.*, T. 493, 502, 690.) Because such imaging would be more likely to provide a better understanding of his knee condition than the x-rays and CT scans that were taken, and because the arthrograms suggest greater impairment than shown in those scans, the ALJ's reliance on the objective imaging that shower milder findings in this case is not wholly persuasive.

on multiple examinations. (T. 581, 690, 727, 819, 832, 846, 849, 852, 1882, 1886.) He was also variously observed to have knee tenderness, swelling, and diminished lower extremity strength on examinations throughout the relevant period; it was also noted that his knee impairment appeared to be causing tightness in the Achilles tendon that resulted in calf pain. (*See, e.g.*, T. 681, 700-01, 703, 850, 853, 1719, 1736, 1741, 1747-48, 1757, 1882, 1886.)

Additionally, Plaintiff's reported activities of daily living do not support an ability to stand or walk for six hours in an eight-hour workday. At the September 2012 hearing, Plaintiff testified he could not walk much due to his knee and indicated he could only walk a few blocks at one time and stand less than a half hour before needing to sit. (T. 47-48.) At the June 2015 hearing, Plaintiff testified he could walk approximately a block or two at once and could stand "a couple of hours" while shopping or doing things around the house, such as cleaning every few weeks and cooking once per day. (T. 76-77.) He reported getting cramps in his calves daily when walking due to muscle tightness related to his knee impairment. (T. 81-82.) In a function report from 2012, Plaintiff reported he could not constantly stand at the stove while cooking due to pain, but he performed household chores such as light dusting, sweeping, and laundry every two weeks, and drove short distances. (T. 421.) He indicated he had leg pain if standing for more than 10 or 15 minutes and could only walk a couple of blocks at one time. (T. 423-24.) Contrary to the ALJ's assertions, there is nothing in Plaintiff's reported daily activities that is inconsistent with Dr. Fuchs' and Dr. Perkins-Mwantuali's opinions that Plaintiff was limited to standing and walking two hours total in an eight-hour workday.

Most tellingly, the two other opinions regarding physical functioning, provided by another examining physician and an orthopedic surgeon who had the opportunity to examine all the evidence before the ALJ when affirming his earlier interrogatory opinion at the June 2015

hearing, both indicate an ability to stand and walk for only two hours total in an eight-hour workday. (T. 838, 904.) Dr. Fuchs also opined that Plaintiff would need the ability to change positions at will within the confines of his ability to sit eight hours in an eight-hour day and stand or walk two hours in an eight-hour day. (T. 904.)

Although the treatment evidence alone does not reveal overwhelmingly clear evidence that Plaintiff would be restricted to standing and walking for two hours in an eight-hour workday contrary to the ALJ's assessment, orthopedic surgeon Dr. Fuchs concluded that such a limitation was warranted after reviewing all of this evidence. However, rather than relying on Dr. Fuchs' expert assessment of the evidence, the ALJ instead relied on his own assessment of the treatment evidence and a less-than-specific opinion from a one-time examiner who did not review the treatment records. (T. 21-22.) While it is the duty of the ALJ to weigh all the evidence and make the final RFC determination, the circumstances of this case suggest that the ALJ improperly substituted his own lay opinion of the medical evidence for that of a specialist physician. *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (internal quotations omitted); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted a medical opinion to] or testified before him."); *see also Provencher v. Comm'r of Soc. Sec.*, No. 6:15-CV-1287 (GTS), 2017 WL 56702, at *5 (N.D.N.Y. Jan. 5, 2017) ("It is well settled that the ALJ is not permitted to substitute his or her own expertise or view of the medical proof for any competent medical opinion.") (citing *Greek*, 802 F.3d at 375; *Rosa*, 168 F.3d at 79; *Balsamo*, 142 F.3d at 81). Accordingly, there is not substantial evidence to support the ALJ's assertion that Dr. Fuchs'

opinion was inconsistent with the evidence, particularly as the only opinion that suggests a greater ability to stand and walk is couched in fairly vague terms and does not appear to be consistent with that physician's own examination. The ALJ's rejection of Dr. Fuchs' opinion, and particularly the limitations related to Plaintiff's ability to stand and walk, is therefore not supported by substantial evidence, which in turn leaves the physical RFC assessment unsupported by substantial evidence.

However, based on the vocational expert's testimony at the hearing, this error is nonetheless harmless. An error is considered harmless where proper application of standards or consideration of evidence would not change the outcome of the ALJ's decision. *Jaghamin v. Comm'r of Soc. Sec.*, No. 1:11-cv-1273 (GLS), 2013 WL 1292061, at *7 (N.D.N.Y. Mar. 28, 2013) (citing *Walzer v. Chater*, No. 93-cv-6240 (LAK), 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995)); *Dombrowski v. Astrue*, No. 5:12-cv-0638 (GLS), 2013 WL 528456, at *3 (N.D.N.Y. Feb. 11, 2013); *see Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) (finding that, although the ALJ improperly discounted the treating physician's opinion, that error was harmless because the ALJ nonetheless included those limitations in the RFC). Although substantial evidence does not support the ALJ's conclusion that Plaintiff remained capable of standing and walking six hours in an eight-hour workday, the opinions of Dr. Fuchs and Dr. Perkins-Mwantuali do not necessarily indicate that the ALJ's ultimate determination is not supported by substantial evidence. Notably, the ALJ posed a hypothetical question to the vocational expert at the hearing in which he described an individual who could perform sedentary work (described as lifting up to ten pounds, standing and walking for two hours total with normal breaks, and sitting for up to six hours total with normal breaks) with all the other non-exertional limitations included in the RFC. (T. 113-14.) In response to this hypothetical, the vocational expert

testified that Plaintiff would be able to perform other work in the national economy such as optical final assembler, document preparer, and stem mounter. (T. 114.) The vocational expert also testified that the need to change positions at will between sitting and standing would not prevent an individual from performing the identified sedentary occupations because, in his opinion, they "generally can be done from standing or sitting position[s]." (T. 117.) Although the vocational expert noted the individual would need to stoop to their desk while standing in order to remain on task, he also noted that the hypothetical question allowed the individual to stoop occasionally, which would be consistent with an individual who was limited to standing only two hours in an eight-hour workday.[10] (T. 117-18.) Therefore, even if the ALJ had accepted limitations for standing and walking for only two hours in an eight-hour workday, as opined by both Dr. Fuchs and Dr. Perkins-Mwantuali, and the need to change positions between sitting and standing at will, as opined by Dr. Fuchs, the vocational expert's testimony indicates that there would still be a substantial number of jobs Plaintiff would be able to perform with all of the supported limitations. Because the outcome would not change in the absence of the ALJ's errors in weighing the opinion evidence, those errors are harmless and do not necessitate remand.

As a corollary matter, the ALJ found that Plaintiff was not entirely credible, noting that his reports of symptoms were not consistent with much of the objective medical evidence, that Plaintiff had some non-compliance with his mental health medications and treatment, and that he reporting the ability to perform a range of activities despite his limitations, including cooking, cleaning, shopping, socializing with friends, going to church, going to the casino, and driving.

---

[10]    As the vocational expert noted, the term "occasionally" is defined for Social Security disability purposes as up to one-third of the workday. (T. 118.) *See also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996) (defining "occasionally" as "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday").

(T. 21.)  The ALJ is required to provide reasons for rejecting a claimant's allegations of symptoms with "sufficient specificity to enable [this Court] to decide whether the determination is supported by substantial evidence." *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 205 (N.D.N.Y. 2012) (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)).  The Second Circuit recognizes that "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," and that "[i]f there is substantial evidence in the record to support the Commissioner's findings, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Id.* (alternation in original) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Because the ALJ has provided specific reasons grounded in the evidence for finding that Plaintiff's allegations were not entirely credible and his conclusion regarding Plaintiff's credibility is supported by substantial evidence, this Court defers to that finding.[11]

Because the ALJ's errors in assessing the opinion evidence and RFC are harmless, the ALJ's ultimate decision remains supported by substantial evidence and remand is not warranted.

### C.    Whether the Step Five Finding is Supported By Substantial Evidence

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (*See* Dkt. No. 20 at 24-25.)  To those reasons, the Court adds the following analysis.

---

[11]     Although Plaintiff's reported daily activities do not contradict Dr. Fuchs' and parts of Dr. Perkins-Mwantuali's opinions related to Plaintiff's ability to stand and walk as noted previously, the ALJ's separate finding that those activities reported by Plaintiff were not consistent with the extent of disability alleged is not unreasonable and is supported by substantial evidence in the record.

Although the claimant has the general burden to prove he has a disability under the definitions of the Social Security Act, the burden shifts to the Commissioner at Step Five "to show there is other work that [the claimant] can perform." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (alteration in original) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)). The Commissioner can usually establish that there is other work that a plaintiff can perform by reliance on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grids." *Baldwin v. Astrue*, No. 07-Civ.-6958 (RJH/MHD), 2009 WL 4931363, at *20 (S.D.N.Y. Dec. 21, 2009). However, when a plaintiff suffers from nonexertional limitations that significantly limit the plaintiff's employment opportunities, exclusive reliance on the Grids is inappropriate. *Id.* at *27. However, "the mere existence of a non-exertional limitation does not automatically . . . preclude reliance on the guidelines." *Zabala v. Astrue,* 595 F.3d 402, 410-11 (2d Cir. 2010) (alteration in original) (quoting *Bapp*, 802 F.2d at 603.) A plaintiff's range of potential employment is significantly limited when the plaintiff "suffers from the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Baldwin*, 2009 WL 4931363, at *27 (internal quotations omitted).

As noted above in Section III.B of this Decision and Order, the ALJ consulted a vocational expert and posed hypothetical questions regarding limitations covering the ability to perform both light and sedentary work with additional postural, environmental, and mental limitations that resulted in a showing of light and sedentary jobs that could be performed with those limitations. (T. 112-20.) Because this testimony shows a substantial number of jobs Plaintiff can perform when the full range of limitations supported by the record are considered,

including those the ALJ improperly failed to adopt, the vocational expert's testimony provides

substantial evidence to support the ALJ's Step Five finding and remand is not required on this

basis.

ACCORDINGLY, it is

ORDERED that Defendant's motion for judgment on the pleadings (Dkt. No. 20) is

**GRANTED**; and it is further

ORDERED that Defendant's decision denying Plaintiff disability benefits is

**AFFIRMED**; and it is further

ORDERED that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.


Dated: June 29, 2017
         Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2010 WL 2545961
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Cindy DAVIS, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 6:09–CV–186 (LEK/GHL).
|
June 3, 2010.

West Headnotes (1)

[1]     **Social Security**
        👉 Particular conditions or impairments in general

        **Social Security**
        👉 Particular cases

        ALJ failed to provide rationale for finding
        that back impairment did not meet a listing
        in a proceeding denying supplemental security
        income (SSI) and disability insurance benefits
        (DIB) under the Social Security Act to a
        claimant alleging disability due to throat
        cancer, back pain, and depression. Remand
        to allow the ALJ to explain why claimant did
        not meet the listing was therefore warranted.
        MRIs revealed that claimant suffered from
        disc herniation and marked degenerative
        disc change. Moreover, claimant consistently
        complained of neuro-anatomic distribution
        of pain, exhibited limited range-of- motion
        in the lumbar spine and positive straight
        leg raising, and according to her treating
        physician, exhibited decreased strength. 20
        C.F.R. Part 404, Subpart P, App. 1, 1.00 et
        seq.

        5 Cases that cite this headnote

**Attorneys and Law Firms**

Empire Justice Center, Louise Marie Tarantino, Esq., of
Counsel, Albany, NY, for Plaintiff.

Social Security Administration, Office of General
Counsel, Andreea Lechleitner, Esq., Special Assistant
U.S. Attorney, of Counsel, New York, NY, for
Defendant.

***REPORT–RECOMMENDATION***[1]

[1]     This matter was referred to me for report and
        recommendation by the Honorable Lawrence E.
        Kahn, Senior United States District Judge, pursuant
        to 28 U.S.C. § 636(b) and Northern District of New
        York Local Rule 72.3.

GEORGE H. LOWE, United States Magistrate Judge.

## I. BACKGROUND

### A. Procedural History

**\*1** On March 27, 2006, Plaintiff Cindy Davis protectively
applied for disability insurance benefits ("DIB") and
supplemental security income ("SSI"). *See* Administrative
Transcript ("T") 84–88, 327–32. On June 16, 2006,
her applications were denied by the Social Security
Administration. T 50–54, 335–39. On December 11,
2007,[2] a hearing was held before an Administrative Law
Judge ("ALJ"). T 343–63. On April 25, 2008, the ALJ
determined that Plaintiff was not disabled. T 12–22.

[2]     More than one year lapsed between the day Plaintiff
        was initially denied benefits and the day that a hearing
        was held due to issues regarding the timeliness of
        Plaintiff's requests for hearings. T 25, 27–31, 64–66,
        56–58, 333.

Plaintiff appealed to the Appeals Council. On December
22, 2008, the Appeals Council denied Plaintiff's request for
review, making the ALJ's decision the final decision of the
Commissioner. T 5–7. Plaintiff commenced this action on
February 18, 2009. Dkt. No. 1.

### B. Plaintiff's Contentions

Plaintiff makes the following claims:

1. The ALJ erred by failing to find that Plaintiff's back impairment met a listed impairment. Dkt. No. 12 at 16 n. 23.

2. The ALJ failed to properly evaluate the treating sources' opinions. Dkt. No. 12 at 14–18.

3. The residual functional capacity ('RFC') determination was not supported by substantial evidence. Dkt. No. 12 at 18–22.

4. The ALJ should have found Plaintiff credible. Dkt. No. 12 at 22–24.

5. The Commissioner erred by applying the Medical–Vocational Guidelines. Dkt. No. 12 at 24–25.

Defendant disagrees, and argues that the decision finding Plaintiff not disabled should be affirmed. Dkt. No. 14.

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or supplemental security income benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. §§ 405(a), 1383(d)(1)), the Social Security Administration ("SSA") has promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 404.1520. "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas,* 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

> At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R. §§ ] 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [ ]
> If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [ ]
> 20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

**\*2** *Barnhart v. Thomas,* 540 U.S. at 24–25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). If the plaintiff-claimant meets his or her burden of proof on all four steps, the burden then shifts to the defendant-Commissioner to prove that the plaintiff-claimant is capable of performing other jobs which exist in significant numbers in the national economy. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler,* 728 F.2d 582, 587–88 (2d Cir.1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams olbl o Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

### III. THE PLAINTIFF

At the time of the administrative hearing, Plaintiff was forty-three years old. T 347. She obtained her general equivalency diploma. T 110. She lived in an apartment with her seventeen-year old disabled son. T 348.

From 1984 to 1997, Plaintiff was "home raising [her] children and [her] spouse was working." T 90. From 1998 to 2005, Plaintiff worked as a certified nurses' aide. T 106. From 2006 to 2007, she worked part-time as a housekeeper. *Id.*

**\*3** Plaintiff alleges disability due to throat cancer, back pain, and depression. T 105.

### IV. THE ALJ'S DECISION

In determining that Plaintiff was not disabled, the ALJ made the following findings:

1. Plaintiff had not engaged in substantial gainful activity since the alleged onset date. T 17–18.

2. Plaintiff's "cancer of the larynx (in remission), lumbar degenerative disease, depression, and anxiety," were severe impairments. T 18.

3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T 19.

4. Plaintiff had the physical RFC to perform light work. In addition, Plaintiff had the mental RFC to understand, remember, and carry out simple tasks, learn new simple tasks, maintain attention and concentration, and work in a low stress environment. T 19–20.

5. Plaintiff was unable to perform any past relevant work. Considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Therefore, Plaintiff was not disabled. T 20–21.

### V. DISCUSSION

#### A. Listed Impairment

Plaintiff argues that the ALJ erred by failing to find that her back impairment met Listing 1.04, and points out that the ALJ failed to even discuss this listing. Dkt. No. 12 at 16 n. 23. Defendant argues that the ALJ properly found that Plaintiff's back impairment did not meet or medically equal this listed impairment. Dkt. No. 14 at 6–8.

A claimant is automatically entitled to benefits if his or her impairment(s) meets criteria set forth in "the Listings." 20 C.F.R. § 404.1520(d). The burden is on the plaintiff to present medical findings that show that his or her impairments match a listing or are equal in severity to a listed impairment. *Zwick v. Apfel,* No. 97 Civ. 5140, 1998 WL 426800, at *6 (S.D.N.Y. July 27, 1998). In order to show that an impairment matches a listing, the claimant must show that his or her impairment meets all of the specified medical criteria. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); 20 C.F.R. § 404.1525(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. *Sullivan,* 493 U.S. at 530.

However, in cases in which the disability claim is premised upon one or more listed impairments of appendix 1, "the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry,* 675 F.2d at 469. While a court may be able "to look to other portions of the ALJ's decision" and to "credible evidence" in finding that his determination was supported by substantial evidence, the Second Circuit has noted that "[c]ases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record .... In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision." *Id.* (citations omitted). Thus, while an ALJ is not obligated to address specifically each piece of evidence in his decision, *Jones v. Barnhart,* No. CV–04–2772, 2004 WL 3158536, at *6 (E.D.N.Y. Feb.3, 2004), he is not excused from addressing an issue central to the disposition of the claim. *See Ramos v. Barnhart,* No. 02 Civ. 3127, 2003 WL 21032012, at *10 (S.D.N.Y. May 6, 2003) (citing, *inter alia, Ferraris,* 728 F.2d at 587 ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.")). Moreover, " '[w]here the claimant's symptoms as described by medical evidence appear to match those described in the Listings, the ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings.' " *Pitcher v. Barnhart,* No. 5:06–CV–1395, 2009 WL 890671, at *11 (N.D.N.Y. Mar.30, 2009) (Bianchini, M.J.) (quoting *Brown ex rel. S.W. v. Astrue,* No. 1:05–CV0985, 2008 WL 3200246, at *10 (N.D.N.Y. Aug. 5, 2008)).

**\*4** Here, the ALJ summarily concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T 19. The ALJ provided absolutely no rationale for this finding. *Id.*

Defendant concedes that the ALJ provided no "express rationale" for this determination. Dkt. No. 14 at 7. However, he argues that this omission provides no basis for reversal because a review of the ALJ's decision and the evidence of record indicates that Plaintiff's back impairment did not meet or medically equal Listing 1.04A. *Id* .

Listing 1.04A provides as follows:

Disorders of the spine (*e.g.,* herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); ....

20 C.F.R. Pt. 404, Subpt. P, App. 1. Each of these requirements will be discussed in turn.

The first requirement to meet Listing 1.04A is "evidence of nerve root compression characterized by neuro-anatomic distribution of pain." 20 C.F.R. Pt. 404, Subpt. P, App. 1. An MRI of Plaintiff's lumbar spine revealed a disc herniation at L5–S1, which "does come in close proximity to both descending nerve roots **and may abut their nerve root sheaths. Compression of the descending nerve roots with axial loading may be present.**" T 242 (emphasis added). The MRI also revealed "marked degenerative disc change with moderate diffuse annular disc bulge at L4–5 which is stable. **Compression of the left descending nerve root may be present with axial loading.**" *Id.* (emphasis added). In addition, another MRI revealed a central disc herniation at L4–5, **which may "possibly [be] affecting the left L5 nerve root minimally."** T 305 (emphasis added).

Moreover, Plaintiff consistently complained of neuro-anatomic distribution of pain. T 203, 273, 275, 310, 323. She testified at the hearing that the pain radiated up her neck, and down her left leg. T 351, 359. Further, Aimee Pearce, M.D. assessed Plaintiff as suffering from lumbar radiculopathy. [3] T 274; *see also* T 275.

[3]    Radiculopathy is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary* 1595 (31st ed.2007).

The second requirement to meet Listing 1.04A is "limitation of motion of the spine." 20 C.F.R. Pt. 404, Subpt. P, App. 1. During an examination by Myra Shayevitz, M.D., Plaintiff exhibited limited range-of-motion in the lumbar spine. T 205. Defendant himself notes that a reduced range-of-motion in the lumbar spine was observed during this examination. Dkt. No. 14 at 13. Plaintiff also exhibited a "decreased range of motion due to pain" during an orthopaedic consultation with Rudolph Buckley, M.D. T 324–25.

**\*5** The third requirement to meet Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Plaintiff's treating physician, Zoltan Teglassy, M.D., noted that Plaintiff exhibited decreased strength during a follow-up appointment for Plaintiff's back pain. T 310.

The fourth requirement to meet Listing 1.04A is a "positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1. The record reveals several instances during which Plaintiff exhibited positive straight leg raising. T 273–75.

In sum, the evidence indicates that Plaintiff may meet Listing 1.04A. [4] Thus, the Court is unable to conclude that the ALJ properly found that Plaintiff met no listing. Accordingly, it is recommended that this case be remanded in order to allow the ALJ to explain why Plaintiff did not meet Listing 1.04A. *See Pitcher,* 2009 WL 890671, at *12 (holding similarly).

[4]    I note that the ALJ discussed only some of this evidence while addressing other steps.

## B. Residual Functional Capacity and Treating Physicians

Plaintiff argues that the RFC determination was not supported by substantial evidence. Dkt. No. 12. Defendant argues that the RFC finding was supported by substantial evidence. Dkt. No. 14.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id.; Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999).

Plaintiff's primary challenge to the RFC determination is her belief that the ALJ improperly weighed opinions rendered by two of her treating physicians. Dkt. No. 12 at 15–18. Defendant argues that the ALJ properly weighed these opinions. Dkt. No. 14 at 8–19.

The medical opinions of a treating physician are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with other substantial evidence contained in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Even if the treating physician's opinion is contradicted by substantial evidence and thus is not controlling, it still may be entitled to significant weight "because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir.1988). However, if not controlling, the proper weight given to a treating physician's opinion depends upon the following factors: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d) (2).

### 1. Dr. Firooz Tabrizi

**\*6** In determining Plaintiff's mental RFC, the ALJ discussed the opinion of Firooz Tabrizi, M.D., Plaintiff's treating psychiatrist. T 19–20. Dr. Tabrizi opined that Plaintiff had moderate restrictions in her abilities to understand and remember simple instructions, and to

carry out simple instructions. T 296. He also opined that Plaintiff had marked restrictions in her abilities to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions. *Id.*

Dr. Tabrizi also opined that Plaintiff had marked restrictions in her abilities to interact appropriately with the public, supervisor(s), and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting. T 297. He also opined that Plaintiff had a moderate restriction in her ability to respond appropriately to changes in a routine work setting. *Id.*

The ALJ afforded this opinion "little weight because it is not well supported by the medical record." T 19. However, Dr. Tabrizi's progress notes, which are replete with his notations that Plaintiff was depressed and anxious, support the assessment. T 293–95. Moreover, Dr. Tabrizi specifically stated the factors that supported his assessment. T 296–97. He indicated that Plaintiff was anxious and depressed; she worried; her mind raced; her sleep was poor; she felt stressed; and she cried at times. T 296.

The ALJ also based his determination on a report from a consultative orthopaedist, Dr. Buckley. T 19 (citing T 323). The ALJ cited this report for the proposition that Plaintiff "recently exhibited no depression or anxiety." *Id.* In his report, Dr. Buckley noted that Plaintiff exhibited no depression or anxiety. T 323. However, as stressed by Plaintiff, Dr. Buckley performed an **orthopaedic** examination, focusing on Plaintiff's **orthopaedic** complaints. Dkt. No. 12 at 20. Indeed, his report states that Plaintiff "presents today for evaluation with complaints of back and leg pain." T 323.

The ALJ also explained that Plaintiff's "depression has responded to medication." T 20 (citing T 277). He cited a progress note from St. Elizabeth's Family Practice in which it is noted that Plaintiff's "response to Prozac is encouraging." T 277. **However, the next sentence of the progress note states, "[h]owever, she does seem to have significant residual depressive symptoms. We will ... increase her dose of Prozac."** *Id.* (emphasis added). It was also noted that she suffered from insomnia and experienced "underlying anxiety." *Id.*

The ALJ also stated that Dr. Tabrizi's opinion was "inconsistent" with Plaintiff's activities. T 20. The ALJ pointed out that Plaintiff testified that she drove, performed activities of daily living, followed news on the television, shopped, prepared meals, and performed housework. *Id.* It is unclear how Dr. Tabrizi's opinion conflicts with these activities.

**\*7** In light of the foregoing, the Court is unable to find that the ALJ's assignment of "little" weight to Dr. Tabrizi's opinion was supported by substantial evidence.

### 2. Dr. Zoltan Teglassy
In determining Plaintiff's physical RFC, the ALJ discussed an opinion rendered by Dr. Teglassy, a treating physician. T 20. Dr. Teglassy opined that Plaintiff could never lift ten pounds, but could occasionally carry ten pounds; Plaintiff could sit for eight hours without interruption, but could stand or walk for only one hour, each, without interruption in an eight-hour workday. T 300. He also indicated that Plaintiff was limited in her abilities to use her hands and feet, and had limitations in her abilities to perform postural activities. T 301–03.

The ALJ assigned "little" weight to this opinion. T 20. The ALJ's only explanation was the following: "The extreme physical limitations set forth by Dr. Teglassy are not consistent with the relatively mild nature of the claimant's degenerative disc disease or her daily activities." *Id.* (citing T 204, 241–43, and "testimony").

However, as previously determined, Plaintiff may meet Listing 1.04A. Therefore the Court is unable to conclude that the ALJ's finding that Plaintiff's degenerative disc disease was "relatively mild" was correct. Moreover, the ALJ vaguely states that Plaintiff's daily activities are "inconsistent" with Dr. Teglassy's opinion. T 20. It is unclear how the activities conflict with the opinion.

In light of the foregoing, the Court is unable to find that the ALJ's assignment of "little" weight to Dr. Teglassy's opinion was supported by substantial evidence.

### 3. Evidence Cited by the ALJ
In addition to challenging the ALJ's evaluation of her treating sources' opinions, Plaintiff challenges the evidence cited by the ALJ for support of the physical RFC determination.[5] Dkt. No. 12. The ALJ stated that

the RFC determination was supported by, *inter alia,* Dr. Shayevitz's opinion and an RFC assessment completed by an individual from a State agency. T 20.

5  Plaintiff included a section in her brief that at first blush appears to challenge the evidence cited by the ALJ for the mental RFC determination. Dkt. No. 12 at 21–22. However, after a review, it appears that this section, in essence, is a challenge to the ALJ's step five determination. *See id.* (citing T 21–step five determination). Accordingly, the Court will touch upon this issue in Section (V)(D) of this Report–Recommendation.

First, Plaintiff points out that Dr. Shayevitz noted that Plaintiff would have difficulty with repetitive overhead lifting. Dkt. No. 12 at 19. Indeed, Dr. Shayevitz opined that Plaintiff would have difficulty lifting overhead. T 206. The Court also notes that the RFC assessment completed by the individual from the State agency indicates that Plaintiff should avoid repetitive overhead activities. T 221. However, the RFC determination inexplicably fails to provide for such limitations.

Second, Plaintiff points out that Dr. Shayevitz opined that Plaintiff "might have difficulty with prolonged hours of sitting, standing, and walking." Dkt. No. 12 at 19 (citing T 206). Plaintiff argues that this finding conflicts with the RFC determination that she could perform light work because light work requires standing or walking for six hours in an eight-hour day, or sitting most of the time. Dkt. No. 12 at 19. Defendant apparently argues that there is no conflict because Dr. Shayevitz never specifically stated that Plaintiff was unable to perform the amount of standing or walking required for light work, and that "light work does not require uninterrupted standing and walking for hours on end." Dkt. No. 14 at 14–15.

**\*8** While it is true that standing or walking is performed off-and-on, and that sitting may occur intermittently during the remaining time for at least some jobs in the light work category, 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83–10, 1983 WL 31251, at \*5–6 (S.S.A.1983), a job is also in the light category when it involves **sitting most of the time** with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ did not specify the kind of light work that Plaintiff could perform. In fact, he stated that Plaintiff had the RFC "for the full range of light work." T 21. Thus, Defendant's argument is unpersuasive because Dr. Shayevitz's finding

that Plaintiff might have difficulty with prolonged hours of sitting, standing, and walking appears to conflict with the RFC determination that Plaintiff could perform light work, which may consist of a job involving sitting most of the time.

For all of the foregoing reasons, the Court is unable to find that the RFC determination is supported by substantial evidence. Accordingly, I recommend that the matter in this regard be reversed and remanded.

### C. Credibility

Plaintiff argues that the ALJ erred in his determination that Plaintiff was not totally credible. Dkt. No. 12. Defendant argues that the ALJ properly determined Plaintiff's credibility. Dkt. No. 14.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' " *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (quoting *Gallardo v. Apfel,* Civ. No. 96–9435, 1999 WL 185253, at \*5 (S.D.N.Y. Mar.25, 1999)).

To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. 20 C.F.R. § 404.1529; *see also Foster v. Callahan,* Civ. No. 96–1858, 1998 WL 106231, at \*5 (N.D.N.Y. Mar. 3, 1998). First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged ....." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating

factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c) (3). An ALJ's evaluation of a plaintiff's credibility is entitled to great deference if it is supported by substantial evidence. *Murphy v. Barnhart,* No. 00–9621, 2003 WL 470572, at *10 (S.D.N.Y. Jan.21, 2003) (citing *Bischof v. Apfel,* 65 F.Supp.2d 140, 147 (E.D.N.Y.1999) and *Bomeisl v. Apfel,* Civ. No. 96–9718, 1998 U.S. Dist. LEXIS 11595, at *19, 1998 WL 430547 (S.D.N.Y. July 30, 1998) ("Furthermore, the ALJ has discretion to evaluate a claimant's credibility ... and such findings are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing.")).

**\*9** In this case, the ALJ found that Plaintiff's subjective complaints were "only partially credible." T 20. The ALJ provided four reasons for this determination. First, the ALJ stated that Plaintiff's "activities" were "inconsistent with **total** disability." *Id.* (emphasis added). However, a "claimant need not demonstrate that he is completely helpless or totally disabled." *Rivera v. Schweiker,* 717 F.2d 719, 722 (2d Cir.1983). Moreover, the mere fact that an individual is mobile and able to engage in some light tasks at his home does not alone establish that she is able to engage in substantial gainful activity. *Lecler v. Barnhart,* No. 01 Civ. 8659, 2002 WL 31548600, at *7 (S.D.N.Y. Nov.14, 2002) (quoting *Gold v. Sec. of Health, Ed. & Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1972)).

The ALJ pointed to Plaintiff's testimony that she cooks, cleans, does laundry, shops, takes care of her disabled son, drives, and could use public transportation if needed. T 20. However, Plaintiff does laundry only **twice per week** and shops only **once per month,** which the ALJ himself noted. T 20. Plaintiff also stated that it "took her awhile" to do housework "because of her back condition, and she had "a lot of trouble" cleaning, and needed help vacuuming and cleaning her house. T 114, 116. She also stated that she had "a lot of trouble" cooking, and prepared only "simple meals." T 114, 115. She also stated that her **monthly** food shopping took her "awhile because I have to constantly stop because of the pain." T 116, 117. With regard to her son, the only care that she provided to him was giving him medications when he woke up, and driving him to medical appointments. T 353, 355. She further stated that

regarding her ability to drive, she drove a **total** of ten-to-fifteen miles in **one week** if she or her son had medical appointments. T 355.

Second, the ALJ stated that Plaintiff was only "partially credible" because the "objective clinical findings and MRI results do not provide strong support for a disabling back disorder." T 20. However, as previously discussed, Plaintiff may meet Listing 1.04A.

Third, the ALJ stated that Plaintiff was only "partially credible" because a "specialist recently recommended conservative treatment, rather than surgery." T 20 (citing T 322–26). The specialist, Dr. Buckley, recommended that Plaintiff attend physical therapy. T 325. He made no mention of surgery, as the ALJ suggests.

Fourth, the ALJ stated that Plaintiff's "sporadic work history and limited earnings record do not bolster her credibility." T 20. It is unclear how Plaintiff's work history and earnings record fail to "bolster" her credibility. Plaintiff indicated that she did not work from 1984 to 1997 because she was "home raising [her] children and [her] spouse was working." T 90. From 1998 to 2006, she consistently worked in only a few different positions. T 106.

In light of the foregoing, the Court is unable to find that the credibility determination was supported by substantial evidence. Accordingly, the matter in this regard should be reversed and remanded.

### D. Medical Vocational Guidelines

**\*10** Plaintiff argues that the ALJ erred by relying on the Medical–Vocational Guidelines ("the Grids") to determine that she was not disabled. Dkt. No. 12 at 24–25. Specifically, Plaintiff argues that her non-exertional impairments and pain significantly erode the occupational base, making application of the Grids inappropriate. *Id.* at 25; *see id.* at 21–22. Defendant argues that the ALJ properly relied on the Grids. Dkt. No. 14 at 22–24.

Because the Court is recommending remand for several reasons, the Court recommends remand on this issue as well. Also, I note that the ALJ made no mention at this step of whether Plaintiff had any non-exertional impairments. Upon remand, the ALJ shall obtain the opinion of a vocational expert if Plaintiff's nonexertional limitations present significant limitations. *See Bapp v.*

*Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986) (holding that if a claimant's nonexertional impairments "significantly limit the range of work permitted by his exertional limitations" the application of the grids is inappropriate).

**WHEREFORE,** for the reasons set forth above, it is hereby

**RECOMMENDED,** the Commissioner's determination of no disability be **VACATED,** and the matter **REMANDED** to the agency for further consideration.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2545961

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 782979
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald BLINKOVITCH, Plaintiff,
v.
COMMISSIONER OF SOCIAL
SECURITY, Defendant.

3:15-CV-1196 (GTS/WBC)
|
Signed 01/23/2017

**Attorneys and Law Firms**

LACHMAN, GORTON LAW FIRM, OF COUNSEL:
PETER A. GORTON, ESQ., P.O. Box 89, 1500 East
Main St., Endicott, NY 13761-0089, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE
OF REG'L GEN. COUNSEL—REGION II, OF
COUNSEL: EMILY M. FISHMAN, ESQ., 26 Federal
Plaza—Room 3904, New York, NY 10278, Counsel for
Defendant.

## REPORT and RECOMMENDATION

William B. Mitchell Carted, U.S. Magistrate Judge

**\*1** This matter was referred for report and
recommendation by the Honorable Judge Suddaby, Chief
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(d). (Dkt. No. 15.) This case
has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action
filed by Ronald Blinkovitch ("Plaintiff") against the
Commissioner of Social Security ("Defendant" or "the
Commissioner") pursuant to 42 U.S.C. §§ 405(g) and
1383(c)(3), are the parties' cross-motions for judgment on
the pleadings. (Dkt. Nos. 11, 14.) For the reasons set
forth below, it is recommended that Plaintiff's motion be
granted, in the extent it seeks remand under Sentence Four
of 42 U.S.C. § 405(g), and Defendant's motion be denied.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was 32 at the time of the hearing. (T. 47.) He
completed high school. (Id.) Generally, Plaintiff's alleged
disability consists of cervical spine injury, posterior
lumbar fusion, degenerative disc disease, leg pain, dorsal
osteophytes with attendant radiculopathy, lateral recess
foraminal stenosis, anxiety, and depression. (T. 194.) His
alleged disability onset date is April 18, 2012. (T. 189.) His
date last insured is December 31, 2017. (Id.) He previously
worked as an auto mechanic. (T. 21.)

### B. Procedural History

On August 17, 2012, Plaintiff applied for a period of
Disability Insurance Benefits ("SSD") under Title II of
the Social Security Act. (T. 189.) Plaintiff's application
was initially denied, after which he timely requested a
hearing before an Administrative Law Judge ("the ALJ").
On January 2, 2012 and again on May 15, 2014, Plaintiff
appeared before the ALJ, Marie Greener. (T. 27-42,
43-65.) On July 8, 2014, ALJ Greener issued a written
decision finding Plaintiff not disabled under the Social
Security Act. (T. 10-26.) On September 10, 2015, the
Appeals Council ("AC") denied Plaintiff's request for
review, rendering the ALJ's decision the final decision of
the Commissioner. (T. 1-6.) Thereafter, Plaintiff timely
sought judicial review in this Court.

### C. The ALJ's Decision

Generally, in her decision, the ALJ made the following
five findings of fact and conclusions of law. (T. 15-22.)
First, the ALJ found that Plaintiff met the insured status
requirements through December 31, 2017 and Plaintiff
had not engaged in substantial gainful activity since April
18, 2012. (T. 15.) Second, the ALJ found that Plaintiff
had the severe impairments of lumbar spine residuals from
fusion and an adjustment disorder. (Id.) Third, the ALJ
found that Plaintiff did not have an impairment that meets
or medically equals one of the listed impairments located
in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 16-18.)
Fourth, the ALJ found that Plaintiff had the residual
functional capacity ("RFC") to perform light work. (T.
18.)[1] Specifically, the ALJ concluded that Plaintiff could:
lift 20 pounds occasionally and ten pounds frequently; sit
for a total of six hours in an eight-hour workday, and
stand or walk for a total of six hours in an eight-hour
work day. (Id.) The ALJ determined that Plaintiff needed
to alternate sitting and standing, with sitting limited to one

hour at a time. (*Id.*) The ALJ determined that Plaintiff needed to stand for five minute "or so" but he did not have to leave the workstation or area during the change of position. (*Id.*) The ALJ determined that Plaintiff could stand or walk for an hour at a time, but would then need to sit for five minutes "or so" before standing or walking again. (*Id.*) The ALJ limited Plaintiff to unskilled work. (*Id.*) Fifth, the ALJ determined that Plaintiff was incapable of performing his past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 21-22.)

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments

**\*2** Plaintiff makes five separate arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues that the ALJ's finding that Plaintiff could stand or walk for most of the day as required by a light job was contrary to the medical evidence in the record. (Dkt. No. 11 at 10-14 [Pl.'s Mem. of Law].) Second, Plaintiff argues that he cannot do the sitting required by the ALJ's RFC or sedentary work. (*Id.* at 14-15.) Third, Plaintiff argues that the ALJ's credibility determination was insufficient and erroneous. (*Id.* at 15-21.) Fourth, Plaintiff argues that the ALJ did not properly evaluate treating physician opinions. (*Id.* at 21-24.) Fifth, and lastly, Plaintiff argues that the ALJ erred in her step five determination. (*Id.* at 24-25.)

### B. Defendant's Arguments

In response, Defendant makes four arguments. First, Defendant argues that the ALJ's RFC finding was supported by substantial evidence. (Dkt. No. 14 at 5-12 [Def.'s Mem. of Law].) Second, Defendant argues that the ALJ properly weighed the medical source opinion. (*Id.* at 12-16.) Third, Defendant argues that the ALJ properly found Plaintiff's complaints not fully credible. (*Id.* at 16-21.) Fourth, and lastly, Defendant argues that substantial evidence supported the ALJ's step five finding. (*Id.* at 21.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

## IV. ANALYSIS

For ease of analysis, Plaintiff arguments will be addressed out of order and in a consolidated fashion.

### A. The ALJ's RFC Determination

Plaintiff's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In making an RFC determination, the ALJ will base her determination on an assessment of all the relevant evidence in the case record. *See id.* Further, Plaintiff's RFC is his maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis. *See id.* at § 404.1545(b)-(c). "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009).

In formulating an RFC the ALJ will afford weight to the medical opinion evidence in the record. The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. § 404.1527(c)(1)-(6).

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the treating source opinion should receive, even if it is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 404.1527(c)(2)(i)-(iv). The ALJ is required to set forth her reasons for the weight she assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

In making her physical RFC determination, the ALJ relied primarily on the medical examination and source opinion of consultative examiner, Shannon Gearhart, M.D. and to a lesser extent the medical opinions provided by Plaintiff's treating providers, David Kammerman, M.D. and Cori Pane, F.N.P. (T. 19-20.)

On October 31, 2012, Dr. Gearhart conducted an internal medicine examination of Plaintiff and provided a medical source statement. (T. 376-380.) On examination, Dr. Gearhart observed that Plaintiff was in no acute distress, his gait was slightly antalgic, he declined to walk on heels and toes, his squat was 10% of full, his stance was normal, he needed no help changing for the exam or getting on and off the exam table, and he was able to rise from a chair without difficulty. (T. 378.) Dr. Gearhart observed that Plaintiff's lumbar spine range of motion was limited due to pain and because Plaintiff declined to remove his back brace. (T. 379.) Dr. Gearhart noted that Plaintiff declined to do a lumbar spinal rotation. (*Id.*) Dr. Gearhart observed positive straight leg raise on the right, sitting only. (*Id.*) Plaintiff had full strength in his upper and lower extremities and no sensory deficits. (*Id.*)

**\*4** In a medical source statement, Dr. Gearhart stated that Plaintiff had "marked restriction for heavy lifting, carrying, pushing, and pulling." (T. 380.) She further opined that Plaintiff had "moderate to marked restrictions for prolonged walking and standing." (*Id.*) Lastly, she opined that Plaintiff had "moderate restrictions for squatting, kneeling, climbing, going up and down stairs, and prolonged sitting." (*Id.*)

On October 1, 2013, Nurse Pane completed a "Questionnaire." (T. 482-483.) Nurse Pane was a nurse practitioner with Comprehensive Pain Relief. (T. 442.) In the questionnaire, Nurse Pane indicated that Plaintiff could sit for approximately four hours out of an eight hour workday. (T. 483.) She opined that Plaintiff could stand/walk for approximately four hours out of an eight hour workday. (*Id.*) She indicated that Plaintiff should change positions approximately every 30 minutes. (*Id.*)

On November 8, 2013, Dr. Kammerman, also with Comprehensive Pain Relief, completed a "Questionnaire." (T. 493-494.) Dr. Kammerman opined that Plaintiff could sit for approximately two hours out of an eight hour workday. (T. 494.) He opined that Plaintiff could stand/walk for approximately two hours out of an eight hour workday. (*Id.*) He indicated that Plaintiff should change positions approximately every hour. (*Id.*)

Plaintiff testified at the hearing that he could sit for about forty minutes and stand for about thirty minutes. (T. 51.) In his disability report, Plaintiff indicated that he could

stand "no more than 20 minutes" and sit "no more than thirty minutes." (T. 216-217.)

Plaintiff argues that the ALJ erred in her evaluation of treating source opinions because the ALJ failed to acknowledge that both providers were specialist and had an extensive treatment relationship with Plaintiff, and because both sources provided uncontradicted opinions. (Dkt. No. 11 at 21-24 [Pl.'s Mem. of Law].)

Where an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation. *Atwater v. Astrue*, 512 Fed.Appx. 67, 70 (2d Cir. 2013) (plaintiff challenged ALJ's failure to review explicitly each factor provided for in 20 C.F.R. § 404.1527(c), the Court held that "no such slavish recitation of each and every factor [was required] where the ALJ's reasoning and adherence to the regulation [was] clear"). Here, the ALJ's reasoning and adherence to the Regulations was clear. Although the ALJ did not specifically refer to Dr. Kammerman or Nurse Pane as "treating providers," or specifically note how often they treated Plaintiff, her decision cites to the numerous treatment records and medical source statements provided by both providers. Further, in assessing the opinions of Dr. Kammerman and Nurse Pane, the ALJ provided specific reasoning for the weight she afforded their opinions. (T. 20.) Therefore, the ALJ did not commit legal error in failing to explicitly acknowledge that Dr. Kammerman or Nurse Pane were treating sources or their length of treatment because her reasoning and adherence to the Regulations was clear.

Plaintiff argues that the ALJ's RFC determination, that Plaintiff could stand/walk for six hours and sit for six hours in a workday, was not supported by medical evidence in the record. (Dkt. No. 11 at 13-15 [Pl.'s Mem. of Law].)

Light work requires "a good deal of walking or standing." 20 C.F.R. § 404.1567(b); *see also* SSR 83-10 (S.S.A. 1983) ("the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday"); *see also* SSR 83-12 (S.S.A. 1983) (most light work requires "prolonged standing or walking"). Here, substantial evidence did not support the ALJ's RFC determination that Plaintiff could stand or walk, for an hour at a time, six hours in an eight hour work day. (T. 18.) Further, the ALJ's decision failed to provide an adequate

analysis of how the evidence in the record supported her determination that Plaintiff could stand or walk for six hours with a limitation of one hour at a time.

**\*5** The medical opinions in the record indicated that Plaintiff had greater restriction on his ability to stand and walk than provided for in the RFC. Dr. Gearhart opined that Plaintiff had "moderate to marked restrictions for prolonged walking and standing." (T. 380.) To be sure, a "moderate" limitation would not necessarily preclude the ability to perform the walking and standing requirements of light work; however, a "moderate to marked" limitation does not support the determination that Plaintiff can perform the requirements.

Further, the opinions of Plaintiff's treating providers do not support the contention that Plaintiff could perform the walking or standing requirements of light work. Dr. Kammerman opined Plaintiff could stand or walk for approximately two hours out of an eight hour work day. (T. 494.) Nurse Pane opined Plaintiff could stand or walk for approximately four hours in an eight hour day. (T. 483.) Plaintiff testified that he could not stand more than "about half an hour" and could not "really walk too far without having to take a rest." (T. 51.) Plaintiff stated in his Function Report that he could stand for 20 minutes and walk ten to 20 minutes. (T. 216.) Therefore, neither the medical evidence in the record, not Plaintiff's testimony, supported the conclusion that Plaintiff could stand or walk for "prolonged" periods.

The ALJ's determination failed to provide an analysis of how the record supported the determination that Plaintiff could stand/walk for six hours in a workday. *See Otts v. Colvin*, No. 15-CV-6731, 2016 WL 6677192, at \*4 (W.D.N.Y. Nov. 14, 2016) (remanding where ALJ failed to explain how consultative examiner's "moderate to marked" restriction for lifting, carry, pushing, and pulling supported an RFC to perform light work). Therefore, remand is recommended for a proper analysis of Plaintiff's ability to stand and walk.

The ALJ also determined that Plaintiff could sit, for one hour increments, for a total of six hours in an eight hour workday. (T. 18.) Substantial evidence did not support this conclusion. Although Dr. Gearhart opined that Plaintiff had a "moderate" restriction for sitting, treating providers indicated Plaintiff could sit for two or four hours in a work day. (T. 483, 494.) Plaintiff

testified that he could sit for about forty minutes. (T. 51.) Elsewhere Plaintiff indicated he could sit for thirty minutes. (T. 217.) Again, the medical evidence indicated that Plaintiff had greater restriction in his ability to sit for prolonged periods than accounted for by the ALJ. In addition, the ALJ failed to explain how she arrived at the conclusion that Plaintiff could sit for six hours in a workday based on Dr. Gearhart's opinion that he had a moderate restriction for sitting.

To be sure, although an "ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in [her] decision, [she] was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013). Further, "it is not per se error for an ALJ to make the RFC determination absent a medical opinion ..., [and] remand is not necessary where 'the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.' " *Lewis v. Colvin*, No. 13-CV-1072S, 2014 WL 6609637, at \*6 (W.D.N.Y. Nov. 20, 2014) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 Fed.Appx. 29, 34 (2d Cir. 2013)).

The "regulatory language provides ample flexibility for the ALJ to consider a broad array of 'medical opinions.' " *Sickles v. Colvin*, No. 12-CV-774, 2014 WL 795978, at \*4 (N.D.N.Y. Feb. 27, 2014) (citation omitted). Plaintiff's testimony and the treatment notes may constitute "relevant evidence [that] a reasonable mind might accept as adequate to support" the RFC as determined by an ALJ. *Johnson v. Colvin*, No. 15-3483-CV, 2016 WL 5539890, at \*2 (2d Cir. Sept. 29, 2016) (quoting *Richardson*, 402 U.S. at 401); *see also Scouten v. Colvin*, No. 15-CV-76S, 2016 WL 2640350, at \*4 (W.D.N.Y. May 10, 2016) ("[t]here is no error where ... an ALJ bases his RFC on Plaintiff's own testimony" together with relevant medical evidence). Here, however, the record did not contain sufficient evidence to support the ALJ's conclusion that Plaintiff could stand or walk per the requirements of light work, or sit for six hours, even if such postures were limited to an hour at a time.

**\*6** Defendant argues that the ALJ's RFC determination accounted for Plaintiff's restrictions for standing, walking, and sitting because the RFC stated that Plaintiff could not perform a position for more than an hour at a time. (Dkt. No. 14 at 7 [Def.'s Mem. of Law].) This

Court may not "create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Martinbeault v. Astrue*, 2009 WL 5030789, *5 (N.D.N.Y. Dec. 14, 2009) (citing *Grogan v. Barnhart,* 399 F.3d 1257, 1263 (10th Cir. 2005)); *see also Hall v. Colvin*, 37 F. Supp. 3d 614, 626 (W.D.N.Y. 2014) ("Even if accurate, this is a *post hoc* rationalization that is not apparent from the face of the ALJ's decision."); *see also Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999) (a reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999). Although the ALJ concluded that Plaintiff could stand, walk, and sit, for an hour at a time, it is not apparent from the ALJ's decision how she arrived at this conclusion.

In addition, the ALJ appears to have misread the objective medical evidence in the record. The ALJ relied on this misreading in weighing opinion evidence and formulating her RFC determination.

To be sure, as indicated by the ALJ, the MRI performed on August 30, 2013 indicated "no disc herniation, central or foraminal narrowing at L1-L2 through L4-L4." (T. 463.) However, the ALJ either overlooked or ignored the MRI results indicating "mild abnormal hypointense T1 signal along the ventral aspect of the spinal canal which appear[ed] to abut the left more than right S1 nerve root" at L5-S1. (T. 463.) The results also indicated minimal hypointense T1 signal along the posterior aspect of the spinal canal that may represent "postoperative granulation tissue." (*Id.*) This oversite was not harmless, because Plaintiff's treating providers relied on these results in formulating treatment and medical opinions. Plaintiff's neurologist, Khalid Sethi, reviewed the MRI on October 16, 2013, and indicated that he was "not impressed with a robust incorporation" and Plaintiff's "symptoms may be partially referable to micromotion." (T. 495.) Both Dr. Kammerman and Nurse Pane indicated in their medical source statements that their diagnoses were supported by the MRI which showed granulation tissue abutting the S1 nerve root. (T. 482, 493.)

The ALJ reasoned that Dr. Kammerman's opinion, and Nurse Pane's opinion, were undermined by an MRI which showed "no disc herniation, central or foraminal narrowing." (T. 20.) The ALJ relied, in part, on the MRI findings as support for Dr. Gearhart's opinion. (T. 19.)

The ALJ's reliance on a misreading of the MRI findings compounded her erroneous RFC determination.

In sum, the record did not contain sufficient evidence to support the ALJ's determination that Plaintiff could perform the standing or walking requirements of light work, or that Plaintiff could sit for six hours in a work day, even if Plaintiff was limited to those positions for an hour at a time. The ALJ's decision provided no analysis of how she reached the determination that Plaintiff could perform positional requirements of light work for an hour at a time. Further, the ALJ appears to have misread or misunderstood the objective medical evidence. Therefore, remand is recommended for a new physical RFC determination.

Plaintiff also argues that there was no adverse medical opinion to Dr. Kammerman's statement that Plaintiff would be off task 33% of the day and absent more than four days a month, and as such the ALJ was required to accept the limitations. (Dkt. No. 11 at 23-24 [Pl.'s Mem. of Law].) However, the ALJ's conclusion that Plaintiff could sustain attention and concentration for unskilled work was supported by the medical opinion of consultative examiner, Cheryl Loomis, Ph.D.

**\*7** Dr. Loomis concluded, based on her examination of Plaintiff, that he was capable of following, understanding, and performing simple tasks independently. (T. 373.) She concluded that Plaintiff could maintain attention and concentration, maintain a schedule, and learn new tasks. (*Id.*) She concluded that Plaintiff could make appropriate decision, relate adequately with others, and appropriately deal with stress. (T. 374.) Therefore, the ALJ's determination that Plaintiff retained the ability to perform unskilled work was supported by the opinion of Dr. Loomis.

### B. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing

*Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F. Supp. 2d at 270.

The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. § 404.1529. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a). Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. (T. 19.) In making her credibility determination the ALJ first relied on Plaintiff's statement that he applied for benefits because he could not return to his past work as a mechanic. (T. 20.) Second, the ALJ stated that clinical findings and testing did not support his allegations. (*Id.*) Third, the ALJ stated that Plaintiff's statements were not fully credible because he claimed his back did not fully fuse; however, the record did not support that statement. (*Id.*) And lastly, the ALJ took into consideration that Plaintiff had previously filed for benefits and went back to work after he was denied. (*Id.*)

**\*8** Plaintiff argues that the ALJ erred in her credibility determination because the ALJ failed to discuss the relevant factors outlined in the Regulations and the reasons the ALJ relied on in making her determination had no bearing on credibility. (Dkt. No. 11 at 17-21 [Pl.'s Mem. of Law].) For the reasons stated herein, the ALJ's credibility determination was the product of legal error and not supported by substantial evidence.

To be sure, the ALJ is not required to make a "slavish" recitation of each and every factor in the Regulation where the ALJ's reasoning and adherence to the Regulations is clear. *See Halloran v. Barnhart,* 362 F.3d 28, 31-32 (2d Cir. 2004). However, in the instant case, the ALJ's reasoning and adherence to the Regulations is not clear. The ALJ's discussion makes no mention or reference to any factor outlined in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

In her credibility determination the ALJ found Plaintiff to be less credible because he was not familiar with the legal standard of obtaining Social Security Disability benefits. (T. 20.) The ALJ relied on a notation made by a physical therapist in September of 2012. (T. 422.) The statement was not made by the Plaintiff at the hearing or in his application. Even if Plaintiff misunderstood the disability standard, that does not equate with Plaintiff's statements being less credible. Second, as stated herein, the ALJ failed to acknowledge the MRI finding of nerve root abutment. Therefore, the ALJ erred in relying the MRI to undermine Plaintiff's credibility. Further, the ALJ's erroneously concluded that Plaintiff incorrectly stated that his back had not fully fused and was therefore not credible. (T. 20.) Plaintiff's treating source did indicate, as Plaintiff's alleged, his back had not fully fused. (T. 390-391.) The ALJ also selectively relied on one notation that Plaintiff's pain increase because he had been more active. (T. 20, *referring to* T. 524.) Outside of this one notation, the record indicated that Plaintiff complained his symptoms were aggravated by "daily activities." (*see generally* T. 346-370, T. 401-453.)

Because the ALJ made no mention of the factors outlined in the Regulations in making her credibility determination and the ALJ's adherence to the Regulations was not clear from her determination, remand is recommended for a proper credibility analysis.

### C. The ALJ's Step Five Determination

Because remand is recommended for a physical RFC determination and credibility determination, remand is recommended for a new analysis at step five.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Plaintiff's motion for judgment on the pleadings be **GRANTED**, and the Commissioner's determination be **DENIED**, and the matter be **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g) and consistent with this report.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2017 WL 782979

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 782901
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald BLINKOVITCH, Plaintiff,
v.
COMMISSIONER OF SOCIAL
SECURITY, Defendant.

3:15-CV-1196 (GTS/WBC)
|
Signed 02/28/2017

**Attorneys and Law Firms**

LACHMAN & GORTON, OF COUNSEL: PETER A.
GORTON, ESQ., P.O. Box 89, 1500 East Main Street,
Endicott, New York 13761, Counsel for Plaintiff.

SOCIAL SECURITY ADMINISTRATION, OFFICE
OF REG'L GEN. COUNSEL–REGION II, OF
COUNSEL: EMILY M. FISHMAN, ESQ., 26 Federal
Plaza, Room 3904, New York, New York 10278, Counsel
for Defendant.

**DECISION and ORDER**

HON. GLENN T. SUDDABY, Chief United States
District Judge

**\*1** Currently before the Court, in this Social Security
action filed by Ronald Blinkovitch ("Plaintiff") against
the Commissioner of Social Security ("Defendant" or
"the Commissioner"), is the Report-Recommendation
of United States Magistrate Judge William B. Mitchell
Carter recommending that Plaintiff's motion for judgment
on the pleadings be granted, Defendant's motion for
judgment on the pleadings be denied, the Commissioner's
decision denying Plaintiff Social Security benefits
be reversed, and this matter be remanded to the
Commissioner of Social Security for further proceedings
under sentence four of 42 U.S.C. § 405(g). (Dkt. No. 16.)
Objections to the Report-Recommendation have not been
filed and the time in which to do so has expired. (*See
generally* Docket Sheet.)

After carefully reviewing all of the papers in this action,
including Magistrate Judge Carter's thorough Report-
Recommendation, the Court can find no clear error in
the Report-Recommendation. [1] Magistrate Judge Carter
employed the proper legal standards, accurately recited
the facts, and correctly applied the law to those facts.
(Dkt. No. 16.) As a result, the Report-Recommendation
is accepted and adopted in its entirety; Plaintiff's motion
for judgment on the pleadings is granted; Defendant's
motion for judgment on the pleadings is denied; the
Commissioner's decision denying disability insurance
benefits is reversed; and this matter is remanded to the
Commissioner of Social Security for further proceedings
under sentence four of 42 U.S.C. § 405(g).

| [1] | When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a "clear error" review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted). |
|---|---|

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Carter's Report-
Recommendation (Dkt. No. 16) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for judgment on the
pleadings (Dkt. No. 11) is **GRANTED**, Defendant's
motion for judgment on the pleadings (Dkt. No. 14) is
**DENIED**, the Commissioner's decision denying Plaintiff
Social Security benefits is **REVERSED**, and this matter
is **REMANDED** to the Commissioner of Social Security
for further proceedings under sentence four of 42 U.S.C.
§ 405(g).

**All Citations**

Slip Copy, 2017 WL 782901

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

SSR 06-03P (S.S.A.), 2006 WL 2329939

Social Security Ruling

TITLES II AND XVI:II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL AND NONGOVERNMENTAL AGENCIES

SSR 06-03p
August 9, 2006

Policy Interpretation Ruling

**\*1** PURPOSE: To clarify how we consider opinions from sources who are not "acceptable medical sources" and how we consider decisions by other governmental and nongovernmental agencies on the issue of disability or blindness.

CITATIONS: Sections 205(a), 216(i), 221, 223(d), 1614(a)(3), 1631(d), and 1633 of the Social Security Act (the Act), as amended; Regulations No. 4, subpart P, sections 404.1502, 404.1503, 404.1504, 404.1512(b), 404.1513(a), (d), and (e), 404.1520(a), 404.1527, and subpart Q, section 404.1613, and Regulations No. 16, subpart I, sections 416.902, 416.903, 416.904, 416.912(b), 416.913(a), (d), and (e), 416.920(a), 416.927 and subpart J, section 416.1013.

Introduction: We use medical and other evidence to reach conclusions about an individual's impairment(s) to make a disability determination or decision as described in 20 CFR 404.1512, 404.1513, 416.912 and 416.913. In accordance with sections 223(d)(5) and 1614(a)(3)(H) of the Act, when we make a determination or decision of disability, we will consider all of the available evidence in the individual's case record. This includes, but is not limited to, objective medical evidence; other evidence from medical sources, including their opinions; statements by the individual and others about the impairment(s) and how it affects the individual's functioning; information from other "non-medical sources" and decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind. See 20 CFR 404. 1512 and 416.912.

*Medical Sources*

The term "medical sources" refers to both "acceptable medical sources" and other health care providers who are not "acceptable medical sources." See 20 CFR 404. 1502 and 416.902.

Under our current regulations, "acceptable medical sources" are:
• Licensed physicians (medical or osteopathic doctors);

• Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;

• Licensed optometrists, for the measurement of visual acuity and visual fields (for claims under title II, we may need a report from a physician to determine other aspects of eye disease);

• Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and

• Qualified speech-language pathologists, for purposes of establishing speech or language impairments only.

**\*2** See 20 CFR 404.1513 (a) and 416.913(a).

*Medical Source Distinction*

The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).

Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

*"Other Sources"*

In addition to evidence from "acceptable medical sources," we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to:
• Medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists; and

• "Non-medical Sources" including, but not limited to:

• Educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers;

• Public and private social welfare agency personnel, rehabilitation counselors; and

• Spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.

Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

*Evaluating Opinions and Other Evidence*

Sections 404.1527 and 416.927 of our regulations provide general guidance for evaluating all relevant evidence in a case record and provide detailed rules for evaluating medical opinions from "acceptable medical sources." [1] Medical opinions are statements from physicians and psychologists or other "acceptable medical sources" that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions. See 20 CFR 40 4.1527(a)(2) and 416.927(a)

(2). The regulations set out factors we consider in weighing medical opinions from treating sources, nontreating sources, and nonexamining sources. See 20 CFR 404.1527(d) and 416.927(d). These factors include:

**\*3** • The examining relationship between the individual and the "acceptable medical source";

• The treatment relationship between the individual and a treating source, including its length, nature, and extent as well as frequency of examination;

• The degree to which the "acceptable medical source" presents an explanation and relevant evidence to support an opinion, particularly medical signs and laboratory findings;

• How consistent the medical opinion is with the record as a whole;

• Whether the opinion is from an "acceptable medical source" who is a specialist and is about medical issues related to his or her area of specialty; and

• Any other factors brought to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an "acceptable medical source" has, regardless of the source of that understanding, and the extent to which an "acceptable medical source" is familiar with the other information in the case record, are all relevant factors that we will consider in deciding the weight to give to a medical opinion.

In addition, these regulations provide that the final responsibility for deciding certain issues, such as whether an individual is disabled under the Act, is reserved to the Commissioner.

These regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 CFR 404.1513(d) and 416.913(d). With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

"Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time. Consistent with 20 CFR 404.1513(d)(4) and 416.913(d)(4), we also consider evidence provided by other "non-medical sources" such as spouses, other relatives, friends, employers, and neighbors.

**\*4** Although 20 CFR 404. 1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from "other sources," they do require consideration of such evidence when evaluating an "acceptable medical source's" opinion. For example, SSA's regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from "other sources"—both medical sources and "non-medical sources"—can be important in this regard. In addition, and as already noted, the Act requires us to consider all of the available evidence in the individual's case record in every case.

Accordingly, this ruling clarifies how we consider opinions and other evidence from medical sources who are not "acceptable medical sources" and from "non-medical sources," such as teachers, school counselors, social workers, and others who have seen the individual in their professional capacity, as well as evidence from employers, spouses, relatives, and friends. This ruling also explains how we consider decisions on disability made by other governmental and nongovernmental agencies.

Policy Interpretation

*I. Evidence From "Other Sources"*

As set forth in regulations at 20 CFR 404.1527(b) and 416.927(b), we consider all relevant evidence in the case record when we make a determination or decision about whether the individual is disabled. Evidence includes, but is not limited to, opinion evidence from "acceptable medical sources," medical sources who are not "acceptable medical sources," and "non-medical sources" who have seen the individual in their professional capacity. The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors, as described below.

Factors for Considering Opinion Evidence

Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

 **\*5** • Any other factors that tend to support or refute the opinion.


Opinions From Medical Sources Who Are Not "Acceptable Medical Sources"

Opinions from "other medical sources" may reflect the source's judgment about some of the same issues addressed in medical opinions from "acceptable medical sources," including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions.

Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955 , dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

Evidence From "Non-Medical Sources"

Opinions from "non-medical sources" who have seen the individual in their professional capacity should be evaluated by using the applicable factors listed above in the section "Factors for Weighing Opinion Evidence." Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a "non-medical source" who has seen the individual in his or her professional capacity depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

For opinions from sources such as teachers, counselors, and social workers who are not medical sources, and other non-medical professionals, it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion.

 **\*6** An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole.

In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

Explanation of the Consideration Given to Opinions From "Other Sources"

Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a

treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination (that is, in the personalized disability notice) at the initial and reconsideration levels, if the determination is less than fully favorable.

*II. Decisions on Disability by Other Governmental and Nongovernmental Agencies*

The regulations at 20 CFR 404.1504 and 416.904 provide that:

[a] decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

Under sections 221 and 1633 of the Act, only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled. Our regulations at 20 CFR 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (see also SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"). However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 4 04.1512(b)(5) and 416.912(b)(5)). Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

 **\*7**  These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

Effective Date: This SSR is effective upon publication in the Federal Register.

Cross-References: Social Security Rulings 96-2p, "Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner"; Program Operations Manual System sections DI 22505.003, DI 24515.001, DI 24515.002, DI 24515.011, and DI 24515.012.

---

[1]     As explained in SSR 96-6p, "Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence," paragraphs (c), (d), and (e) of 20 CFR 404.1527 and 416.927

provide general rules for evaluating the record, with particular attention to medical opinions from "acceptable medical sources."

Social Security Administration

Department of Health and Human Services
SSR 06-03P (S.S.A.), 2006 WL 2329939

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4491710
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Louise Gamble, Plaintiff,

v.

Commissioner of Social Security, Defendant.

1:15-CV-0352 (GTS/WBC)
|
Signed 07/25/2016

**Attorneys and Law Firms**

BUCKLEY, MENDLESON LAW FIRM, 29 Wards
Lane, OF COUNSEL: IRA MENDLESON, III, ESQ.,
Albany, NY 12204, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF
REG'L GEN. COUNSEL–REGION II, 26 Federal Plaza
– Room 3904, OF COUNSEL: DAVID L. BROWN,
ESQ., SANDRA M. GROSSFELD, ESQ., New York,
NY 10278, Counsel for Defendant.

**REPORT and RECOMMENDATION**

Wiliam B. Mitchell Carter, U.S. Magistrate Judge

**\*1** This matter was referred for report and
recommendation by the Honorable Judge Suddaby, Chief
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(d). (Dkt. No. 15.) This case
has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security
action filed by Louise Gamble ("Plaintiff") against the
Commissioner of Social Security ("Defendant" or "the
Commissioner") pursuant to 42 U.S.C. §§ 405(g) and
1383(c)(3), are the parties' cross-motions for judgment on
the pleadings. (Dkt. Nos. 10, 13.) For the reasons set forth
below it is recommended that this matter be remanded for
further proceedings under Sentence Four of 42 U.S.C. §
405(g).

# I. RELEVANT BACKGROUND

## A. Factual Background

Plaintiff was born on November 13, 1960. (T. 103.) She
completed high school. (T. 120.) Generally, Plaintiff's
alleged disability consists of right lumbar radiculitis, right
knee popliteal spasm, nerve damage to low left back/hip,
two bulging discs, carpal tunnel syndrome, arthritis in
the right hand, left shoulder injury, a "dropped metatarsal
bone" in her right foot, and blackouts. (T. 119.) Her
alleged disability onset date is January 15, 2007. (T. 49.)
Her date last insured is March 30, 2012. (T. 116.) She
previously worked as a certified nurse's aide ("CNA"). (T.
120.)

## B. Procedural History

On April 17, 2012, Plaintiff applied for a period of
Disability Insurance Benefits ("SSD") under Title II of the
Social Security Act. (T. 116.) Plaintiff's application was
initially denied, after which she timely requested a hearing
before an Administrative Law Judge ("the ALJ"). On
August 20, 2011, Plaintiff appeared before the ALJ, Dale
Black-Pennington. (T. 26-48.) On September 11, 2013,
ALJ Black-Pennington issued a written decision finding
Plaintiff not disabled under the Social Security Act.
(T. 10-25.) On February 23, 2015, the Appeals Council
("AC") denied Plaintiff's request for review, rendering the
ALJ's decision the final decision of the Commissioner. (T.
1-6.) Thereafter, Plaintiff timely sought judicial review in
this Court.

## C. The ALJ's Decision

Generally, in her decision, the ALJ made the following
five findings of fact and conclusions of law. (T. 15-22.)
First, the ALJ found that Plaintiff met the insured
status requirements through March 30, 2012 and Plaintiff had
not engaged in substantial gainful activity since January
15, 2007. (*Id.*) Second, the ALJ found that Plaintiff had
the severe impairments of back disorder with degenerative
changes, left hip disorder, right knee disorder, and left
shoulder disorder. (*Id.*) Third, the ALJ found that Plaintiff
did not have an impairment that meets or medically
equals one of the listed impairments located in 20 C.F.R.
Part 404, Subpart P, Appendix. 1. (*Id.*) Fourth, the
ALJ found that Plaintiff had the residual functional
capacity ("RFC") to perform light work with additional
non-exertional limitations. (*Id.*)[1] The ALJ determined
that Plaintiff required the ability to move about and
change positions for comfort, but would not be off task
while changing positions. (*Id.*) The ALJ determined that
Plaintiff could occasionally squat, stoop, crouch, and

crawl. (*Id.*) She determined that Plaintiff could frequently, but not repetitively or continuously, reach with her left arm. (*Id.*) The ALJ determined that Plaintiff must avoid concentrated exposures to temperature extremes and Plaintiff must avoid unprotected heights, vibrations, and moving mechanical parts. (*Id.*) Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20-21.)

[1]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments
**\*2** Plaintiff makes four separate arguments in support of her motion for judgment on the pleadings. First, Plaintiff argues the ALJ's determination, that Plaintiff could perform light work, was not supported by substantial evidence. (Dkt. No. 10 at 8-11 [Pl.'s Mem. of Law].) Second, Plaintiff argues the ALJ failed to follow the treating physician rule. (*Id.* at 12-13.) Third, Plaintiff argues the ALJ's credibility analysis was not supported by substantial evidence. (*Id.* at 14-15.) Fourth, and lastly, Plaintiff argues the ALJ's determination should be reversed and the matter should be remanded for calculation of benefits. (*Id.* at 16.)

### B. Defendant's Arguments
In response, Defendant makes four arguments. First, Defendant argues the ALJ properly declined to grant controlling weight to Plaintiff's treating physician. (Dkt. No. 13 at 5-7 [Def.'s Mem. of Law].) Second, Defendant argues that substantial evidence supported the ALJ's RFC

determination. (*Id.* at 7-12.) Third, Defendant argues the ALJ did not err in evaluating Plaintiff's credibility. (*Id.* at 12-16.) Fourth, and lastly, Defendant argues an award of benefits is not warranted. (*Id.* at 16-17.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review
A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words,

this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B. Standard to Determine Disability**
The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is

other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

**IV. ANALYSIS**
For ease of analysis, Plaintiff's arguments will be addressed out of order and in a consolidated manner.

**A. Medical Opinion Evidence in the Record**

**i.) Treating Physician, James J. Cole, M.D.**

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 404.1527(c)(2)(i)-(iv). The ALJ is required to set forth her reasons for the weight she assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

Plaintiff argues that the ALJ erred in her assessment of Plaintiff's treating source, Dr. Cole, because she failed to assess his opinion in accordance with the Regulations. (Dkt. No. 10 at 12-13 [Pl.'s Mem. of Law].) [2]

---

[2]    Plaintiff erroneously cited to the outdated Regulations regarding treatment of a plaintiff's treating source. The proper citation is 20 C.F.R. § 404.1527(c)(2).

Treatment notations from Dr. Cole span from 2007 to 2011. Dr. Cole essentially opined, on numerous occasions, that Plaintiff was limited to lifting no more than ten or twelve pounds. On November 13, 2006 and December 12, 2006, Dr. Cole opined Plaintiff could not lift more than ten pounds and could not push more than twenty pounds. (T. 229-230, 251-252.) On August 30, 2007, Dr. Cole opined Plaintiff had a "strict" ten pound lifting limit. (T. 219.) On October 17, 2007, Dr. Cole opined Plaintiff was restricted for lifting over ten pounds. (T. 218.) On January 10, 2008, Dr. Cole opined that Plaintiff could not lift over twelve pounds. (T. 216-217.) On March 19, 2008, Dr. Cole opined Plaintiff was capable of "below sedentary work." (T. 215.) On June 19, 2008, Dr. Cole opined Plaintiff "persist[ed] at low sedentary level." (T. 214.) On September 11, 2008, Dr. Cole stated that Plaintiff "continu[ed] at marked disability, low sedentary" and it was "appropriate for her to retrain for a more clerical position." (T. 210.) On November 2, 2008, Dr. Cole opined that Plaintiff could not lift over ten pounds. (T. 208.) On May 15, 2009, Dr. Cole stated Plaintiff was at "no-lifting capacity" at work due to her injury. (T. 203.) On August 23, 2010, Dr. Cole opined Plaintiff could return to work, provided that she not lift at all. (T. 198.) On November 22, 2010, Dr. Cole opined that Plaintiff could return to work, provided that she not lift at all. (T. 196.) On various occasions Dr. Cole opined that Plaintiff could not return to work in any capacity due to her "weak right back, leg, and knee." (T. 190, 192, 194, 241.)

**\*4** Dr. Cole opined only to Plaintiff ability to lift, his assessments were otherwise silent regarding Plaintiff's functional abilities. Although Dr. Cole's notations dated June 19, 2008, indicated he completed a VESID [3] form (T. 214) and notations dated March 2, 2009, indicated he completed a "work restrictions form" for Plaintiff's attorney (T. 204), these forms were not found in the record. (T. 204.)

[3]     Vocational and Educational Services for Individuals with Disabilities ("VESID") is now referred to as Adult Career and Continuing Education Services —Vocational Rehabilitation ("ACCES-VR"). http://www.acces.nysed.gov/

In her decision, the ALJ accurately summarized Dr. Cole's treatment notations, including his opinions that Plaintiff was essentially limited to lifting ten pounds. (T. 17-18.) The ALJ afforded Dr. Cole's lifting limitations "little weight" reasoning that the limitations were inconsistent

with Plaintiff's testimony that she performed a variety of household chores and performed childcare. (T. 20.) For the reasons stated herein, the ALJ failed to provide good reasons for affording little weight to Dr. Cole's opinion.

The ALJ did not provide any other explanation for why Dr. Cole's opinion was not "well-supported by medically acceptable ... techniques" or "inconsistent with the other substantial evidence," 20 C.F.R. § 404.1527(c)(2), nor did she explicitly consider any of the factors for determining the weight given to a non-controlling opinion, *see id.* § 404.1527(c)(2)(i), (2)(ii), (3)-(6); *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015).

To be sure, where an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation. *Atwater v. Astrue*, 512 Fed.Appx. 67, 70 (2d Cir. 2013) (plaintiff challenged ALJ's failure to review explicitly each factor provided for in 20 C.F.R. § 404.1527(c), the Court held that "no such slavish recitation of each and every factor [was required] where the ALJ's reasoning and adherence to the regulation [was] clear"). However, here the ALJ's reasoning and adherence to the Regulations was not clear because the ALJ did not provide any other explanation in her analysis of Dr. Cole's opinion. The ALJ's discussion of Dr. Cole's opinion failed to include an analysis of why the opinion was, or was not, well supported by other medical evidence or why the opinion was, or was not, consistent with other substantial evidence in the record.

Further, the reason provided by the ALJ for rejecting Dr. Cole's lifting limitation, that it was inconsistent with Plaintiff's testimony regarding house work and childcare, was improper. To be sure, the ability to care for an infant, or small child, may require a plaintiff to lift and carry more than ten pounds; however, here Plaintiff's grandchildren were teenagers at the time of the hearing. (T. 30.) Plaintiff testified that her care of her grandchildren encompassed "feeding them" and that often her husband prepared meals or they ordered out. (T. 128-129.) Plaintiff informed the consultative examiner that she had a "cleaning lady" (T. 263.) Therefore, it was unclear from the ALJ's determination how Plaintiff's activities of daily living and ability to care for teenagers was inconsistent with Dr. Cole's opinion.

In sum, the ALJ failed to follow the treating physician rule under 20 C.F.R. § 404.1527(c)(2). In her analysis of Dr.

Cole's opinion the ALJ did not provide any explanation for why the opinion was not well supported by medical evidence or inconsistent with other substantial evidence. Instead the ALJ relied solely on Plaintiff's ability to perform housework and childcare; however, it is unclear from her decision how Plaintiff's testimony regarding her house work and childcare was inconsistent with Dr. Cole's lifting limitations.

### ii.) State Agency Medical Examiners

**\*5** Plaintiff argues the ALJ erred in affording more weight to the State agency examiners than to Dr. Cole. (Dkt. No. 10 at 9 [Pl.'s Mem. of Law].) Providing greater weight to the opinion of a consultative examiner, or non-examining State agency medical consultant, does not warrant automatic remand as Plaintiff appears to argue. It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e).

"[A]n ALJ is entitled to rely upon the opinions of both examining and nonexamining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Baszto v. Astrue,* 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010). The Regulations recognize that the Commissioner's consultants are highly trained physicians with expertise in evaluation of medical issues in disability claims whose "opinions may constitute substantial evidence in support of residual functional capacity findings." *Lewis v. Colvin,* 122 F. Supp. 3d 1, at 7 (N.D.N.Y. 2015) (citing *Delgrosso v. Colvin,* 2015 WL 3915944, at \*4 (N.D.N.Y. June 25, 2015), *adopting Report & Recommendation,* (rejecting similar "global objection to reliance on nonexamining medical advisers' opinions")); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02-CCV-3561, 2004 WL 99935, at \*9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

Here, consultative examiner, Jose Corvalan, M.D. examined Plaintiff and supplied a medical source statement on June 13, 2012. (T. 262-266.) Based on his examination of Plaintiff he opined that she had:

> mild limitations for the use of the left upper extremity because of pain in the left scapula and shoulder. This mild limitation is for reaching up, reaching back, or lifting heavy object[s]. She also [had] mild limitation for sitting and standing for a long period of time, walking [a] long distance, bending, squatting, or lifting any heavy object. This is due to low back pain radiating to the left lower extremity down to her toes with peripheral neuropathy of the left side.

(T. 266.)

Based on Dr. Corvalan's examination and opinion, non-examining State agency consultant, Joyce Goldsmith, M.D., opined that Plaintiff was capable of performing the exertional requirements of light work. (T. 274.) Dr. Goldsmith opined Plaintiff could perform postural requirements occasionally, except that she should never climb ladders, ropes, or scaffolds. (T. 276.) She opined Plaintiff was limited in her ability to reach in all directions. (*Id.*) Dr. Goldsmith opined Plaintiff should avoid concentrated exposure to extreme cold and wetness; should avoid even moderate exposure to vibrations; and should avoid all exposure to hazards. (T. 277.)

Plaintiff argues that Dr. Corvalan's opinion was "too vague" to constitute substantial evidence. (Dkt. No. 10 at 9 [Pl.'s Mem. of Law].) To be sure, a consultative examiner's report which concludes that a plaintiff's condition is "mild" or "moderate," without additional information, does not allow an ALJ to infer that a plaintiff is capable of performing the exertional requirements of work. *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir. 2000), *superseded by statute on other grounds; see Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir. 2013) (consultative examiner's opinion was "remarkably vague" and meaning was left to the ALJ's "sheer speculation"); *see Carrube v. Astrue,* No. 3:08-CV-0830, 2009 WL 6527504, at \*8 (N.D.N.Y. Dec. 2, 2009) (remanding where consultative examiner's opinion on claimant's ability to lift weight, was so vague that the court "cannot fathom what might support the ALJ's conclusion that Plaintiff could

lift and carry twenty-five to fifty pounds"), *report and recommendation adopted by,* 2010 WL 2178499 (N.D.N.Y. May 28, 2010). Additionally, the "use of imprecise and nebulous terms regarding functional limitations raises a red flag." *Anderson v. Colvin*, No. 5:12-CV-1008, 2013 WL 5939665, at *9 (N.D.N.Y. Nov. 5, 2013).

**\*6** Although a consultative examiner's opinion may use terminology that, on its face, is vague, such language does not render the consultative examiner's opinion useless in all situations. *Zongos v. Colvin*, No. 5:12-CV-1007, 2014 WL 788791, at *10 (N.D.N.Y. Feb. 25, 2014) ("[W]hether an [ALJ's] reliance on a consultative examiner's vague opinion is reversible error is contextual rather than *per se.* Reviewing courts must weigh the impart of vague opinion in its unique factual circumstance."). Courts have held that terms such as "mild" and "moderate" pass substantial evidence muster when medical evidence shows relatively little physical impairment. *Waldau v. Astrue,* No. 5:11-CV-925, 2012 WL 6681262, at *4 (N.D.N.Y. Dec. 21, 2003); *Walker v. Astrue,* No. 08-CV-0828, 2010 WL 2629832, at *7 (W.D.N.Y. June 11, 2010) (finding that where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment); *see Tolhurst v. Comm'r of Soc. Sec.*, No. 5:15-CV-0428, 2016 WL 2347910, at *5 (N.D.N.Y. May 4, 2016) (holding that a consultative examiner's opinion was too vague to support a finding that plaintiff could perform sedentary work because the ALJ determined, at step two, that plaintiff suffered from back disorders, knee disorders, and Factor V Leiden; and therefore, plaintiff did not have relatively little physical impairments).

Further, courts have held that a consultative examiner's conclusion was not impermissibly vague where the conclusion was "well supported by his extensive examination." *Waldau,* 2012 WL 6681262, at *4; *Mauzy v. Colvin*, No. 5:12-CV-866, 2014 WL 582246, at *9 (N.D.N.Y. Feb. 13, 2014). Courts have also held that medical source statements from consultative examiners which provide vague language may be rendered "more concrete" by the facts in the underlying opinion and other opinion evidence in the record. *Davis v. Massanari*, No. 00-CV-4330, 2001 WL 1524495, at *8 (S.D.N.Y. Nov. 29, 2001) (a consultative examiner's opinion was not too vague where "the facts underlying that opinion and the other medical opinions in the record lend it a

more concrete meaning"); *see Sweeting v. Colvin,* No. 12-CV-0917, 2013 WL 5652501, at *8 (N.D.N.Y. Oct. 15, 2013) (plaintiff's contention that consultative examiner's use of the term "moderate" in his opinion was vague lacked merit as consultative examiner made specific findings based on physical examination of plaintiff); *Melton v. Colvin*, No. 13-CV-6188, 2014 WL 1686827, at *13 (W.D.N.Y. Apr. 29, 2014) (substantial evidence supported ALJ's RFC determination that plaintiff could perform sedentary work were consultative examiner opined plaintiff had moderate limitations in lifting and carrying and other objective evidence in the record to supported this determination).

Dr. Corvalan's opinion regarding Plaintiff's functional abilities utilized vague terminology; however, Dr. Corvalan conducted a physical examination which was detailed in his report and Dr. Goldsmith provided specific functional limitations based on Dr. Corvalan's examination and report, thus providing definition to Dr. Corvalan's limitations. Therefore, Dr. Corvalan's use of vague terminology did not, in this case, render his opinion useless.

Plaintiff also argued that the ALJ erred in affording Dr. Corvalan's opinion more weight than Dr. Cole's opinion because Dr. Corvalan did not have the opportunity to review the medical record and Dr. Corvalan was not a specialist. (Dkt. No. 10 at 9 [Pl.'s Mem. of Law].) According to the Regulations, specialty is one factor to consider in the overall evaluation of the medical opinion evidence. 20 C.F.R. § 404.1527(c)(5). Further, under the Regulations, a consultative examiner is not required to review a plaintiff's medical record. *Id.* at § 404.1519n. The ALJ did not commit legal error in failing to specifically mention these factors in her decision; however, because remand is recommended for a proper evaluation of Dr. Cole's opinion, this recommendation should not be read as to preclude a review of other medical opinions in light thereof.

**\*7** The opinions of Drs. Corvalan and Goldsmith provided substantial evidence to support the ALJ's determination that Plaintiff had the functional capacity to perform the walking, sitting, and standing requirements of light work. The record does not contain any other medical source opinion regarding Plaintiff's functional ability to walk, sit, stand, or perform postural limitations. However,

there is a conflict in the record regarding the amount of weight that Plaintiff could lift and carry.

Although Plaintiff requests remand for calculation of benefits, remand for further proceedings is appropriate. (Dkt. No. 10 at 16-17 [Pl.'s Mem. of Law].) The Second Circuit has held that in some cases it is appropriate to remand for payment of benefits where there is "no apparent basis to conclude that a more complete record might warrant the Commissioner's decision," *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005), and evidence of disability is "overwhelming," *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000). Here, there is a conflict in the record which needs to be resolved by the ALJ regarding Plaintiff's ability to lift. Dr. Cole opined Plaintiff could lift up to ten to twelve pounds; however, Dr. Goldsmith opined (based on Dr. Corvalan's examination and medical source statement) that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently.

In addition, substantial evidence supported the ALJ's determination that Plaintiff could perform the standing, walking, and postural limitations of light work with additional non-exertional limitations; however, assuming Dr. Cole's weight limitation was adopted, a limitation to lifting ten pounds does not necessarily limit Plaintiff to sedentary work. *See Pardee v. Astrue*, 631 F. Supp. 2d 200 (N.D.N.Y. 2009). The testimony of a VE may be necessary to determine if any occupations exist in the nation economy that Plaintiff could perform if limited to lifting ten pounds. Therefore, on remand, the ALJ should clarify Plaintiff's ability to lift.

### B. Function by Function Analysis

Plaintiff argues the ALJ erred in her RFC determination that Plaintiff could perform light work because she failed to conduct a function by function analysis. (Dkt. No. 10 at 10 [Pl.'s Mem. of Law].) The Second Circuit has held that the failure to explicitly engage in a function-by-function analysis as part of the RFC assessment does not constitute a per se error requiring remand. *See Chichocki v. Astrue*, 729 F.3d 172, 174 (2d Cir. 2013). Therefore, contrary to Plaintiff's argument, the ALJ did not commit reversible error in failing to engage in a function by function analysis.

### C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

**\*8** The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. § 404.1529; SSR 96-7p. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); SSR 96-7p. Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); SSR 96-7p.

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (T. 16.)

Plaintiff argues the ALJ erred in her credibility analysis because she selectively relied on only portions of the record, improperly relied on Plaintiff's conservative course of treatment, erred in concluding Plaintiff's statements were inconsistent with her RFC determination, and failed to consider the factors outlined in 20 C.F.R. § 404.1529(c)(3)(i)-(vii). Because remand is recommended for a proper evaluation of Dr. Cole's opinion, remand is also recommended for a proper credibility analysis. However, contrary to Plaintiff's contentions, the ALJ did not fail to adhere to the Regulations in her credibility analysis.

Despite the ALJ concluding elsewhere in her determination that Plaintiff was less credible because her testimony was inconsistent with the RFC determination (T. 19)[4], the ALJ did not fail to adhere to the Regulations. The ALJ considered Plaintiff's activities of daily living (T. 16, 19), she considered Plaintiff's testimony regarding her symptoms (T. 16); she considered Plaintiff's medical care, treatment, and medications (T. 17-18). Therefore, contrary to Plaintiff's contention, the ALJ did not fail to adhere to the Regulations at 20 C.F.R. § 404.1529(c)(3)(i)-(vii). Despite the ALJ's adherence to the Regulations, remand is nonetheless recommended for a new credibility analysis in light of a proper analysis of Dr. Cole's opinion.

[4]    Although a "[plaintiff's] credibility may be questioned if it is inconsistent with the medical evidence ..., it is improper to question the plaintiff's credibility because it is inconsistent with the RFC determined by the ALJ." *Gehm v. Astrue*, 10-CV-1170, 2013 WL 25976, at *5 (N.D.N.Y. Jan. 2, 2013); *see also Patterson v. Astrue*, 11-CV-1143, 2013 WL 638617, at *14 (N.D.N.Y. Jan. 24, 2013) ("This assessment of plaintiff's credibility is formed only on the basis of how plaintiff's statements compare to the ALJ's RFC assessment. The ALJ's analysis is therefore fatally flawed, because, it demonstrates that he

improperly arrived at his RFC determination before making her credibility assessment, and engaged in a credibility assessment calculated to conform to that RFC determination."). Therefore, the ALJ did improperly conclude Plaintiff's statements were not credible in that they were inconsistent with the RFC determination; however, this error was harmless.

Courts have concluded that despite this language, an ALJ's credibility determination may still be proper, if the ALJ provided a detailed discussion of a plaintiff's credibility "explicitly and with sufficient specificity to enable the court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270. Further, it is the function of the ALJ, not the reviewing courts to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the plaintiff. *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1982).

**ACCORDINGLY**, based on the findings above, it is **\*9 RECOMMENDED**, that the matter be **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g) and consistent with this report.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2016 WL 4491710

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4487780
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Louise Gamble, Plaintiff,
v.
Commissioner of Social Security, Defendant.

1:15-CV-0352 (GTS/WBC)
|
Signed 08/25/2016

**Attorneys and Law Firms**

BUCKLEY, MENDLESON, CRISCIONE & QUINN,
29 Wards Lane, OF COUNSEL: IRA MENDLESON,
III, Albany, NY 12204, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF
REG'L GEN. COUNSEL – REGION II, 26 Federal
Plaza, Room 3904, OF COUNSEL: DAVID L. BROWN,
ESQ, SANDRA M. GROSSFELD, ESQ., New York,
NY 10278, Counsel for Defendant.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this Social Security
action filed by Louise Gamble, against the Commissioner
of Social Security ("Defendant" or "the Commissioner")
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are (1) the
Report and Recommendation of United States Magistrate
Judge William B. Mitchell Carter, recommending that
Plaintiff's motion for judgment on the pleadings be
granted, and that Defendant's motion for judgment on the
pleadings be denied, and (2) Defendant's objection to the
Report and Recommendation. (Dkt. Nos. 16, 18.) For the
reasons set forth below, the Report and Recommendation
is accepted and adopted in its entirety.

## I. DEFENDANT'S OBJECTIONS

Generally, Defendant argues that the Court should reject
Magistrate Judge Carter's finding that the ALJ erred in
evaluating the opinions of treating physician, Dr. Cole,
regarding the amount of weight that Plaintiff could lift.

(Dkt. No. 18, at 2-9.) Within this argument, Defendant
argues that (1) the ALJ properly afforded little weight to
the lifting restrictions opined by Dr. Cole (because the
ALJ properly found that these lifting restrictions were
inconsistent with Plaintiff's reported activities), and (2)
Magistrate Judge Carter did not apply the deferential
standard of review in declining to affirm the ALJ's RFC
determination. (*Id.*)

## II. APPLICABLE LEGAL STANDARD

A district court reviewing a magistrate judge's Report
and Recommendation "may accept, reject, or modify,
in whole or in part, the findings or recommendations
made by the magistrate judge." 28 U.S.C. § 636(b)(1)
(C). Parties may raise objections to the magistrate judge's
Report and Recommendation, but they must be "specific
written objections," and must be submitted "[w]ithin 14
days after being served with a copy of the recommended
disposition." Fed. R. Civ. P. 72(b)(2); *accord*, 28 U.S.C.
§ 636(b)(1)(C). "A judge of the court shall make a de
novo determination of those portions of the [Report
and Recommendation] ... to which objection is made."
28 U.S.C. § 636(b)(1)(C); *accord*, Fed. R. Civ. P. 72(b)
(2). "Where, however, an objecting party makes only
conclusory or general objections, or simply reiterates
his original arguments, the Court reviews the Report
and Recommendation only for clear error." *Caldwell v.
Crosset*, 9-CV-0576, 2010 WL 2346330, at * 1 (N.D.N.Y.
June 9, 2010) (quoting *Farid v. Bouey*, 554 F. Supp. 2d 301,
307 [N.D.N.Y. 2008]) (internal quotation marks omitted).

## III. ANALYSIS

The Court finds that Defendant's objection largely restates
arguments presented in her initial brief. (*Compare* Dkt.
No. 18 *with* Dkt. No. 13.) To the extent that Plaintiff's
objection raises specific objections to Magistrate Judge
Carter's findings, the Court reviews these portions of the
Report and Recommendation de novo.

First, the Court agrees with Magistrate Judge Carter
that the ALJ failed to follow the treating physician
rule in assessing Dr. Cole's numerous opinions of
Plaintiff's lifting restrictions for the reasons stated in the
Report and Recommendation. (Dkt. No. 16.) Second,
turning to Defendant's argument that Magistrate Judge
Carter did not apply the deferential standard of review
in declining to affirm the ALJ's RFC determination,
the Court finds this argument without merit. After

carefully reviewing the relevant filings in this action, including Magistrate Judge Carter's thorough Report and Recommendation, the Court finds that Magistrate Judge Carter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*Id.*) Therefore, the Court accepts and adopts the Report and Recommendation in its entirety for the reasons stated herein and in the Report and Recommendation. (Dkt. No. 16.)

**\*2** **ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Carter's Report and Recommendation (Dkt. No. 16) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the Commissioner's determination is **VACATED**; and it is further

**ORDERED** that the matter is **REMANDED** to the Commissioner of Social Security for further proceedings consistent with this Order.

Dated: August 25, 2016.

**All Citations**

Slip Copy, 2016 WL 4487780

---

**End of Document**　　　　　　　　© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 56702
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Melissa Provencher, Plaintiff,

v.

Commissioner of Social Security, Defendant.

6:15-CV-1287 (GTS)
|
Signed 01/05/2017

**Attorneys and Law Firms**

LAW OFFICES OF STEVEN R. DOLSON, 126 North
Salina Street, Suite 3B, OF COUNSEL:, STEVEN R.
DOLSON, ESQ., Syracuse, NY 13202, Counsel for
Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF
REG'L GEN. COUNSEL–REGION II, 26 Federal
Plaza, Room 3904, OF COUNSEL: PETER W.
JEWETT, ESQ., New York, NY 10278, Counsel for
Defendant.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District
Judge

**\*1** Currently before the Court, in this Social Security
action filed by Melissa Provencher ("Plaintiff") against
the Commissioner of Social Security ("Defendant" or
"the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and
1383(c)(3), are the parties' cross-motions for judgment on
the pleadings. (Dkt. Nos. 9, 11.) For the reasons set forth
below, Plaintiff's motion for judgment on the pleadings
is granted and Defendant's motion for judgment on the
pleadings is denied.

# I. RELEVANT BACKGROUND

## A. Factual Background
Plaintiff obtained a certificate of general educational
development (GED), and has past work as a housekeeper
and a child care provider. (T. 173, 177-78.) [1] Generally,
Plaintiff's alleged disability consists of intervertebral disc

disorder, lumbago, and sciatica with pain in both legs. (T.
176.)

[1]     Page citations refer to the page numbers used on CM/
        ECF rather than the page numbers contained in the
        parties' respective motion papers.

## B. Procedural History
On September 12, 2012, Plaintiff applied for a period
of Disability and Disability Insurance Benefits, alleging
disability beginning July 7, 2011. (T. 16.) Plaintiff's
application was initially denied on December 26, 2012,
after which she timely requested a hearing before an
Administrative Law Judge ("ALJ"). (*Id.*) On May 20,
2014, Plaintiff appeared in a video hearing before the ALJ,
Angela Miranda. (T. 26-54.) On June 27, 2014, the ALJ
issued a written decision finding Plaintiff not disabled
under the Social Security Act. (T. 10-25.) On September
3, 2015, the Appeals Council denied Plaintiff's request for
review, rendering the ALJ's decision the final decision of
the Commissioner. (T. 1-6.) Thereafter, Plaintiff timely
sought judicial review in this Court.

## C. The ALJ's Decision
Generally, in her decision, the ALJ made the following
six findings of fact and conclusions of law. (T. 18-24.)
First, the ALJ found that Plaintiff met the insured
status requirements of the Social Security Act through
December 31, 2016, and has not engaged in substantial
gainful activity since July 7, 2011, the alleged onset date.
(T. 18.) Second, the ALJ found that Plaintiff has the
following severe impairments: lumbar spine dysfunction
including protrusions and bulges at multiple levels with
mild foraminal stenosis and described as generalized
spondylitis with mild degenerative changes. (T. 18-19.)
The ALJ found that Plaintiff's allergic rhinitis and obesity
are not severe impairments under the regulations. (*Id.*)
Third, the ALJ found that Plaintiff's severe impairments,
alone or in combination, do not meet or medically equal
one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, App. 1 (the "Listings"). (T. 19.) The ALJ
considered Listing 1.04 (disorders of the spine). (*Id.*)

Fourth, the ALJ found that Plaintiff has the residual
functional capacity ("RFC") to perform

> light work as defined in 20
> CFR 404.1567(b) with postural
> limitations. More specifically, the

claimant has the capacity to occasionally lift and carry 20 pounds and to frequently lift and carry 10 pounds. The claimant has the unlimited capacity to push and pull up to the weight capacity for lifting and carrying. The claimant has the capacity to stand and walk 6-8 hours in an 8-hour workday and has the capacity to sit 6-8 hours in an 8-hour workday. The claimant requires the ability to change position while at work and this can be met at normal breaks or meal periods and without leaving the work position. Given the claimant's limitations in mobility, the claimant has the capacity to occasionally stoop, kneel, crouch, crawl, and climb stairs and ramps. The claimant has no limitations in manipulative abilities and no limitations in the ability to balance. Despite the claimant's subjective complaints of pain, mentally the claimant has the capacity to understand, remember, and carry out multi-step tasks, consistent with the demands of a normal workday. The claimant has the capacity to appropriately interact with supervisors, coworkers, and the general public. The claimant has the capacity to identify and avoid normal work place hazards and to adapt to routine changes in the work place.

**\*2** (T. 19-22.) Fifth, the ALJ found that Plaintiff is able to perform past relevant work as a cashier and a housekeeper. (T. 22-23.) Sixth, in the alternative, the ALJ determined that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (T. 23-24.)

### D. The Parties' Briefings on Their Cross-Motions
Plaintiff argues that the ALJ committed reversible error by improperly evaluating the opinion of treating physician Vivienne Taylor, M.D. (Dkt. No. 9, at 4-9 [Pl.'s Mem. of Law].) Construed liberally, Plaintiff appears to argue that the ALJ improperly substituted her own lay opinion in assessing Dr. Taylor's opinion and Plaintiff's RFC because the ALJ failed to cite an alternative medical opinion to support her findings. (*Id.,* at 5, 9.)

Defendant argues that the ALJ properly assessed Dr. Taylor's opinion and Plaintiff's RFC. (Dkt. No. 11, at 5-19 [Def.'s Mem. of Law].)

## II. RELEVANT LEGAL STANDARD

### A. Standard of Review
A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord, Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis

of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

**\*3** The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowyen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if

> the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), *accord, McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III. ANALYSIS

### A. Whether the ALJ Properly Assessed the Opinion of Treating Physician Dr. Taylor in Determining Plaintiff's RFC

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Plaintiff's memorandum of law. (Dkt. No. 9, at 4-9 [Pl.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Residual functional capacity ("RFC") is defined as

> what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

*Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at \*2 [July 2, 1996]). "In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory and other requirements of work." *Domm v. Colvin,* 12-CV-6640, 2013 WL 4647643,

at *8 (W.D.N.Y. Aug. 29, 2013) (citing 20 C.F.R. § 404.1545[a][3]-[4] ). The ALJ must consider opinions from acceptable medical sources, and may consider opinions from other sources, to show how a claimant's impairments may affect his or her ability to work.[2] 20 C.F.R. § 404.1513(a)(1)-(5) (identifying the five types of acceptable medical sources as: (1) licensed physicians, (2) licensed or certified psychologists, (3) licensed optometrists, (4) licensed podiatrists, and (5) qualified speech-language pathologists).

[2]     Social Security regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of ... [a plaintiff's] impairment(s), including ... [a plaintiff's] symptoms, diagnosis and prognosis, what ... [a plaintiff] can still do despite impairment(s), and ... [a plaintiff's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

**\*4** Under the "treating physician's rule," controlling weight is afforded to an opinion from a plaintiff's treating physician when (1) the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) the opinion is not inconsistent with other substantial evidence in the record, such as opinions of other medical experts. 20 C.F.R. § 404.1527(c)(2); *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015), *Brogan-Dawley v. Astrue,* 484 Fed.Appx. 632, 633-34 (2d Cir. 2012). Regulations require an ALJ to set forth his or her reasons for the weight afforded to a treating physician's opinion. *Greek,* 801 F.3d at 375; *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir. 2000).

When controlling weight is not afforded to the opinion of a treating physician, or when assessing a medical opinion from another source, the ALJ should consider the following factors to determine the proper weight to afford the opinion: (1) the frequency, length, nature and extent of the physician's treatment, (2) the amount of medical evidence supporting the opinion, (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist. 20 C.F.R. § 404.1527(c); *Halloran v. Barnhart,* 362 F.3d 28, 31-32 (2d Cir. 2004) (listing regulatory factors).

Here, the record includes opinions of Plaintiff's work-related physical abilities and limitations from the following two acceptable medical sources: (1) consultative

examining neurologist Kautilya Puri, M.D., and (2) treating primary care physician Vivienne Taylor, M.D. (T. 272-74, 370-72.)

### i. Consultative Examining Neurologist Dr. Puri

On November 7, 2012, Dr. Puri examined Plaintiff and diagnosed her with low back pain with radiculopathy. (T. 272-74.) Dr. Puri noted that an MRI study of Plaintiff's spine showed disc bulges and degenerative joint disease. (T. 272.) Upon examination, Dr. Puri observed that Plaintiff could stand on her heels and toes, but Plaintiff stated that she could not walk on her heels and toes. (T. 273.) Dr. Puri observed that Plaintiff had a decreased squat, but she was able to rise from a chair without difficulty. (*Id.*) Dr. Puri observed that Plaintiff's lumbar spine had a general decreased range of motion of five to ten degrees to all modalities with mild local tenderness. (*Id.*) Dr. Puri further observed that Plaintiff's straight leg raising test was mildly positive on the left. (*Id.*) In sum, Dr. Puri opined that Plaintiff had "mild" limitations in bending, stooping, and kneeling; and Plaintiff should not lift "heavy" weights. (T. 274.) Dr. Puri opined that Plaintiff exhibited no objective limitations in communication, fine motor activity, gross motor activity, or gait. (*Id.*)

### ii. Treating Primary Care Physician Dr. Taylor

On April 28, 2014, Dr. Taylor provided an opinion of Plaintiff's work-related physical abilities and limitations due to her intervertebral degenerative disc disease of the lumbar spine. (T. 370-72.) Dr. Taylor opined that Plaintiff could sit and stand/walk for six minutes at a time and for less than two hours in an eight-hour workday, could "rarely" lift less than ten pounds, and could "never" lift ten pounds or more during an eight-hour workday.[3] (T. 370-71.) Dr. Taylor opined that Plaintiff would need a job that permits shifting positions at will from sitting, standing, or walking; and Plaintiff would need to take unscheduled breaks every 15 minutes during an eight-hour workday. (*Id.*) Finally, Dr. Taylor opined that Plaintiff could "rarely" look down, twist, and climb stairs; and could "never" crouch/squat or climb ladders. (T. 372.) Dr. Taylor's opinion indicated that Plaintiff's symptoms and limitations have existed since January 2, 1996. (*Id.*)

3    Dr. Taylor's assessment form stated that " 'rarely' means 1% to 5% of an 8-hour working day; [and] 'occasionally' means 6% to 33% of an 8-hour working day." (T. 370.)

**\*5** The ALJ afforded "limited weight" to Dr. Taylor's opinion, stating that the opinion was "at odds" with objective evidence and examination notes in the record. (T. 21.) However, the ALJ failed to cite, and the record does not contain, a medical opinion to dispute Dr. Taylor's opinion of Plaintiff's lifting and carrying restrictions, and to establish that Plaintiff could perform all of the exertional demands of the ALJ's RFC (namely, lifting and carrying 20 pounds occasionally, and 10 pounds frequently). (*Id.*) Accordingly, it appears that the ALJ improperly substituted her own lay opinion for competent medical opinion evidence.

It is well settled that the ALJ is not permitted to substitute his or her own expertise or view of the medical proof for any competent medical opinion. *Greek*, 802 F.3d at 375; *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (stating that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion"); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted a medical opinion to] or testified before him."). Therefore, the Court need not address whether Dr. Taylor's opinions bound the ALJ under the regulations due to the ALJ's aforementioned omission. *Balsamo*, 142 F.3d at 81 (finding that the Court need not address whether the physicians' opinions bound the ALJ under the regulations because the ALJ did not cite *any* medical opinion to dispute the physicians' conclusions as to the plaintiff's work-related limitations).

Moreover, even if the ALJ properly assessed Dr. Taylor's opinion, the ALJ's RFC determination that Plaintiff could perform a range of light work is not supported by substantial evidence based on the current record. *See id.*, at 81-82 (finding that the ALJ's RFC determination was not supported by substantial evidence in the absence of a medical opinion indicating that the plaintiff could perform the work activities in the RFC determination); *House v. Astrue*, 11-CV-0915, 2013 WL 422058, at \*4 (N.D.N.Y. Feb. 1, 2013) (holding that remand was necessary where there was no medical opinion supporting the ALJ's RFC determination).

As discussed above, the ALJ determined that Plaintiff had the RFC to perform a range of light work, which requires lifting and carrying up to 20 pounds occasionally (up to one-third of an eight-hour workday), and lifting and carrying up to ten pounds frequently (up to two-thirds of an eight-hour workday). (T. 19-22); 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251 (1983). However, Dr. Taylor opined that Plaintiff could "rarely" lift less than ten pounds and "never" lift ten pounds or more; and Dr. Puri opined that Plaintiff should not lift "heavy" weights. (T. 274, 370-71.) Notably, Dr. Puri's opinion neither defined the term "heavy" nor specified an amount of weight that Plaintiff *could* lift and carry in an eight-hour workday. (T. 274.) The ALJ indicated that Dr. Puri's opined limitations were "somewhat vague," noting that Dr. Puri did not define the term "mild," and the meaning of the term was not evident from the examination report. (T. 19.) However, the ALJ did not recontact Dr. Puri to resolve any ambiguities in the opinion, or to obtain a more specific opinion of Plaintiff's work-related physical abilities and limitations.

The Court recognizes that an ALJ is not required to seek additional information absent "obvious gaps" in the administrative record that preclude an informed decision. *Rosa*, 168 F.3d at 79 n.5; *see also Hart v. Comm'r*, 07-CV-1270 2010 WL 2817479, at \*5 (N.D.N.Y. July 16, 2010). However, additional evidence or clarification is sought when there is a conflict or ambiguity that must be resolved, when the medical reports lack necessary information, or when the reports are not based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1520b(c)(1)-(4); *Rosa*, 168 F.3d at 80; *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

**\*6** The Second Circuit has found that a consultative examiner's use of the terms "moderate" and "mild," without additional information, was so vague as to render the opinion useless in evaluating whether the plaintiff could perform the exertional requirements of sedentary work. *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (superceded by statute on other grounds). The use of terms like "mild" and "moderate" has been found to pass substantial evidence muster when medical evidence shows relatively little physical impairment. *Anderson v. Colvin*, 12-CV-1008, 2010 WL 5939665, at \*9 (N.D.N.Y. Nov. 5, 2013) (citing *Waldau v. Astrue*, 11-CV-0925,

2010 WL 6681262, at 4 ( [N.D.N.Y. Dec. 21, 2003] ). However, that is not the case in the present matter because the ALJ determined that Plaintiff's had severe lumbar spine dysfunction including protrusions and bulges at multiple levels with mild foraminal stenosis (described as generalized spondylitis with mild degenerative changes). (T. 18-19.) Accordingly, based on the current record, Dr. Puri's opinion is too vague to establish whether Plaintiff can perform the physical requirements of the ALJ's RFC, including lifting and carrying up to 20 pounds occasionally and up to ten pounds frequently. (T. 19-22.)

For these reasons, remand is necessary for the ALJ to reassess the opinion of treating physician Dr. Taylor. As appropriate, the ALJ may recontact Dr. Taylor and/or Dr. Puri to request clarification or additional information regarding their opinions. *See* 20 C.F.R. § 404.1520b(c)(1) (providing that an ALJ may recontact a medical source for clarification or to obtain additional information). This may include recontacting Dr. Puri to obtain a more specific opinion of Plaintiff's physical abilities and limitations, including the amount of weight that Plaintiff can lift and carry, and how frequently Plaintiff can lift and carry objects, during an eight-hour workday. Remand is also required for the ALJ to reevaluate Plaintiff's RFC based on a proper evaluation of the physical opinions and in light of any new information obtained.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is **GRANTED**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 11) is **DENIED**; and it is further

**ORDERED** that this matter is **REMANDED** to Defendant, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Decision and Order.

**All Citations**

Slip Copy, 2017 WL 56702

---

2013 WL 1292061
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patricia A. JAGHAMIN, Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 1:11–cv–1273 (GLS).
|
March 28, 2013.

**Attorneys and Law Firms**

Office of Peter M. Margolius, Peter M. Margolius, Esq., of Counsel, Catskill, NY, for the Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Tomasina Digrigoli, Special Assistant U.S. Attorney, of Counsel, Syracuse, NY, Steven P. Conte, Regional Chief Counsel, Social Security Administration, Office of General Counsel, Region II, New York, NY, for the Defendant.

## *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Patricia A. Jaghamin challenges the Commissioner of Social Security's denial of her claim for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI) and seeks judicial review under 42 U.S.C. § 405(g). (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering Jaghamin's arguments, the court affirms the Commissioner's decision and dismisses the Complaint.

### II. *Background*

On February 25, 2009, Jaghamin filed applications for DIB and SSI under the Social Security Act ("the Act"), alleging disability since September 23, 2008.

(*See* Tr.[1] at 62–63, 100–06.) After her applications were denied, (*see id.* at 64–71,) Jaghamin requested a hearing before an Administrative Law Judge (ALJ), which was held on July 23, 2010, (*see id.* at 26–61, 75). On September 9, 2010 the ALJ issued an unfavorable decision denying the requested benefits, which became the Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review. (*See id.* at 1–5, 8–25.)

[1]    Page references preceded by "Tr." are to the Administrative Transcript. (*See* Dkt. No. 9.)

Jaghamin commenced the present action by filing her Complaint on October 26, 2011 wherein she sought review of the Commissioner's determination. (*See generally* Compl.) The Commissioner filed an answer and a certified copy of the administrative transcript. (*See* Dkt. Nos. 7, 9.) Each party, seeking judgment on the pleadings, filed a brief. (*See* Dkt. Nos. 13, 17.)

### III. *Contentions*

Jaghamin contends that the Commissioner's decision is tainted by legal error and is not supported by substantial evidence. (*See* Dkt. No. 13 at 3–8.) Specifically, Jaghamin claims that the: (1) Appeals Council erred by failing to grant review or remand in light of new and material evidence; (2) residual functional capacity (RFC) determination is not supported by substantial evidence; (3) ALJ improperly evaluated the opinions of her treating physicians; and (4) ALJ failed to consider the records or opinion of her chiropractor. (*See id.*) The Commissioner counters that the appropriate legal standards were used by the ALJ and her decision is supported by substantial evidence. (*See* Dkt. No. 17 at 10–23.)

### IV. *Facts*

The court adopts the parties' undisputed factual recitations. (*See* Dkt. No. 13 at 1–3; Dkt. No. 17 at 2–5.)

### V. *Standard of Review*

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[2] is well established

and will not be repeated here. For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.,* No. 1:05–CV–932, 2008 WL 759076, at *1–2 (N.D.N.Y. Mar. 19, 2008).

[2]   42 U.S.C. § 1383(c)(3) renders section 405(g) applicable to judicial review of SSI claims. As review under both sections is identical, parallel citations to the Regulations governing SSI are omitted.

## VI. *Discussion*

### A. *Appeals Council Review*

First, Jaghamin contends that the Appeals Council erred by failing to reverse or remand based on evidence submitted to it after the ALJ's decision. (*See* Dkt. No. 13 at 3–4.) The Commissioner counters, and the court agrees, that the records presented to the Appeals Council provided no basis to change the ALJ's decision. (*See* Dkt. No. 17 at 10–11.)

 **\*2**  The Appeals Council shall consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.976(b)(1); *see Perez v. Charter,* 77 F.3d 41, 45 (2d Cir.1996). The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). However, even if "the Appeals Council denies review after considering new evidence, the [Commissioner]'s final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Perez,* 77 F.3d at 45 (internal quotation marks and citation omitted). Accordingly, the additional evidence becomes part of the administrative record reviewed by the district court. *Id.* at 45–46.

In this case, Jaghamin submitted additional evidence to the Appeals Council, which was noted by the Appeals Council in its denial of review. (*See* Tr. at 1–5.) The evidence submitted by Jaghamin included a letter from treating psychologist Dr. Walter Kendall and additional treatment records from Greene County Mental Health Center, as well as treatment records from Albany Medical Center, St. Peter's Cancer Care Center, and Capitol

Region Urological Surgeons. (*See* Tr. at 412–25, 432–44.) The Appeals Council determined that the additional evidence did not provide a basis for changing the ALJ's decision. (*See id.* at 2, 4.)

In his October 2010 letter, Dr. Kendall opined that Jaghamin's "ability to perform work related activities on a sustained basis is notably impaired." (*Id.* at 414.) In addition, the treatment records from Green County Mental Health Center contain an August 2010 treatment plan completed by Dr. Kendall who rated Jaghamin's Global Assessment of Functioning at fifty. [3] (*See id.* at 414–15.) Presuming, without deciding, that this evidence relating to Jaghamin's mental condition was within the relevant time period, [4] the court agrees with the Commissioner that these records do not render the ALJ's findings or conclusion contrary to the weight of the evidence. *See* 20 C.F.R. § 404.970(b). Specifically, the ALJ had before him numerous treatment records from Green County Mental Health Center, including assessments of Jaghamin's GAF score in May, September and November 2009 as well as February and May 2010. [5] (*See* Tr. at 276–89, 362–69.) Indeed, the ALJ specifically noted Jaghamin's GAF scores of fifty and explained her reasoning for according them "little weight" in making her RFC determination. (*Id.* at 22–23.) As the evidence submitted to the Appeals Council from Green County Mental Health Center was consistent with the evidence before the ALJ from this treating source, it did not "undermine[ ] the findings on which the ALJ's denial of [Jaghamin]'s claims was based." *See Brown v. Apfel,* 174 F.3d 59, 60 (2d Cir.1999).

[3]   The GAF Scale "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 n. 1 (2d Cir.2004). A GAF score of between forty-one and fifty indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev.2000).

[4]   "The Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." *See* 20 C.F.R. § 416.1470(b).

5    Throughout this time, Jaghamin's GAF score was assessed to be fifty, fifty-four, or fifty-five. (*See* Tr. at 276–78, 282, 364–65.) A GAF score of between fifty-one and sixty indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Diagnostic and Statistical Manual of Mental Disorders at 34.

**\*3** Jaghamin further contends that a March 2010 consultation report—first submitted to the Appeals Council—which referred to a January 2010 MRI of her cervical spine, contradicts the ALJ's finding that the small nerve sheath lesion at the C5–C6 level was stable. (*See* Dkt. No. 13 at 4; Tr. at 20, 412.) Specifically, the January 2010 MRI found "[p]erhaps [a] slight increase in size of enhancing intradural, extramadullary mass at C5–C6 on the left." jr. at 301.) In addition to discussing the results of the January 2010 MRI, the consultation report also notes that Jaghamin had symmetrical reflexes and full 5/5 motor strength in her upper extremities. (*See id.* at 413.) Further, the report noted that Jaghamin experienced tenderness in the neck area, diminished range of motion in her neck, and diminished sensation in her upper right extremity, but was able to sit without discomfort and walk with a normal gait. (*See id.*) Thus, these records do not " 'significantly discredit[ ] or undercut the ALJ's decision to deny benefits.' " *See Knight v. Astrue,* No. 10 Civ. 5301, 2011 WL 4073603, at \*13 (E.D.N.Y. Sept. 13, 2011) (quoting *Fernandez v. Apfel,* CIV. A. CV–977532DGT, 1999 WL 1129056, at \*4 (E.D.N.Y. Oct. 4, 1999)).

With respect to the records from St. Peter's Cancer Care Center, which document treatment Jaghamin received from November 2010 through July 2011 for the "[s]chwannoma involving the C5–C6 region," and the records from Capitol Region Urological Surgeons, where Jaghamin was evaluated for urinary incontinence beginning in October 2010, even if the evidence could be construed to relate to the relevant period of disability, the court agrees with the Commissioner that they do not add so much to the record as to displace the substantial evidence supporting the ALJ's RFC determination. jr. at 420; *see id.* at 419–25, 432–44.) The records do not offer any retrospective opinion as to Jaghamin's condition during the relevant period or any opinion as to Jaghamin's functional capabilities. In addition, despite Jaghamin's contention, her treatment with a specialist after the ALJ's decision does not undermine the ALJ's finding that

Jaghamin's urinary incontinence was not severe, [6] in part, because she had failed to follow through with her treating physician's repeated recommendation to see a urologist. (*See* Dkt. No. 13 at 4; Tr. at 14.)

6    A "severe impairment" is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

**B. *RFC Determination***

Next, Jaghamin attacks the ALJ's RFC determination that she is able to perform sedentary or light work with certain restrictions to account for her specific limitations. (*See* Dkt. No. 13 at 4–5.) According to Jaghamin, the ALJ's RFC determination "is simply conclusory and does not contain any rationale or reference to any opinions relied upon." (*Id.* at 5.) The court does not agree.

A claimant's RFC "is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including a claimant's subjective complaints of pain. *Id.* § 404.1545(a)(3). An ALJ's RFC determination must be supported by substantial evidence [7] in the record. *See* 42 U.S.C. 405(g). If it is, that determination is conclusive and must be affirmed upon judicial review. *See id.; Perez,* 77 F.3d at 46.

7    "Substantial evidence is defined as more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) (internal quotation marks and citations omitted).

**\*4** Here, the ALJ's decision examined the relevant factors in reaching an RFC determination—principally relying on the opinions of state agency medical consultant R. Weiss and consultative examiner Amelita Balagtas. [8] (*See* Tr. at 21–23.) It is readily apparent that the ALJ considered all of the record evidence, as the lengthy RFC determination—which spans seven pages—specifically discusses Jaghamin's daily activities, her pain and the medications she used to treat it, the objective medical evidence of record, and the opinion evidence from treating, examining, and non-examining sources. (*See id.* at 17–23.) Indeed, the record as a whole demonstrates the ALJ's RFC assessment is supported by substantial

evidence and is therefore conclusive. *See Alston v. Sullivan,* 904 F.2d 122, 126 (2nd Cir.1990); *Perez,* 77 F.3d at 46.

8 Although the ALJ failed to specify what weight she assigned to Dr. Balagtas' opinion, the ALJ explicitly considered the results of her examination and her Medical Source Statement, which support the ALJ's RFC determination. (*See* Tr. at 21, 228–30.)

## C. *Weighing Medical Opinions*

Jaghamin also alleges that the ALJ failed to comply with the treating physician rule by inadequately weighing the opinions of treating physician Walter Hubicki and Dr. Kendall. (*See* Dkt. No. 13 at 5–7.) The Commissioner counters, and the court agrees, that the weight afforded to these opinions by the ALJ is supported by substantial evidence. (*See* Dkt. No. 17 at 17–20.)

Medical opinions, regardless of the source, are evaluated by considering several factors outlined in 20 C.F.R. § 404.1527(c). Controlling weight will be given to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *see Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). Unless controlling weight is given to a treating source's opinion, the ALJ is required to consider the following factors in determining the weight assigned to a medical opinion: whether or not the source examined the claimant; the existence, length and nature of a treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner. *See* 20 C.F.R. § 404.1527(c).

Here, Dr. Hubicki completed a Medical Source Statement form and opined that Jaghamin could lift up to twenty pounds occasionally and carry up to ten pounds occasionally. (*See* Tr. at 331.) Further, he reported that, in an eight-hour work day, Jaghamin could sit for three hours, for up to forty-five minutes at one time, stand for three hours, one hour at a time, and walk for two hours, one hour at a time. (*See id.* at 332.) In addition, Jaghamin was limited to occasionally reaching and handling with her left hand and could never feel, push, or pull with her left hand. (*See id.* at 333.) Finally, Jaghamin could never climb ladders or scaffolds and could never tolerate exposure to unprotected heights, moving mechanical

parts, extreme cold, extreme heat, or vibrations, but could occasionally balance and tolerate exposure to operating a motor vehicle, humidity and wetness, dust, odors, fumes, and pulmonary irritants. (*See id.* at 334–35.) The ALJ accorded Dr. Hubicki's opinion "little weight" because it was not supported by the objective medical evidence and was based primarily on Jaghamin's subjective complaints. (*Id.* at 21.)

**\*5** Indeed, Dr. Hubicki's own treatment notes evidence a decreased range of motion in Jaghamin's neck and occasional tenderness in her left shoulder, cervical midline, and left trapezius, but they otherwise indicate no musculoskeletal or neurological findings. (*See id.* at 370–71, 374–75, 381–82, 385, 390, 402, 411.)

Consistent with Dr. Hubicki's treatment records, Jaghamin was examined by Dr. Balagtas in April 2009 and found to suffer a decreased range of motion in her cervical spine and left shoulder, but have 5/5 strength in her biceps and triceps bilaterally, no muscle atrophy in her upper extremities, and normal reflexes, although sensation was decreased in her left hand. (*See* Tr. at 229.) Jaghamin's hand and finger dexterity were intact but her grip strength was 4.5/5 on the left. (*See id.*) Based on this examination, Dr. Balagtas opined that Jaghamin "would have moderate limitations in activities that require lifting and overhead activities." (*Id.* at 230.)

Thereafter, in July 2009, Jaghamin was examined at Columbia Memorial Hospital Pain Management and was found to suffer muscle waste in her left hand and a decreased range of motion in her left shoulder, however, her sensory and reflex exams were normal and she had a normal gait and stance. (*See id.* at 271.) A subsequent examination, in August 2009, revealed a normal gait and stance, normal reflexes, and, except for decreased grip strength in her left hand, a normal motor exam. (*See id.* at 262.) In December 2009, Jaghamin was examined by Dr. Louis Noce who noted that she sat comfortably, in no apparent distress and walked with a normal heel-to-toe gait. (*See id.* at 296.) Dr. Noce indicated that Jaghamin's reflexes were not fully intact, but her upper extremity strength, including in her biceps, triceps, and grip, was 5/5. (*See id.*) Finally, in March 2010, she was examined by Dr. Farag Aboelsaad and found to "sit[ ] with no apparent distress or discomfort [and w]alk[ ] with [a] normal gait." (*Id.* at 413.) Dr. Aboelsaad also noted that Jaghamin's motor strength was 5/5 and the deep

tendon reflexes in her upper extremities were symmetrical, although sensation was diminished in her upper right extremity and her neck exam revealed tenderness and a decreased "left side range of motion." (*Id.*)

In addition to these treatment notes and the opinion of Dr. Balagtas, an EMG study conducted in December 2009 revealed "a mild, chronic radiculopathy at C6 or C7 on the left along with mild carpal tunnel syndrome." (*Id.* at 299.) MRIs of Jaghamin's cervical spine and brain showed a small nerve sheath lesion at the C5–C6 level and some osteophyte formation at the C5–C6 level "producing impingement on the left ventral aspect of the thecal sac," (*id.* at 301; *see id.* at 290), but there were no definitive findings for localized nerve root impingement, central canal stenosis, or other significant abnormalities, (*see id.* at 301–02).

**\*6** In sum, the ALJ provided sufficient reasons for discounting Dr. Hubicki's opinion, and her decision to do so is supported by substantial evidence.

Turning to the opinion of Dr. Kendall, the ALJ accorded "little weight" to the GAF scores of fifty that Dr. Kendall assigned to Jaghamin, explaining that "the objective medical evidence does not support more than moderate limitations in any area of functioning." (*Id.* at 23.) Jaghamin argues that her testimony with respect to the frequency and intensity of her anxiety and panic attacks —which she testified she suffered seven to eleven times per day—support Dr. Kendall's assessment, and, further, the ALJ erred in discounting such testimony as the record reflects that she made similar complaints to her treating and examining medical sources. (*See* Dkt. No. 13 at 6–7.)

Jaghamin was initially assessed by Green County Mental Health Center in May 2009 and complained of suffering from depression and fourto-six panic attacks a day. (*See* Tr. at 279–82.) At this time, Jaghamin was reported to be non-psychotic and non-suicidal, with average intelligence, fairly good insight and judgment, and intact impulse control and memory functions. (*See id.* at 281.) Further, her thought process was clear and logical, quality of speech was normal and coherent, and she was able to care for her basic activities of daily living. (*See id.* at 280–81.) In June 2009, Jaghamin reported to Dr. Hubicki that her panic attacks had decreased in frequency to three or four times a day. (*See id.* at 401.) Jaghamin thereafter reported an increase in her panic attacks in December 2009, but, in

April 2010, she reported experiencing fewer anxiety and panic symptoms since she began a new medication, as well as improved sleep. (*See id.* at 366.)

In addition, in April 2009, Jaghamin was evaluated by consultative examiner Kerry Brand who noted that Jaghamin was cooperative with an adequate manner of relating, social skills, and overall presentation, although her mood was depressed and anxious. (*See id.* at 231– 36.) Jaghamin's attention and concentration and recent and remote memory skills were found to be intact, intellectual functioning was estimated to be in the average range, and insight and judgment were good. (*See id.* at 234.) Further, she was appropriately dressed with good personal hygiene, her speech was intelligible and clear, and thought processes were coherent and goal directed. (*See id.* at 233.) Based on this examination, Dr. Brand opined that Jaghamin retained the ability to follow and understand simple directions and instructions, perform simple and complex tasks with supervision, and learn new tasks. (*See id.* at 234.) However, according to Dr. Brand, Jaghamin may have moderate difficulty maintaining attention and concentration and maintaining a regular schedule and moderate to severe difficulty making appropriate decisions, relating with others, and dealing with stress. (*See id.*) In June 2009, Dr. Weiss reviewed the evidence of record, including Jaghamin's reported activities of daily living and Dr. Brand's evaluation, and concluded that Jaghamin maintained the RFC "to carry out work procedures with a consistent pace, understand and remember simple instructions, interact and relate adequately with coworkers and supervisors, adapt to changes, and handle stress in the workplace." (*Id.* at 259.) He further concluded that "the opinion of [Dr. Brand] that [Jaghamin] is markedly impaired in the ability to function is not supported." (*Id.*)

**\*7** Ultimately, the ALJ's decision to discount Dr. Kendall's opinion that Jaghamin suffered "[s]erious symptoms" or a "serious impairment in social, occupational, or school functioning" is supported by substantial evidence in the record. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Rev.2000); (*see id.* at 22–23).

### D. *Weighing Opinion Evidence from "Other Sources"*
Lastly, Jaghamin asserts that the ALJ failed to "reference, discuss or consider" the records or opinion of her chiropractor, Thomas Tini. (Dkt. No. 13 at 7–8.) The

Commissioner argues that, because Tini is not an acceptable medical source and his opinion was on an issue reserved to the Commissioner, the ALJ did not err. (*See* Dkt. No. 17 at 20–21.) The court again agrees with the Commissioner.

Overall, "the ultimate finding of whether a claimant is disabled and cannot work ... [is] reserved to the Commissioner." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999) (internal quotation marks and citation omitted). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." *Id.* Thus, opinions from treating sources on issues reserved to the Commissioner, *i.e.,* dispositive issues, are not given "any special significance." 20 C.F.R. § 404.1527(d) (3). Moreover, chiropractors are not "acceptable medical sources" and, therefore, their treatment records "cannot establish the existence of a medically determinable impairment," but can only "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06–03p, 71 Fed.Reg. 45,593, 45,594 (Aug. 9, 2006); *see* 20 C.F.R. § 404.1513(a), (d)(1); *O'Connor v. Chater,* 164 F.3d 618, 1998 WL 695418, at *1 (2nd Cir. Sept. 25, 1998).

Here, in April 2009, Tini submitted a "narrative report" to the New York State Office of Temporary and Disability Assistance and opined that Jaghamin "has suffered a permanent, partial disability." jr. at 215–19.) Notably, this opinion offers no assessment of Jaghamin's functional capabilities and is, instead, on an issue reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d). Accordingly, it is evident that the opinion would not have changed the outcome of the ALJ's decision and her failure to explicitly discuss the report therefore constitutes harmless error. *See Walzer v. Chater,* No. 93 Civ. 6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) (explaining that, where discussion of an omitted medical report "would not have changed the outcome of the ALJ's decision," such omission constitutes "harmless error"); *see also Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000) (indicating that, while the ALJ is obligated to fully develop the record, she is not required to discuss all of the evidence submitted and a failure to do so does not indicate that the evidence was not considered).

**E.** *Remaining Findings and Conclusions*

**\*8** After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Jaghamin's Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1292061

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

1995 WL 791963
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Virginia WALZER, S.S. # XXX-XX-XXXX, Plaintiff,
v.
Shirley CHATER, Commissioner
of Social Security, Defendant.
Virginia WALZER, Plaintiff,
v.
Shirley S. CHATER, Commissioner
of Social Security, * Defendant.

No. 93 Civ. 6240 (LAK).
|
Sept. 26, 1995.

**Attorneys and Law Firms**

Irvin M. Portnoy, Neuburgh, NY for plaintiff.

Linda A. Riffkin, Asst. U.S. Attorney, New York City,
for defendant.

ORDER

KAPLAN, District Judge.

**\*1** Plaintiff objects to the Report and Recommendation
of Magistrate Judge Andrew J. Peck, dated August
17, 1995, which recommended that the Court grant
the defendant's motion for judgment on the pleadings
dismissing plaintiff's challenge to the denial of her claim
for disability benefits under the Social Security Act.

1. Plaintiff faults Judge Peck first for failing to discuss
Social Security Ruling ("SSR") 83-12, 1983 WL 31253
(S.S.A.) But SSR 83-12 deals with individuals whose
medical assessments of residual functional capacity are
compatible with sedentary or light work except that the
person must alternate periods of sitting and standing,
a problem for those who cannot sit and stand for the
minimum periods required. Here the medical evidence
that plaintiff could sit for up to six hours per day is
consistent with the conclusion that she is capable of
performing sedentary work. See Ferraris v. Heckler, 728
F.2d 582, 587 n.3 (2d Cir. 1984). While it appears that
plaintiff must stand every 45 minutes or so in order to

relieve discomfort, there is no evidence to support the
plaintiff's reliance on SSR 83-12, as there is nothing to
suggest that a word processor is required to alternate
periods of standing and sitting in the manner discussed in
the Ruling.

2. Plaintiff argues next that Judge Peck erred in concluding
that the failure of the Administrative Law Judge ("ALJ")
to discuss Dr. Leahy's report was harmless error. Dr.
Leahy's report states that plaintiff is able to sit for one
hour at a time or a total of six hours a day and that she
could not stand for more than a total of one hour a day.
Plaintiff contends that this report is inconsistent with the
findings of the ALJ and of Judge Peck, suggesting that it
is inconsistent with the conclusion that plaintiff is capable
of performing sedentary work.

Sedentary work involves sitting with occasional walking
and standing. 20 C.F.R. §§ 404.1567(a)(1994). According
to SSR 83-10, 1983 WL 31251 (S.S.A.), sitting generally
should total no more than about six and standing two
hours of an eight hour workday.

While it would have been desirable for the ALJ to discuss
Dr. Leahy's report, the report does not undermine his
conclusion. Rather, it is consistent with substantially all of
the other evidence in the case save the fact that Dr. Leahy's
estimate of the maximum duration of any tolerable sitting
period was longer, and thus less favorable to plaintiff,
than plaintiff's own estimate, which is the one relied
upon below. Moreover, the report was considered Appeals
Council in denying plaintiff's application for review of the
ALJ's decision. Hence, the ALJ's failure to discuss Dr.
Leahy's report, as Judge Peck concluded, was harmless
error.

3. Plaintiff finally claims that a vocational expert should
have been consulted pursuant to SSR 83-13 on the issue
of whether plaintiff's sit/stand limitations left her with
residual functional capacity. SSR 83-13, however, was
superseded by SSR 85-7, which in turn was superseded by
SSR 85-15. 1983 WL 31261, 56860 (S.S.A.) SSR 85-15,
1985 WL 56857 (S.S.A.), certainly did not require the ALJ
to consult a vocational specialist in this case.

**\*2** At bottom, this case is a simple matter. The plaintiff
contends that "Judge Peck [erred because he] failed to
articulate how a person who can only sit for one hour
at a time, and stand for a total of one hour in an eight

hour day, could perform sedentary work (which requires the ability to sit for six hours) in light of SSR 83-12 ... "The difficulty with the position is that plaintiff's own testimony permitted the ALJ to conclude that she could sit for at least 45 minutes, and SSR 83-12 does not hold that plaintiff must be able to sit without interruption for six hours in order to be found capable of performing sedentary work. The ALJ's conclusion that plaintiff failed to sustain her burden of proving that she is unable to work as a typist or word processor is supported by substantial evidence. *See Parker v. Sullivan,* No. 91 Civ. 0981 (PNL), 1992 WL 77552 (S.D.N.Y. Apr. 8, 1992) (Leval, J.).

Magistrate Judge Peck's excellent Report and Recommendation is adopted. Defendant's motion for judgment on the pleadings is granted, and plaintiff's cross-motion is denied.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

PECK, United States Magistrate Judge:

Plaintiff Virginia Walzer brings this action, pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her disability benefits. Both parties have cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, I recommend that the Court grant the Commissioner's motion for judgment on the pleadings, and deny Walzer's cross motion.

## *PROCEDURAL BACKGROUND*

On October 15, 1991, Walzer filed an application for disability insurance benefits. (Administrative Record filed by the Commissioner [hereafter, "R."], at 65-57.) The application was denied initially (R. 77-79) and on reconsideration. (R. 82-84.) Walzer subsequently requested a hearing before an administrative law judge ("ALJ"), which was conducted on December 17, 1992. (R. 21-64.) On January 20, 1993, the ALJ issued his decision finding that Walzer was not disabled. (R. 11-18.) The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied Walzer's request for review on July 14, 1993. (R. 4-5.) This appeal followed. The issue before the Court is whether the Commissioner's decision that plaintiff Walzer was not disabled is supported by substantial evidence.

## *FACTS*

### *Plaintiff's Testimony Before the ALJ*

Walzer was represented at the hearing before the ALJ on December 17, 1992 by the same counsel representing her in this case. (R. 13, 21.) Ms. Walzer testified at the administrative hearing that she was born December 26, 1932 and was diagnosed at birth with cerebral palsy. (R. 25, 40.) Ms. Walzer attended a special school from 1937 to 1939, but was otherwise educated in the mainstream public system, and attended one year of community college. (R. 26, 95.) Walzer worked full time between February 1977 and April 1, 1988 for Western Union in many capacities, including as a telex operator, word processor and personnel assistant. (R. 38-39.) Her most recent job for Western Union, as a personnel assistant, entailed in-putting information into an employee's personnel files and physically lifting and filing paper records. (R. 36-37.) Walzer testified that she had this position for two years, but was fired when she was no longer capable of lifting file boxes weighing over 20 pounds. (R. 37.)

**\*3** After leaving Western Union, Walzer testified that she worked in her husband's business at home from January 1990 to September 1990. (R. 27, 95.) Walzer answered the phones, took mail orders and went to the post office to pick up and deliver mail and small packages. (R. 27-28.) She testified that her husband decided to discontinue the business because it could not support the family as a main source of income and Mr. Walzer obtained a full time job for New York state. (R. 32-33.) Further, both Ms. Walzer and her husband testified that she had trouble with the stair climbing involved in the business and she frequently misplaced business messages. (R. 33-35, 56-60.)

Walzer testified that her cerebral palsy affected the left side of her body below the waist. (R. 40.) She further stated that she had difficulty standing for long periods because she had "a lot of pain on the right side in, in the sacroiliac." (R. 41.) She also testified that she had

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

problems lifting or sitting too long while at Western Union. (R. 42.)

Walzer stated that she previously had seen a chiropractor, but stopped a couple of years ago because her new group health insurance wouldn't pay for the treatments. (R. 43.) Instead, she did exercises on her own to strengthen her muscles. (R. 43.) She further asserted that she is able to sit in a chair for about 45 minutes without interruption, stand in one spot for about 10 minutes at a time, walk about 2-3 blocks, and lift ten pounds "with difficulty." (R. 43-44.) The only medication she takes is aspirin. (R. 47.)

Walzer testified that her daily activities include playing piano, watching television "a lot," listening to radio talk shows, swimming, light household cleaning, visiting her grandchildren, and participating in a senior citizen exercise class. (R. 48-51; 109.)

*The Medical Evidence*
The medical evidence in the record consists of two medical reports made by treating physicians, one report by a consultative examiner, and one report by a physical therapist.

Walzer's first treating physician, Dr. Sanford Kryger, saw Walzer initially in October 1988, two years before her alleged onset date of disability. (R. 113.) At that time, Walzer received emergency room treatment for a fractured K-4 vertebrae she had sustained after falling down some stairs. (R. 113, 130-34.) Dr. Kryger wrote in his treatment notes for November 1, 1988 that Walzer was using a corset and was able to walk. (R. 131.) Walzer had experienced one episode of numbness which had been "totally resolved." (*Id.*) Three weeks later Walzer's pain had decreased, but she continued to use the corset. (*Id.*) Dr. Kryger wrote that Walzer stated that she was feeling "good," exhibited good trunk range of motion and was neurologically intact. (R. 132.) Dr. Kryger started Walzer "on a PT [physical therapy] program which she tolerated well and got her back to a relatively functioning status." (R. 113.)

Dr. Kryger treated plaintiff Walzer again in August 1991, after she fell again, injuring her knee and leg. (R. 113.) He stated that "neurovascular examination was intact," and that plaintiff Walzer had "moderate tenderness into her hamstrings with the complete inability to straighten the leg and a moderate antalgic limp." (*Id.*) Dr. Kryger further

noted that Walzer developed "some moderate ecchymosis and swelling in the area with a moderate amount of pain and decreased motion in the leg." (*Id.*) Dr. Kryger again prescribed physical therapy. (*Id.*)

*4 At the time of his last consultation with Walzer in October 1991, Dr. Kryger noted that Walzer's condition was improved, but she was still complaining of moderate weakness in her leg with a mild antalgic limp and local tenderness. (*Id.*) He further noted that she "cannot stand for a prolonged period of time and can certainly not do any lifting." (*Id.*) He concluded that he was not sure as to how long her condition would take to resolve. (*Id.*)

Dr. Stuart Lesch, a consultative physician, examined Walzer in February 1992. (R. 115.) Dr. Lesch concluded that Walzer's symptoms of a "somewhat spastic, slightly scissoring type gait" was consistent with "cerebral palsy as manifested by spastic diplegia." (R. 116.)[1] Dr. Lesch further noted the following: Walzer had "no organic mental deficit or aphasia"; Walzer could walk on her toes, but was unable to walk on her heels; she had "no weakness in the upper extremities"; there is "increased tone in the lower extremities with moderate" weakness of the toes and ankles of both feet and "minimal" weakness of the hip flexors and hamstrings. (R. 115-16.)

Walzer's second treating physician, Dr. Mary Leahy, saw Walzer up until November 1992.[2] Dr. Leahy noted in an evaluation that Walzer was injured at birth in a forceps delivery which explained her delayed motor control. (R. 141.) She further noted that Walzer had surgery at age four for muscle atrophy but still has trouble walking and atrophy of the left leg. (*Id.*) Dr. Leahy opined that Walzer was able to sit for an hour at a time for a total of six hours, but was not able to stand or walk for more than a total of one hour in an eight hour day. (R. 139.)

Dr. Leahy further noted that plaintiff Walzer could lift up to five pounds "frequently" and up to ten pounds occasionally, but had "gait difficulty" and "trouble standing from a seated position." (*Id.*) Dr. Leahy reported that plaintiff could not squat, crawl, or climb, but was able to grasp, push, pull, and perform fine manipulation on a regular basis. (R. 140.) Due to weakness and atrophy in the left leg, moreover, Walzer was not able to perform repetitive movements using foot controls with her left leg, although her right leg could so move. (*Id.*)

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

Finally, the record contained the evaluation of Ronni Silver, a physical therapist who rendered outpatient care to Walzer on twelve occasions between October 1, 1991 and November 22, 1991. (R. 127-29.) Silver also noted Walzer's scissoring gait and weakness in her left leg. (*Id.*)

*The ALJ's Decision*

The ALJ found that plaintiff Walzer's condition of cerebral palsy was a "severe impairment," but that it did not meet or equal the level of severity of any impairment contained in Appendix 1, Subpart P, of Social Security Regulations No. 4. (R. 14-15.) Specifically, the ALJ found that Walzer's condition did not meet the requirements of Listing 1.05 (disorders of the spine)[3] or Listing 11.07 (Cerebral palsy)[4] (*Id.*):

> **\*5** Listing 1.05 requires specific findings including 50% loss of vertical body height which has not been demonstrated in the instant case, or in subsection C evidence of radiculopathy including significant motor loss, muscle weakness, and sensory and reflex deficits.... Regarding her cerebral palsy, Listing 11.07 refers back to Listing 11.04B dealing with disorganization of motor function. That listing requires that there be significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross dexterous movements or gait and station. There is absolutely nothing in the record to show significant and persistent disorganization of functioning in the lower extremities or that there is significantly disturbed gait and station such as to require the claimant to use an assistive device.

(R. 15.)

Further, the ALJ concluded that, although Walzer's condition was severe, he could "find no reason why claimant would be unable to return to her past relevant work." (*Id.*) In so finding, the ALJ noted that Walzer had an excellent work history, having worked from 1951

through 1955 and again from 1976 through 1988, despite "her cerebral palsy and the effect that it had on her lower extremities." (R. 14-15.) The ALJ further based this opinion on the fact that Walzer's condition required only a "brief" and "conservative" treatment following both the 1988 and 1991 falls. (R. 15.) Specifically, the ALJ noted that Walzer never required hospitalization, medication, significant diagnostic test work-up, or an active on-going course of treatment after her physical therapy. (*Id.*) Moreover, the only limitations placed on Walzer was Dr. Kryger's mandate that "she avoid prolonged standing and do no lifting." (*Id.*) The ALJ further concluded that Walzer's condition had not significantly deteriorated over the years. (*Id.*) The ALJ based this opinion on Walzer's admission to the state consulting physician, Dr. Lestch, that although her difficulty walking had worsened with age, exercise and physical therapy had improved her status. (*Id.*)

The ALJ found Walzer's own testimony concerning her limitations "not inconsistent" with an ability to perform her past work as a typist and word processor, since individuals performing those jobs do not sit for eight hours without interruption. (R. 17.) Further, the ALJ found that Walzer's daily activities (*i.e.,* driving, household chores, and "sedentary activities" including watching television, sewing, reading, and exercising) indicated her ability to return to her past work. (*Id.*) The ALJ noted that Walzer was not suffering from severe or incapacitating pain, and was not receiving medical treatment or therapy at the time of the hearing. (*Id.*) Finally, the ALJ noted that Walzer's allegation of memory loss and concentration difficulties were not substantiated by her medical record. (*Id.*) He therefore concluded that Walzer's testimony concerning her symptoms and limitations appear "somewhat exaggerated and inconsistent with the other evidence of record including the paucity of the treatment sought and the conservative nature of the treatment rendered to date." (R. 18.)

**\*6** Thus, the ALJ concluded that Walzer had the residual functional capacity to perform work related activities except for work involving sustained standing or lifting. (*Id.*)

*ANALYSIS*

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

## I. *THE APPLICABLE LAW*

### A. *Definition of Disability*

For Social Security disability insurance benefits ("SSI") purposes, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). That impairment must be of such severity that the person

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would he hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for SSI purposes, the Secretary must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age and work experience." *E.g., Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam); *Carroll v. Secretary of Health & Human Services,* 705 F.2d 638, 642 (2d Cir. 1983).

A court's review of the Secretary's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir. 1991); *Mongeur v. Heckler,* 722 F.2d at 1037; *Dumas v. Schweiker,* 712 F.2d 1545, 1550 (2d Cir. 1983); 42 U.S.C. §§ 405(g). The Supreme Court has defined "substantial evidence" as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).

The Secretary's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Second Circuit has articulated the five steps as follows:

> [1] First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [5] Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

**\*7** *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982). The claimant bears the burden of proof as to the first four of these steps. *Id.* If the claimant meets the burden of proving that she cannot return to her past work, the Secretary has the burden of proving the last step, that there is other work that the claimant can perform. *Id.*

### B. *The Treating Physician's Rule*

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

The "treating physician's rule" is a series of regulations set forth in 1993 by the Secretary in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Secretary's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2). Further, the regulations specify that when controlling weight is not given a treating physician's testimony (*i.e.,* because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such testimony: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. *Id.*

The Commissioner's current "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir. 1993).

## II. *APPLICATION OF THE FIVE-STEP SEQUENCE TO WALZER'S CLAIM*

### 1. *Walzer was not Engaged in Substantial Gainful Activity*

The first inquiry is whether Walzer was engaged in substantial gainful activity. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510 (1993). It is undisputed that plaintiff Walzer was unemployed during the applicable time period (the period since September 2, 1990). (R. 17.)

### 2. *Walzer Does Not Have A Severe Physical Impairment That Significantly Limits Her Ability to do Basic Work Activities*

The next step of the analysis is to determine whether Walzer has a severe physical impairment that "significantly limit(s) the applicants' physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

The "ability to do basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations.

**\*8** 20 C.F.R. § 404.1521(b)(1)-(5). Walzer has the burden of establishing a prima facie case by showing that the impairment prevents her return to her prior employment. *E.g., Parker v. Harris,* 626 F.2d 225, 231 (2d Cir. 1980).

The ALJ found that Walzer's history of cerebral palsy constitutes a "severe" impairment. (R. 14.) Nevertheless, the ALJ found that Ms. Walzer "has the residual functional capacity to perform work activity except for that requiring prolonged standing or lifting. (R. 16, 18.) Ms. Walzer had the burden of proof on this issue, and I find that there is substantial evidence to support the ALJ's finding that Ms. Walzer had the ability to perform basic work activities.

In evaluating whether Walzer was capable of performing both "basic work activities" and, specifically, her previous work as a typist and word processor, the ALJ considered the medical records and evidence from (1) Dr. Kryger, one of Walzer's two treating physicians, (2) Dr. Stuart Lestch, the state agency consultant who examined Walzer, (3) Ronnie Silva, a physical therapist who treated Walzer, and (4) Walzer herself. (R. 14-17.)

A review of these three medical records demonstrates that all agreed that Walzer had gait difficulty and some

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

weakness in her legs due to her congenital cerebral palsy. However, with the exception of Dr. Kryger, who noted that Walzer "cannot stand for a prolonged period of time and can certainly not do any lifting" (R. 113), none of these other medical personnel placed any restrictions on Walzer's ability to perform sedentary activities. In fact, Dr. Kryger found that Walzer exhibited good trunk range of motion and was neurologically intact. (R. 132.) Dr. Lestch noted that while Walzer had a "somewhat spastic, slightly scissoring type gait" consistent with cerebral palsy, she had "no organic mental deficit," no weakness in her upper extremities, and only moderate to minimal weakness in her toes, ankles and hip flexors and hamstrings bilaterally. (R. 115-16.) The ALJ further found significant that since her alleged onset of disability in 1990, Walzer has received only two months of treatment ending in November 1991, and had not required or received any further treatment since. (R. 17.)

Finally, the ALJ considered the testimony of plaintiff Walzer herself, who complained of back pains and impairment of concentration and memory. Walzer testified that, as a result of her pain, she could not: stand for more than 10 minutes, sit for more than 45 minutes, walk more than two to three blocks, or lift more than 10 pounds without difficulty. (R. 43-44.) Walzer testified, however, that her daily activities included driving short distances, performing light household chores, swimming, sewing, watching television and reading. (R. 48-51.) She admitted that she took no medication except aspirin and that she had not seen a doctor in over a year. (R. 43, 47.) Based on the medical evidence and Walzer's own testimony, the ALJ concluded that Walzer's testimony concerning her symptoms and limitations "appear somewhat exaggerated and inconsistent with the other evidence of record including the paucity of the treatment sought and the conservative nature of the treatment rendered to date." (R. 18.)

**\*9** On this appeal, Walzer asserts that the ALJ's conclusion as to her ability to perform sedentary work was erroneous in that the ALJ failed to consider the testimony of a second treating physician, Dr. Mary Leahy. As a treating physician, Dr. Leahy's testimony has controlling weight, so long as it is supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence in the record. Dr. Leahy concluded that Walzer was able to sit for an hour at a time for a total of six hours a day, but was not able to stand or walk

for more than one hour in an eight hour day. (R. 139.) Dr. Leahy further noted that Walzer could lift up to ten pounds, but had "gait difficulty" and "trouble standing from a sitting position." (R. 139.)

While the ALJ should have discussed Dr. Leahy's report in his decision (even though her report was received after the close of the hearing), the ALJ's failure to do so was harmless error, since his written consideration of Dr. Leahy's report would not have changed the outcome of the ALJ's decision. Essentially, Dr. Leahy's report as to Walzer's gait difficulty was consistent with all the other medical testimony considered by the ALJ. Plaintiff Walzer concedes as much. (Plf's Brief at 4: "The report of Dr. Mary Leahy ... is similar to those by [Walzer's] other treatment advisers.") The only difference was that Dr. Leahy specified the amount of time Walzer could remain in a sitting or standing position before she had to shift positions due to pain. However, Dr. Leahy's report did not preclude the ALJ's finding that Walzer could perform sedentary activity.

Sedentary work is defined as involving "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a) & 416.967(a). Further, a sedentary job is defined as one which involves sitting, although "a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* It is generally agreed by both the Commissioner and the Second Circuit that sedentary work involves sitting six hours out of an eight hour work day. *See Ferraris v. Heckler,* 728 F.2d 582, 587 n.3 (2d Cir. 1984).

As so defined, there is no reason that Ms. Walzer cannot return to her sedentary position as a word processor. Dr. Leahy noted that Walzer was able to sit for an hour at a time for a total of six hours, and could stand or walk for up to an hour in an eight-hour working day. (R. 139.) Further, Dr. Leahy noted that Walzer could lift up to ten pounds. (*Id.*) These abilities qualify Ms. Walzer for sedentary work under the above definition.

Although Ms. Walzer testified that she could only sit in a chair for forty five minutes at a time before experiencing pain requiring her to stand or move, the ALJ was free to deem Dr. Leahy more credible than plaintiff Walzer. *See, e.g., Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979) (ALJ has discretion to evaluate the credibility of

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

a claimant and to arrive at an independent judgment in light of medical findings and other evidence). And, as the Second Circuit has noted, "disability requires more than mere inability to work without pain." *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir. 1983).

**\*10** Furthermore, contrary to plaintiff's assertions, work of a secretarial nature certainly would allow Ms. Walzer to periodically stretch and move around. *See, e.g., Parker v. Sullivan, M.D.,* 91 Civ. 0981, 1992 WL 77552 (S.D.N.Y. April 8, 1992) (Court affirmed ALJ's decision that person only able to sit for 1 ½ hours at a time was capable of resuming secretarial work).

### 3. *Walzer Does Not Have a Disability Listed in Appendix 1 of the Regulations* [5]

The third step of the five part test is whether Walzer had an impairment listed in Appendix 1 of the regulations. The ALJ found that Walzer never met or equaled the severity of the impairments contained in either Listing 1.05 referable to disorders of the spine or Listing 11.07 referable to cerebral palsy. (*See* pages 8-9 and nn.3-4, above.)

The Court agrees with the ALJ's analysis that there is no evidence in the record that Walzer met the requirements under Listing 1.05 or 11.07. Although there was medical evidence that Walzer fractured her K-4 vertebrae in 1988, there was no evidence of 50% vertebral shrinkage or other lasting effects, as required by Listing 1.05. (*See* n.3, above.) In fact, Dr. Kryger's testimony was that Walzer had a good trunk range of motion and was neurologically intact. (R. 132.) Similarly, neither Dr. Leahy nor Dr. Lestch commented on any permanent spinal damage or movement limitations.

Likewise, Walzer cannot meet the requirements of Listing 11.07 applicable to cerebral palsy. (*See* n.4, above.) There is no evidence that Ms. Walzer has an IQ of 69 or less or has emotional instability or abnormal behavior patterns. Further, although Ms. Walzer and her husband testified that she has some memory loss, the medical testimony was that Walzer had "no organic mental deficit or aphasia." (R. 116.) Thus, Walzer's alleged problems would not constitute "significant interference in communication due to speech, hearing, or visual defect." (Listing 11.07(c), n.4 above.)

Finally, although there is evidence of some muscular atrophy in Walzer's left leg (R. 140) and "moderate" weakness of her toes and ankles (R. 116), these difficulties would not rise to the level of "significant and persistent disorganization of motor function in two extremities." (Listing 11.07(D), incorporating Listing 11.04(B), n.4 above.) The evidence is clear that Ms. Walzer could walk without assistance, although for limited distances. Further, there was no evidence of upper body weakness and Walzer was able to grasp, push, pull, and perform fine manipulation on a regular basis. (R. 140.)

The Court further notes that plaintiff Walzer neither contests the ALJ's analysis, nor proffers in her brief any evidence that her condition met or equaled the requirements of any impairment in Appendix 1 to 20 C.F.R. Part 404, Subpart P.

I recommend that the Court find that there is substantial evidence supporting the ALJ's finding that Walzer did not meet the requirements.

### 4. *Walzer Has the Ability to Perform Her Past Work*

**\*11** The fourth prong of the five part analysis is whether plaintiff had the residual functional capacity to perform her past work.

The ALJ found that in spite of her severe impairments, he could "find no reason why claimant would be unable to return to her past relevant work within the meaning of 20 CFR 404.1520(e)." (R. 15.) Specifically, the ALJ found that Walzer was able to perform her past relevant work as a typist and word processor, despite her limitations as to prolonged standing and lifting, since work as a typist did not require such activities. (R. 18.) For the reasons set forth in my discussion of the second prong (at pages 15-20 above), I recommend that the Court find that the ALJ's decision that Walzer is able to return to her previous occupation as a word processor and typist is supported by substantial evidence.

It is not necessary to discuss the fifth prong of this inquiry, since it only applies if the claimant is unable to perform her past work. *Rivera v. Schweiker,* 717 F.2d 719, 722 (2d Cir. 1983); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982); *Velk v. Shalala,* 93 Civ. 3111, 1995 WL 217516 at \*5 (S.D.N.Y. April 11, 1995).

Walzer v. Chater, Not Reported in F.Supp. (1995)

1995 WL 791963

## CONCLUSION

Upon review of the record, I find that the Commissioner has presented substantial evidence that Ms. Walzer was not under a disability and had the residual functional capacity to perform work-related activities and, specifically, her past secretarial work. Accordingly, I recommend that the Court grant the Commissioner's motion for judgment on the pleadings and deny Walzer's cross-motion.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from receipt of this report to file written objections to the foregoing report. *See also* Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, and to the chambers of the undersigned at 40 Centre Street, Room 540. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. Failure to file objections to this Report within ten days may result in a waiver of those objections for purposes of appeal. *See Small v. Secretary of Health & Human Services,* 892 F.2d 15, 16 (2d Cir. 1989); *see also, e.g., Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993), *cert. denied,* 115 S. Ct. 86 (1994); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 113 S. Ct. 825 (1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

( [*] Defendant)

1    Spastic diplegia is a "spastic weakness of the limbs ... present from birth." *Churchill's Illustrated Medical Dictionary* 525 (1989).

2    The report from Dr. Leahy was submitted to the ALJ by Walzer's counsel after the close of the ALJ's hearing. (*See* R. 138.) The ALJ did not mention the testimony of Dr. Leahy in his decision. The ALJ's

failure to note Dr. Leahy's testimony is harmless error. *See* pages 18-20, below.

3    Listing 1.05 requires:
    A. Arthritis manifested by ankylosis or fixation of the cervical or dorsolumbar spine at 30 degrees of more of flexion measured from the neutral position, with X-ray evidence of:
    1. Calcification of the anterior and lateral ligaments; or
    2. Bilateral ankylosis of the sacroiliac joints with abnormal apophyseal articulations; or
    B. Osteoporosis, generalized (established by X-ray) manifested by pain and limitation of back motion and paravertebral muscle spasm with X-ray evidence of either:
    1. Compression fracture of a vertebral body with loss of at least 50 percent of the estimated neither of the vertebral body prior to the compression fracture with no intervening direct traumatic episode; or
    2. Multiple fractures of vertebrae with no intervening direct traumatic episode; or
    C. Other vertebrogenic disorders (e.g., herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
    1. Pain, muscle spasm, and significant limitation of motion in the spine; and
    2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

4    Listing 11.07 requires:
    A. IQ of 69 or less; or
    B. Abnormal behavior patterns, such as destructiveness or emotional instability: or
    C. Significant interference in communication due to speech, hearing, or visual defect; or
    D. Disorganization of motor function as described in 11.04B
    11.04(B) reads:
    B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

5    Because Walzer did not meet her burden of showing that she could not perform "basic work," it is not necessary to reach the remaining steps of the five part analysis. I discuss the third and fourth steps, however, to give the Court a complete analysis for review.

**Walzer v. Chater, Not Reported in F.Supp. (1995)**

1995 WL 791963

**All Citations**

Not Reported in F.Supp., 1995 WL 791963

Footnotes

\*    Defendant was formerly Donna E. Shalala, Secretary of Health and Human Services. Pursuant to P.L. No. 103-296, however, the Social Security Independence and Program Improvement Acts of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security effective March 31, 1995. In accordance with Section 106(d) of P.L. 103-296, Shirley S. Chater has been substituted for Donna E. Shalala. No further action is necessary to continue this suit. (*Id.*)

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 528456
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Scott DOMBROWSKI, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 5:12–cv–638 (GLS).
|
Feb. 11, 2013.

**Attorneys and Law Firms**

Olinsky Law Group, Karen S. Southwick, Esq., Tanisha
T. Bramwell, Esq., of Counsel, Syracuse, NY, for the
Plaintiff.

Hon. Richard S. Hartunian, United States Attorney,
Katrina M. Lederer, Special Assistant U.S. Attorney,
of Counsel, Syracuse, NY, Steven P. Conte, Regional
Chief Counsel, Social Security Administration, Office of
General Counsel, Region II, New York, NY, for the
Defendant.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

### I. Introduction

**\*1** Plaintiff Scott Dombroski[1] challenges the
Commissioner of Social Security's denial of disability
insurance benefits (DIB) and supplemental security
income (SSI), seeking judicial review under 42 U.S.C. §§
405(g) and 1383(c)(3). (See Compl. at 1, Dkt. No. 1.)
After reviewing the administrative record and carefully
considering Dombroski's arguments, the Commissioner's
decision is affirmed and Dombroski's Complaint is
dismissed.

[1]    It appears as though plaintiff's surname is misspelled
in the Complaint and, subsequently, on the docket.
While no change to the docket is necessary, the court
refers to plaintiff throughout as "Dombroski."

### II. Background

On October 29 and 31, 2008, Dombroski filed applications
for DIB and SSI under the Social Security Act ("Act"),
alleging disability beginning February 1, 2007. (See Tr.[2]
at 48–49, 137–141.) After his applications were denied,
Dombroski requested a hearing before an Administrative
Law Judge (ALJ), which was held on April 6, 2010. (See
id. at 9, 20–47, 50–59.) On April 12, 2010, the ALJ issued
a decision denying the requested benefits, which became
the Commissioner's final decision upon the Social Security
Administration Appeals Council's denial of review. (See
id. at 1–3, 9–19.)

[2]    Page references preceded by "Tr." are to the
Administrative Transcript. (See Dkt. No. 8.)

Dombroski commenced the present action by filing
a Complaint on April 13, 2012, seeking review of
the Commissioner's determination. (See Compl.) The
Commissioner filed an answer and certified copy of the
administrative transcript. (See Dkt. Nos. 7, 8.) Both
parties, seeking judgment on the pleadings, filed a brief.
(See Dkt. Nos. 11, 12.)

### III. Contentions

Dombroski contends that the Commissioner's decision
was the product of legal error and is unsupported
by substantial evidence. (See generally Dkt. No. 11.)
Specifically, he claims that the ALJ: (1) improperly
discounted the weight assigned to the opinions of treating
psychiatrist Mitchell Langbart; (2) failed to apply the
appropriate legal standard in assessing his credibility;
and (3) posed an incomplete hypothetical question to
the vocational expert (VE) at step five of the sequential
analysis. (See id. at 9–21.) The Commissioner counters
that the ALJ employed the proper legal standards and
that his decision is supported by substantial evidence. (See
generally Dkt. No. 12.)

### IV. Facts

The evidence in this case is undisputed and the court
adopts the parties' factual recitations. (See Dkt. No. 11 at
2–9; Dkt. No. 12 at 1.)

## V. *Standard of Review*

The standard for reviewing the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) is well established and will not be repeated here. For a full discussion of the standard and the five-step process used by the Commissioner in evaluating whether a claimant is disabled under the Act, the court refers the parties to its previous opinion in *Christiana v. Comm'r of Soc. Sec. Admin.,* No. 1:05–CV–932, 2008 WL 759076, at *1–2 (N.D.N.Y. Mar. 19, 2008).

## VI. *Discussion*

### A. *Treating Physician*

#### 1. July 14, 2009 Opinion

Dombroski argues first that the ALJ provided inadequate explanation in support of his decision to accord portions of Dr. Langbart's July 14, 2009 medical source statement "little weight." (Dkt. No. 11 at 11–16.) The Commissioner counters that the ALJ properly applied the treating source rule, and that his decision to discount the weight given to Dr. Langbart's opinion is supported by substantial evidence. (*See* Dkt. No. 12 at 5–8.) The court agrees with the Commissioner.

**\*2** Controlling weight will be given to a treating source's opinion on the nature and severity of a claimant's impairments where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c) (2); *see Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). When a treating source's opinion is given less than controlling weight, the ALJ is required to consider the following factors: the length, nature and extent of the treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner. 20 C .F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ must provide " 'good reasons' for the weight given to the treating source's opinion." *Petrie v. Astrue,* 412 F. App'x 401, 407 (2d Cir.2011) (citations omitted). "Nevertheless, where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision,' it is not necessary

that the ALJ " 'have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.' " *Id.* (citation omitted).

The ALJ assigned "little weight" to Dr. Langbart's July 14, 2009 opinion "that [Dombroski] has extreme limitations in [his] ability to interact with [the] public and co-workers and marked limitations in [his] ability to interact with supervisors and respond appropriately to [the] pressures of work." (Tr. at 17.) The ALJ concluded that the functional limitations articulated by Dr. Langbart were "not supported by findings on mental status examination and are inconsistent with the claimant's very good activities of daily living." (*Id.*) In reaching that conclusion, the ALJ explicitly referenced 20 C.F.R. §§ 404.1527 and 416.927, as well as relevant social security rulings. (*See id.* at 13.) The ALJ also undertook a thorough discussion of the medical and testimonial evidence of record which suggested impairments less severe than those articulated by Dr. Langbart. (*See id.* at 13–17.) Finally, it is evident from the ALJ's direct citation to treatment notes spanning an eight month period, (*see id.* at 17), that the nature and duration of Dr. Langbart's treatment relationship with Dombroski were properly considered. As it is clear that he properly applied sections 404.1527(c) and 416.927(c), the ALJ did not err in failing to methodically discuss each individual factor, and his assessment of Dr. Lanbart's July 2009 opinion is legally sound. *See* SSR 06–03p, 71 Fed.Reg. 45,593, 45,596 (Aug. 9, 2006) ("Not every factor for weighing opinion evidence will apply in every case.").

Dombroski's argument that the ALJ's decision to discount Dr. Langbart's assessment is not supported by substantial evidence is similarly unavailing. First, it is important to note that the ALJ did not discount Dr. Langbart's opinion wholesale, but rather adopted many of the limitations adduced by him in finding that Dombroski could perform only "simple, routine, low-stress tasks with limited general public contact." (Tr. at 13.) Dr. Langbart himself later concluded that Dombroski did not have "extreme" limitations in his ability to interact appropriately with the public and co-workers. (*Compare id.* at 280–81, *with id.* at 309–11.) In fact, Dr. Langbart's subsequent March 23, 2010 medical source statement indicated less severe limitations than those contained in the July 2009 assessment in all but two functional categories. (*See id.*) While Dr. Langbart opined that Dombroski suffered "marked" limitations in his ability to interact with a

supervisor and handle work pressure, (*see id.* at 281, 310), psychological consultant T. Inman–Dundon, Ph.D., found only "moderate" restrictions in those areas, (*see id.* at 268). Additionally, Dombroski was capable of a wide range of daily activities, (*see id.* at 17), and, when pressed with a deadline to finish construction of a haunted house that "he and his parents offer[ed] to the public," Dr. Langbart noted that he worked "industriously at it," (*id.* at 303). Accordingly, the ALJ provided sufficient reasons for discounting portions of Dr. Langbart's July 2009 opinion, and his decision to do so is supported by substantial evidence.

### 2. March 23, 2010 Opinion

**\*3** Next, Dombroski argues that the ALJ's failure to explicitly discuss Dr. Langbart's March 23, 2010 medical source statement constitutes legal error which requires reversal and remand. (*See* Dkt. No. 11 at 16–17.) The Commissioner contends, and the court agrees, that the ALJ's omission does not necessitate remand. (*See* Dkt. No. 12 at 8–9.)

"[R]emand is unnecessary, even if the ALJ ignores a treating physician's opinion, when the opinion is essentially duplicative of evidence considered by the ALJ, and the report that the ALJ overlooked was not significantly more favorable to the plaintiff." *Seekins v. Astrue,* Civil No. 3:11 CV00264, 2012 WL 4471266, at *5 (D.Conn. Aug. 14, 2012) (citing *Zabala v. Astrue,* 595 F.3d 404, 409–10 (2d Cir.2010)). Where discussion of an omitted medical report "would not have changed the outcome of the ALJ's decision," such omission constitutes "harmless error." *Walzer v. Chater,* No. 93 Civ. 6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995).

As noted above, Dr. Langbart's March 2010 medical source statement indicated greater mental functional capacity by Dombroski than did his July 2009 assessment. (*Compare* Tr. at 280–81, *with id.* at 309–11.) With the exception of two functional areas which remained consistent, the limitations articulated in Dr. Langbart's March 2010 opinion were less severe than those expressed in his July 2009 report. (*See id.*) In other words, to the extent that the second report was not duplicative of the first, it was less favorable to Dombroski. Additionally, at step five of the sequential analysis, the VE explicitly considered the most severe of the limitations contained in Dr. Langbart's March 2010 opinion. (*See id.* at 18–19, 39–47.) Accordingly, it is evident that the omitted report

was duplicative, less favorable to Dombroski, and would not have changed the outcome of the ALJ's decision. *See Seekins,* 2012 WL 4471266, at *5. The ALJ's failure to explicitly discuss the March 2010 opinion therefore constitutes harmless error.

### B. *Credibility Determination*

Dombroski contends next that the ALJ's assessment of his credibility was legally flawed and is factually unsupported. (*See* Dkt. No. 11 at 17–20.) The Commissioner counters that the ALJ's credibility finding was legally sound and is supported by substantial evidence. (*See* Dkt. No. 12 at 9–12.) The court agrees with the Commissioner.

Once the ALJ determines that the claimant suffers from a "medically determinable impairment[ ] that could reasonably be expected to produce the [symptoms] alleged," he "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue,* 370 F. App'x 179, 183 (2d Cir.2010) (internal quotation marks and citations omitted). In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements." SSR 96–7p, 1996 WL 374186, at *4 (July 2, 1996). Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *F.S. v. Astrue,* No. 1:10–CV444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. §§ 404.1529(c)(3) (i)-(vi), 416.929(c)(3)(i)-(vi)).

**\*4** Relying principally on inconsistencies between Dombroski's subjective complaints and the objective medical evidence, as well as with his reported activities of daily living, the ALJ determined that those complaints were credible only to the extent that they were consistent with his RFC. (*See* Tr. at 16.) Specifically, the ALJ noted that, although Dombroski alleged the inability to work because of psychological impairments and chronic back pains, he admitted to being able to cook, clean, listen to the radio, play computer games, drive, build props for a haunted house and drink beer with friends. (*See id.* at

16–17.) The ALJ also found that Dombroski's complaints were "not supported by objective clinical, laboratory and/ or radiological findings and they [were] contradicted [by] the assessments of the consultative examiner [and] the [VE]'s testimony." (*Id.* at 16.) Contrary to Dombroski's contentions, however, the ALJ's credibility analysis did not end there. In addition to inconsistencies with medical evidence and daily activities, the ALJ discussed Dombroski's physical and psychological symptoms, the types and effectiveness of current forms of medication and treatment, and past occurrences of noncompliance with treatment. (*See id.* at 13–17, 281, 286–87, 290.)

Although the ALJ did not undertake a step-by-step exposition of the factors articulated in 20 C.F.R. §§ 404.1529(c) and 416.929(c), "[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record." *Judelsohn v. Astrue,* No. 11–CV–388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012) (internal quotation marks and citation omitted); *see Oliphant v. Astrue,* No. 11– CV–2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (stating that the 20 C.F.R. § 404.1529(c)(3) and 416.929(c)(3) factors are included as " 'examples of alternative evidence that may be useful [to the credibility inquiry], and not as a rigid, seven-step prerequisite to the ALJ's finding' ") (quoting *Snyder v. Barnhart,* 323 F.Supp.2d 542, 546 (S.D.N.Y.2004)). Here, the ALJ explicitly acknowledged consideration of the 20 C.F.R. §§ 404.1529(c) and 416.929(c) factors, (*see* Tr. at 13), and it is evident from his thorough discussion that his credibility determination was legally sound. *See Britt v. Astrue,* 486 F. App'x 161, 164 (2d Cir.2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility). Additionally, the ALJ's determination that Dombroski's subjective complaints were not credible to the extent that they suggested impairment greater than the ability to perform "less than a full range of light work ... limited to simple, routine, low-stress tasks with limited general public contact" is supported by substantial evidence. (Tr. at 13.)

### C. *Step Five Determination*

**\*5** Finally, Dombroski argues that, because the hypothetical question posed to the VE was incomplete,

the ALJ's determination at step five is not supported by substantial evidence. (*See* Dkt. No. 11 at 20–21.) Specifically, he alleges that the ALJ's errors in assessing his RFC and credibility, along with a failure to explicitly include in the hypothetical question the limitations articulated by examining psychiatrist Jeanne Shapiro fatally undermine the step-five determination. (*See id.*) As discussed above, however, the ALJ's RFC and credibility findings were legally sound and are supported by substantial evidence. Although the hypothetical question did not include a verbatim recitation of Dr. Shapiro's limitations, it appropriately encompassed the restrictions contained in the ALJ's RFC analysis. (*See* Tr. at 38– 47.) Furthermore, as noted previously, even though the ALJ did not explicitly discuss Dr. Langbart's March 2010 medical source statement, Dombroski's non-attorney representative added the marked limitations contained within that report to the hypothetical question posed to the VE. (*See id.* at 42–47.) Even considering those marked limitations, the ALJ found that a hypothetical claimant could perform the jobs noted by the ALJ at step five. (*See id.*) As such, the ALJ's step-five determination was free of legal error and is supported by substantial evidence.

### D. *Remaining Findings and Conclusions*

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

### VII. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Dombrowski's Complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 528456

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4931363
United States District Court,
S.D. New York.

William BALDWIN, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendants.

No. 07 Civ. 6958(RJH)(MHD).
|
Dec. 21, 2009.

West KeySummary

1    **Social Security**

👈 Mental and psychological conditions or
impairments

An ALJ's determination that a disability
insurance benefits claimant's non-exertional
limitations had little or no effect on his
ability to perform unskilled work was
not supported by substantial evidence.
The evidence indicated that the claimant
suffered from significant speech and language
difficulties as well as problems with anger,
frustration and concentration, and at least one
treating source opined that these limitations
prohibited the claimant from obtaining
employment. Social Security Act, § 205(g), 42
U.S.C.A. § 405(g).

56 Cases that cite this headnote

*ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** On October 22, 2009, Magistrate Judge Michael
H. Dolinger issued a Report and Recommendation
("Report") granting in part plaintiff's motion, denying
the Commissioner's motion, and remanding to the
Commissioner for further proceedings. To date, the Court
has neither received any objections to the Report nor

any other communication, such as a letter requesting an
extension of time in which to file objections, from the
Commissioner.

The district court adopts a Magistrate Judge's report and
recommendation when no clear error appears on the face
of the record. See Nelson v. Smith, 618 F.Supp. 1186,
1189 (S.D.N.Y.1985). However, the court is required to
make a de novo determination of those portions of a
report to which objection is made, 28 U.S.C. § 636(b)
(1)(C), by reviewing "the Report, the record, applicable
legal authorities, along with Plaintiff's and Defendant's
objections and replies." Badhan v. Lab. Corp. of Am.,
234 F.Supp.2d 313, 316 (S.D.N.Y.2002). The court may
then accept, reject, or modify in whole or in part
recommendations of the Magistrate Judge. See Nelson,
618 F.Supp. at 1189. If a party fails to object to a report
within 14 days of being served with the report, that
party waives their right to object and appellate review of
the district court's decision adopting the report, absent
unusual circumstances, is precluded. See United States v.
Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997).

The Court finds that no clear error appears on the face of
the record and hereby adopts the Report. The Clerk shall
close this case.

SO ORDERED.

*REPORT AND RECOMMENDATION*

MICHAEL H. DOLINGER, United States Magistrate
Judge.

**TO THE HONORABLE RICHARD J. HOLWELL,
U.S.D.J.:**
Plaintiff William Baldwin commenced this action
pursuant to the Social Security Act, 42 U.S.C. § 405(g).
He seeks review of a November 2006 decision by the
Commissioner of the Social Security Administration
(the "SSA"), denying his claims for disability insurance
benefits and Supplemental Security Income ("SSI") under
the Social Security Act ("the Act").

Both parties have moved, pursuant to Rule 12(c) of
the Federal Rules of Civil Procedure, for judgment
on the pleadings. Defendant seeks to dismiss the
complaint, contending that his denial of benefits to
Mr. Baldwin is supported by substantial evidence and

otherwise accords with legal requirements. Plaintiff seeks an order reversing the Commissioner's decision denying his 2004 [1] applications for disability benefits under the Act and remanding the case for further administrative proceedings.

[1]    We note that the relief requested in the complaint improperly dates the applications as being made in 2002.

For the reasons set forth below, we recommend that the case be remanded for further consideration and administrative proceedings, and that defendant's motion be denied.

### PROCEDURAL HISTORY

On July 22, 2004, Baldwin filed an application for Disabled Adult Child benefits under Title II of the Act on the account of his retired father. (Tr. 59–68.) [2] In his application, he stated that his disabilities consisted of speech and language impairments, an emotional disturbance, asthma, ADHD and allergies, beginning July 8, 2004. (Tr. 60). The SSA denied his application on October 20, 2004. (Tr. 45–47). On December 20, 2004, the plaintiff filed an application for SSI benefits under Title XVI of the Act on his own account (Tr. 188–90), and requested a hearing on both applications. (Tr. 48).

[2]    Baldwin had been receiving dependent benefits under Title II on the account of his father prior to turning age 18.

**\*2** On July 17, 2006, the plaintiff appeared with counsel [3] and participated in a hearing before Administrative Law Judge ("ALJ") David Z. Nisnewitz. (Tr. 191). On November 21, 2006, ALJ Nisnewitz issued a decision finding that plaintiff was not disabled and denying both of plaintiffs applications. (Tr. 20). Specifically, he found that despite plaintiff's non-exertional limitations compromising his ability to perform work at all exertional levels, plaintiff is capable of performing "at least unskilled work." [4] The ALJ referenced the Medical–Vocational Guidelines and concluded that a finding of "not disabled" was warranted. (Tr. 20).

[3]    Although the ALJ's opinion indicates that Baldwin appeared and testified without the assistance of an

attorney (Tr. 13), in fact Baldwin's counsel attended and participated in the hearing. (See Tr. 193.)

[4]    Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength." 20 C.F.R. § 404.1568(a).

Plaintiff appealed to the Appeals Council on December 28, 2006. (Tr. 9). The Appeals Council denied plaintiff's request for review of the ALJ's decision on June 1, 2007. (Tr. 4).

On August 2, 2007 plaintiff filed this lawsuit pursuant to 42 U.S .C § 405(g), seeking review of the SSA's decision. He specifically targets the ALJ's evaluation of his record and the failure of the ALJ to introduce evidence by a vocational expert or the equivalent to establish the existence of a substantial number of jobs that plaintiff can perform regardless of his non-exertional impairment. (Pl.'s Mem. 20–23.). Plaintiff seeks a reversal of the Commissioner's decision and a remand for further proceedings. (Id. at 24).

### FACTUAL BACKGROUND

I. *Non–Medical Evidence*

Plaintiff was born on August 20, 1986 (Tr. 188) and lives with his mother (Tr. 54, 78), Fay Christian, a reading teacher with the New York City Board of Education. (Tr. 193). Plaintiff's father is retired. While the plaintiff was a minor he received a derivative Social Security benefit from his father's Social Security Account. (Tr. 196, 201). The plaintiff graduated from the Winston Preparatory School, a private, special education school in Manhattan in June 2006. (Tr. 195). He entered college in September 2006 to study fashion-model and logo-design photography at the School of Visual Arts. (Tr. 194–95). Plaintiff has no past relevant work. (Tr. 60).

Plaintiff submitted several disability reports during the course of his application for SSI benefits that include information about his claimed conditions. (See Tr. 59, 69, 78, 92). In a report dated July 8, 2004 (Tr. 59–68), he claimed disability beginning as of the date of the report. (Tr. 60). He reported suffering from speech and language impairments, an emotional disturbance, asthma, attention deficit hyperactivity disorder (ADHD) and allergies. (Tr. 60). However, he reported that he does not suffer from

pain (Tr. 60) and that he does not take any medication. (Tr. 65). He also stated that he attends special education classes and that he has not completed any type of special job training, trade or vocational school. (Tr. 66). Finally, he can read and understand English (Tr. 59).

In a report dated August 16, 2004 (Tr. 78–86), he stated [5] that he has a speech disorder and expressive and receptive language delays. (Tr. 83). He is dyslexic and has ADHD. (Tr. 84). He also has difficulty in following instructions [6] and directions (Tr. 84), he cannot sit still and has compulsive behavior. (Tr. 83). He has behavioral problems and difficulty with authority. (Tr. 84). He does not respond well to change and he wants the same schedule, places, clothes and activities. (Tr. 85). He is not able to socialize well with his peers because he is self-conscious and embarrassed about his poor academic abilities and speech articulation. (Tr. 82). He is unable to express himself verbally and becomes frustrated when others do not understand him. (Tr. 83). He does not function well in social situations, and he often displays inappropriate language and behavior. (Tr. 85). He can be aggressive to his mother and also exhibits aggression when threatened or fearful of others. (Tr. 83). He is not independent or responsible for meeting his daily needs and he cannot perform daily tasks without supervision. (Tr. 85). He is unable to handle financial matters, including paying bills, handling a savings account or using a checkbook or money orders. (Tr. 82). He is awakened by his mother, has problems with personal care and must be reminded to take his medication. (Tr. 79, 80).

[5]     This report was completed by his mother, Fay Christian. (Tr. 78).

[6]     He reported that he cannot follow written instructions, and sometimes (but not constantly) can follow spoken instructions. (Tr. 84). He also has difficulty in following many or multiple directions. (Tr. 85).

**\*3** In a report dated December 19, 2004 (Tr. 92–98), he stated that he takes Prevacid (30 mg) for ulcers and Albuterol for asthma. (Tr. 95). He also reaffirmed that he has not completed any type of job training or trade or vocational school since he last completed a disability report. (Tr. 96).

In plaintiff's July 8 and December 19 reports he also stated that since January 2002 he has visited

Gildo Consolini, a psychotherapist, for treatment of his emotional problems. (Tr. 62, 93). [7] He also reported visiting Susin Gladstone, a language and speech therapist, since December 2001 for his speech problems, receiving directions and comprehension exercises as treatment. (*Id*.) [8]

[7]     Mr. Consolini's report indicates that he started treating Baldwin in January 2003 (Tr. 115). There is no indication of any attempt to resolve this discrepancy in the record.

[8]     Ms. Gladston's report indicates that she began treating Baldwin in September 2002. Again, there is no mention of this discrepancy in the record.

Finally, on May 13, 2004, the New York City Board of Education completed an Individualized Education Program ("IEP") for him. [9] (Tr. 159–71). The IEP noted that plaintiff had been diagnosed with attention deficit hyperactivity disorder and with a speech or language impairment. (Tr. 159).

[9]     Although the ALJ included the IEP in the list of "medical records," it does not qualify as medical evidence. *See* 20 C.F.R. § 913(d) (reports from educational personnel are an "other source[ ]" of information about an impairment, not a "medical source").

Regarding plaintiff's academic performance and learning characteristics, the IEP reported that plaintiff was administered the Wechsler abbreviated scale of intelligence on January 9, 2002 and obtained an IQ score that fell within the low-average range. (Tr. 161). Overall, plaintiff was expected to perform at a level that was somewhat lower than the performance of same-aged peers. (Tr. 161). Therefore, the IEP indicated that plaintiff's academic management needs could best be met in a small, structured class setting within a New York State approved non-public school program with the related services of counseling and speech/language therapy. (Tr. 161, 167, 168). According to the IEP, a 12–month school year was warranted. (Tr. 161).

As for plaintiff's social and emotional performance, the IEP reported that his behavior did not seriously interfere with instruction and could be addressed by a special education classroom teacher. (Tr. 162). It also suggested that plaintiff would benefit from strategies to help him

stay aware of his feelings and control his frustration before it becomes problematic. (*Id.*). Regarding plaintiff's health and physical development, the IEP reported that he continued to require assistive technology due to graphomotor [10] difficulties. (Tr. 163).

[10]  "Graphomotor" is defined as "pertaining to, or affecting, the movements required in writing". *Dorland's Illustrated Med. Dictionary* 717 (28th ed.1994).

The report then detailed Baldwin's annual goals and short-term objectives, which included identifying triggers that cause him to withdraw or act out and coming closer to meeting grade-level performance standards in reading, writing and math. (Tr. 164–66). It was noted that plaintiff could participate in all school activities, such as lunch, assemblies and trips. (Tr. 169). He should participate in a hands-on academic vocational program and he would benefit from participation in a community arts program. (Tr. 170). Finally, he should meet with appropriate school counselors to formulate a career plan (Tr. 170), and he should investigate services provided by the New York State Vocational and Educational Services for Individuals Program. (Tr. 171).

## II. *Medical Evidence*

### A. *Treating Sources*

#### 1. *Learning Specialist/Speech and Language Therapist*

**\*4**  Susin Gladstone, M.A., a Learning Specialist and Speech and Language Therapist, [11] reported that she began providing one-to-one learning therapy to plaintiff in September 2002, first twice-weekly for 45–minute sessions and since September 2003 once a week for 90–minute sessions. (Tr. 122). The record before the ALJ contained one speech/language questionnaire and two Progress Reports from Ms. Gladstone.

[11]  During Baldwin's hearing, the ALJ questioned whether Ms. Gladstone was licensed as a speech therapist by the State of New York. The plaintiff's mother said Ms. Gladstone told her that she was a licensed speech therapist, although both the plaintiff's attorney and the ALJ questioned why Ms. Gladstone's letterhead did not include this qualification. (Tr. 212–13; *see* Tr. 172). The ALJ then suggested that he was willing to assume that Ms. Gladstone was a state-licensed speech therapist. (Tr.

213). However, there is no indication in the record that the ALJ conducted further inquiry into Ms. Gladstone's qualifications. In his decision he referred to Ms. Gladstone merely as "a learning specialist/ speech and language therapist." (Tr. 18).

In her Progress Report dated May 5, 2005 (Tr. 172–73), Ms. Gladstone noted that the plaintiff had been diagnosed with a multiplicity of learning difficulties, which have resulted in significant delays in cognitive, perceptual, speech, language and social emotional areas. (Tr. 172). She also reported that although the plaintiff had demonstrated observable progress during the year preceding the report, [12] he continued to display severe delays in all areas of development. (Tr. 173). She opined that the growth that Baldwin was demonstrating resulted "from the efforts of highly specialized teachers, a great deal of one-on-one instruction, behavior modification, consistent speech and language therapy and other supports". (*Id.*). As she pointed out, though, even with the daily assistance of his organizational specialist, plaintiff continued to lose assignments. (*Id.*).

[12]  For example, the plaintiff took an interest in team sports, monitored his diet and lost a noticeable amount of weight, and developed some casual friendships. (Tr. 172).

According to the report, plaintiff learned best through his visual modality. (*Id.*). His auditory memory and processing skills were profoundly delayed, as was his discrimination. (*Id.*). His auditory acuity was reported to be within normal limits, but his auditory attention was poor. (*Id.*). Also, his receptive and expressive vocabulary skills were typical of a much younger student. (*Id.*). When asked simple "Wh questions," [13] plaintiff was not always able to provide appropriate answers, even to those questions that pertained to his personal fund of information. (Tr. 173). Plaintiff was also challenged by single-step instructions, and his expressive language skills remained weak, although when working one-on-one, plaintiff was always able to produce the correct sounds when reminded. (*Id.*) Baldwin's written language skills were very poor. (*Id.*).

[13]  Questions asking "who, what, where, when, why." (Tr. 123).

The learning specialist summarized her diagnosis by noting that overall the plaintiff presented as a student with significant difficulties in all areas. (*Id.*). In her

opinion, it was essential that he continue his education in a highly-specialized setting, at all times structured, with individualized attention available throughout the day. (*Id.*). In addition, she stated that plaintiff needed the related services that were in place for him at that time, and she strongly suggested that realistic vocational goals should be set for him. (*Id.*)

Ms. Gladstone also completed a speech/language questionnaire, dated August 16, 2004, in which she opined that approximately 95% of plaintiff's speech was intelligible to unfamiliar listeners. (Tr. 120). Plaintiff was mostly able to comprehend 1–step directions, and could comprehend some 2–step directions, but could not comprehend any 3–step directions. (*Id.*). According to her diagnosis, plaintiff had "significant receptive and expressive language disabilities, in his case, not related to his speech production, but rather the content of his utterances." (*Id.*). Finally, she suggested that plaintiff needed to have frequent reinforcement even in a one-to-one setting. (Tr. 121).

**\*5** In her August 16 questionnaire, Ms. Gladstone frequently referred to another Progress Report, dated May 12, 2004. In that report, Ms. Gladstone concluded that although plaintiff had matured in many ways, he remained an individual with significant challenges. (Tr. 122). His expressive and receptive language skills were markedly below age-level, related to deficits in auditory memory and processing. (*Id.*). In her opinion, plaintiff's most profound deficits were language-related. (Tr. 123). Baldwin was also found to have difficulty understanding spoken and written directions, and although his speech was intelligible, he had to be reminded to lift his head, raise his voice and open his mouth when speaking. (*Id.*). His written language skills also appeared to be extremely limited. (*Id.*). Not only did he struggle with reading comprehension, but serious deficits in his comprehension remained when he listened to material read aloud to him, even when tasks were highly concrete. (*Id.*). In addition, his functioning and his abstract verbal reasoning skills were reported to be characteristic of a much younger student. (Tr. 122–23). Thus, Ms. Gladstone reported:

> At the age of 17.8 years, William cannot list even five of the United States. He becomes confused and names cities and towns. He does not know the states that border New York. His fund of

personal information is limited. He has difficulty with all serial language tasks, including listing the months of the year, quickly and in order. He cannot determine, for example, which number comes before 53 without taking time to work through the question. When presented with simple WH questions (who, what, where, when, why) William frequently offers tangential or unrelated responses.

(Tr. 122–23). On the other hand, the learning specialist also referred to the fact that plaintiff was a talented artist and a visual learner with an intense interest in films and comic books. (Tr. 122).

Ms. Gladstone also stated that plaintiff was self-conscious about his limitations and that he would often appear to be indifferent about his work. (Tr. 123). More likely, she opined, he was embarrassed and fearful of failure, but generally would work cooperatively when motivated. (*Id.*). The learning specialist stressed how essential it was for him to be in a highly structured learning environment, where he could receive individualized attention in small groups of other teenagers with similar dysfunctions. (*Id.*). She recommended that plaintiff be placed in a highly structured, self-contained learning environment and that he undergo vocational counseling, which she deemed to be essential for providing realistic goals. (Tr. 123–24).

### 2. Psychotherapist

Plaintiff also received treatment from a psychotherapist, Gildo Consolini, MSW, CWS, who reported treating plaintiff on a weekly basis from January through October 2003 and on a twice-weekly basis from November 2003 to August 2004. (Tr. 115). In addition to his individual sessions with the plaintiff, he also saw the plaintiff's mother approximately once a month for counseling sessions. (*Id.*).

**\*6** In a report dated May 5, 2003, Mr. Consolini pointed out that deficits in plaintiff's ability to use language hampered him considerably, noting that his angry, disruptive outbursts have had much to do with his difficulties in verbalization. (Tr. 117). He opined that individual treatment was preferable to group treatment at that point. (Tr. 118). He also determined that

Baldwin required individualized attention for his issues of separation and individuation. (*Id.*).

In a report dated August 10, 2004 Mr. Consolini reported that although plaintiff had made steady progress in his academic and personal adjustment, he remained unable to support himself, complete high school or gain employment due to his psychological problems. (Tr. 115). The psychotherapist also stated that despite the fact that plaintiff's ability to adjust to academic and social settings and situations had improved, he still required intensive psychotherapeutic treatment because of his difficult-to-control anger, his limited frustration tolerance and his concentration problems. (*Id.*). Finally, Mr. Consolini stated his expectation that plaintiff would manage to complete his high school education, if placed within a smaller academic environment geared toward providing him with an individualized learning experience and with additional psychotherapeutic support. (Tr. 115–16). In his view, Baldwin would even be able to become gainfully employed upon completion of his education and would eventually be able to support himself. (Tr. 116). [14]

[14]    Mr. Consolini also completed a Statement of Patient's Capability to manage benefits on July 8, 2004, in which he generally reported the same observations. (Tr. 113–14). Among other things, he stressed that plaintiff was dependent on his mother and was unable to provide for himself or manage his finances and other personal matters. (Tr. 114).

### B. *Examining Sources*

#### 1. *Lindamood–Bell Test Results*
Baldwin completed several tests on June 29, 2006 which revealed continued delays in all areas of academic function. The results reflected a mental age of 9 years old on the test of "Verbal Absurdities", a score in the first percentile and reflecting an age equivalent of 11.4 on the "Test of Problem Solving–Adolescent", a fifth-grade reading level on the Woodcock Mastery Test, a 4.9 grade-level score on the Slosson Oral Reading Test, a fourth-grade score on spelling, and a sixth-grade score on arithmetic. (Tr. 174–75). Additionally, plaintiff could read at 100% only on a third-grade level. (Tr. 175). On tests of oral reading, plaintiff scored in the second percentile on reading rate, accuracy and comprehension. (*Id.*). He scored below the first percentile in fluency. (*Id.*).

#### 2. *Program Director, Center for Attention & Learning Disorders*
Michele Shackelford, Ph.D, the program director at the Center for Attention and Learning Disorders, examined plaintiff on January 12 and January 17, 2006. The resulting Neuropsychological Evaluation concluded that plaintiff presented with a language-based learning disability and was found to meet the criteria for a Mixed Receptive–Expressive Language Disorder, a Reading Disorder and a Disorder of Written Expression. (Tr. 183). Dr. Shackelford noted that Baldwin was a young man of at least average intelligence, who presented with cognitive weaknesses in language skills and working memory. (*Id.*) Plaintiff's nonverbal cognitive skills were good (Tr. 180), but academically he continued to struggle with reading and writing (Tr. 182), due to his language-based learning disability. (Tr. 183).

**\*7** In terms of plaintiff's test results, he scored a Full Scale IQ of 89 (23rd percentile) on the Wechsler Adult Intelligence Scale–Third Edition. According to Dr. Shackelford, this result was not a valid indication of his general intellectual abilities, which were in the average to high-average range. (Tr. 179). On the other hand. Dr. Shackelford considered plaintiff's Verbal IQ of 83 (13th percentile) to be reflective of the language difficulties that he had experienced since kindergarten. (*Id.*). Dr. Shackelford found plaintiff's memory for visual information to be overall stronger than his memory for verbally presented material. (Tr. 181). However, his verbal memory abilities improved when the material was presented in a meaningful context. (*Id.*).

Plaintiff's performance on a task of reading comprehension (Nelson–Denny) was found to be in the very low range. (Tr. 182). Dr. Shackelford also reported that plaintiff had a very hard time comprehending what he was reading, even when given extra time. (*Id.*). In addition, plaintiff had great difficulty completing a longer writing activity, as he made many spelling and grammatical errors that made his writing unclear and difficult to understand. (*Id.*). It was also difficult for him to expand on his ideas and express himself adequately. (*Id.*). Plaintiff's math calculation skills were in the average range and therefore were reported as an academic area of strength. (*Id.*). However, his performance in math suffered when he was asked to work quickly. (Tr. 183).

Regarding plaintiff's personality and social-emotional functioning, he tried hard to integrate information and make sense of the world around him, although he was frequently unsuccessful. (*Id.*). Dr. Shackelford indicated that plaintiff's language problems made it difficult for him to communicate verbally and impeded his ability to relate appropriately to others. (*Id.*). On the other hand, the evaluation noted that his reality testing was intact, and that this was a great strength for plaintiff. (*Id.*). Finally, Dr. Shackelford stressed that plaintiff would require specific accommodations in his academic classes to enable him to learn the material and to demonstrate his knowledge. (Tr. 183–84). In her opinion, Baldwin had the ability to be successful in the field of visual arts, as long as he was not penalized too heavily for his learning disabilities. (Tr. 184).

### 3. Speech and Language Pathologist

Dr. Mindy Singer, a New York State licensed speech and language pathologist, conducted a consultive examination of Baldwin upon referral from the New York State Office of Temporary and Disability Assistance. In her Speech and Language Evaluation Report dated September 28, 2004, Dr. Singer noted that Baldwin demonstrated excellent attention span and was cooperative and focused throughout the testing. (Tr. 128). Plaintiff presented adequate skills in the use of language to communicate and interact with those around him, such as asking for help and responding to requests. (Tr. 129). The report also mentioned that plaintiff established eye contact but did not readily maintain it. (*Id.*). Plaintiff made no errors on the Goldman–Fristoe 2 Test of Articulation, which was administered to assess articulation skills at the word level. (*Id.*). Plaintiff's intelligibility was also judged to be good. (*Id.*).

**\*8** Ultimately, Dr. Singer diagnosed Baldwin with a moderate receptive and severe expressive language delay and recommended speech and language services. (Tr. 130). She based her conclusion on test results showing that the plaintiff scored in a single-digit or decimal percentile in all but one category of the Clinical Evaluation of Language Fundamentals (CELF–4) exam. (Tr. 128–29). Dr. Singer pointed out that the results obtained at that time appeared to be significant and as such were consistent with the plaintiff's allegations. (Tr. 130).

### 4. Psychiatrist

Dr. Joshua Algaze, a psychiatrist, examined the plaintiff at the request of the SSA on August 24, 2004. In his psychiatric evaluation, Dr. Algaze diagnosed the plaintiff with an adjustment reaction to illness with depression and anxiety, a speech developmental disorder, and a personality disorder, and he recommended ruling out borderline mental retardation. (Tr. 126). In addition, Dr. Algaze strongly recommended that the plaintiff undergo psychiatric treatment, vocational rehabilitation and psychological testing. (*Id.*). Furthermore, he opined that plaintiff would not be able to manage his own funds. (*Id.*).

Based on plaintiff's mental status examination, Dr. Algaze found him to be somewhat shy, though he exhibited normal psychomotor activity. (Tr. 125). He also appeared occasionally hesitant and unsure of his responses. (*Id.*). His speech was found halting, not spontaneous. (*Id.*). The report also mentioned that the plaintiff exhibited mild-to-moderate receptive and expressive language skill deficits. (*Id.*). His thinking was concrete but logical, although his thought content centered mainly around his feeling of embarrassment and shame over his cognitive and speech deficits. (*Id.*). His intelligence level was reported as low-average. (Tr. 126). In terms of plaintiff's attention and concentration, when he was asked to do serial of three he repeated the question once or twice before he was able to understand the task. (*Id.*). In a test of plaintiff's memory, he was able to recall three-out-of-three objects after five minutes. (*Id.*). Furthermore, his fund of knowledge was reported as average, his mood occasionally angry and depressed and his insight and judgment fair. (*Id.*). Finally, plaintiff did not appear able to engage in age-appropriate social activities. (*Id.*).

### 5. School Psychologists

#### a. Felicia Polikoff

Felicia Polikoff, M.S., a school psychologist, conducted a psycho-educational evaluation of Baldwin on April 7, 2004 to determine the most appropriate academic and social/emotional interventions for him. Ms. Polikoff reported that the plaintiff was polite, cooperative and respectful throughout the evaluation process. (Tr. 110). He spoke in a generally clear fashion and was easily understood by the examiner. (*Id.*). On the Wechsler Individual Achievement Test–II, plaintiff performed equally well on tasks that required him to correctly read a series of printed words, and on tasks that required him

to read sentences and paragraphs and answer questions about what he had read. (Tr. 112). In overall reading skills, plaintiff performed well below the average range. (*Id.*). On the other hand, in the area of mathematics the plaintiff performed in the average range, and his skills exceeded those of approximately 19 percent of individuals his age. (*Id.*). Finally, on tasks that required him to compose an organized, persuasive essay on a named topic, plaintiff was reported to perform well below the average range. (*Id.*).

**\*9** Ms. Polikoff opined that overall, based on the results, plaintiff could be expected to perform at a level somewhat lower than his same-aged peers. (*Id.*). She also noted that although the plaintiff seemed to have a better view of himself and others as compared to previous assessments, he might not always be able to respond in appropriate ways, especially when faced with academic demands that he could not meet. (*Id.*). Finally, she suggested that Baldwin would benefit from strategies that would help him stay aware of his feelings and control his frustration before it became problematic. (*Id.*).

### b. Dr. Dewey Aleem

Dr. Dewey Aleem, Ph.D., NCSP, a school psychologist, evaluated the plaintiff on February 12, 2003. He had previously examined the plaintiff on January 9, 2002. Dr. Aleem stated in his psychological report that Baldwin was cooperative and responsive, established intermittent eye contact and tried to meet the demands of the test situation. (Tr. 106). In addition, the plaintiff provided accurate biographical information. (*Id.*).

According to Dr. Aleem, the plaintiff "continued to impress as an insecure, uneasy adolescent with faulty ego processes and related difficulty with coping with heightened levels of anxiety and frustration, and his feelings of being overwhelmed and ineffective attempts to manage such feelings." (Tr. 108). He was also reported to have difficulties with "concentration and attention, low self-esteem and low self-confidence, anxiety in unfamiliar situations and atypical worries and fears. There was also a tendency to act out." (*Id.*). Finally, Dr. Aleem opined that the plaintiff "would benefit from a structured, supervised, therapeutic educational environment with remediation and counseling services. He would also benefit from a speech and language evaluation and/or progress report." (*Id.*).

### C. Consulting Sources

#### 1. State Medical Consultant

Dr. E. Charles, M.D., a state agency medical consultant, examined plaintiff's claim file and completed a mental Residual Functional Capacity ("RFC") Assessment [15] dated October 12, 2004. The assessment form instructed that each of Baldwin's mental activities was to be evaluated within the context of his capacity to sustain that activity over a normal workday and workweek on an ongoing basis. (Tr. 131). Dr. Charles could assign one of five categories to each skill, depending on the degree of the plaintiff's limitation: 1) Not significantly limited, 2) Moderately limited, 3) Markedly limited, 4) No evidence of limitation and 5) Not ratable on available evidence. Dr. Charles indicated that the plaintiff was "moderately limited" in twelve areas: 1) "the ability to understand and remember detailed instructions", 2) "the ability to carry out detailed instructions", 3) "the ability to maintain attention and concentration for extended periods", 4) "the ability to sustain an ordinary routine without special supervision", 5) "the ability to work in coordination with or proximity to others without being distracted by them", 6) "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods", 7) "the ability to interact appropriately with the general public, 8) the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes", 9) "the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness", 10) "the ability to respond appropriately to changes in the work setting", 11) "the ability to travel in unfamiliar places or use public transportation", and 12) "the ability to set realistic goals or make plans independently of others". (Tr. 131–32). However, despite the fact that plaintiff was found moderately limited in all of these areas, Dr. Charles concluded that plaintiff's limitations were not significantly impeding his mental abilities for substantial gainful activity. (Tr. 133).

[15]    A claimant's RFC refers to his maximum remaining ability, despite his limitations, to do sustained work activities in an ordinary work setting on a regular and continuing basis. The RFC assessment must include a discussion of the individual's abilities on that basis. *Schultz v. Astrue,* 2008 WL 728925, at \*6

(N.D.N.Y. Mar.18, 2008) (quoting *Melville v. Apfel,*
*198 F.3d 45, 52 (2d Cir.1999)*). If a claimant has more
than one impairment, all medically determinable
impairments must be considered, including those that
are not "severe." The assessment must be based
on all relevant medical and non-medical evidence,
such as physical abilities, mental abilities, and
symptomology, including pain and other limitations
that could interfere with work activities on a regular
and continuing basis. 20 C.F.R. §§ 404.1545(a)(1)-(3),
416 .945(a)(1)-(3).

**\*10** Dr. Charles also reviewed the evidence in the record
and completed a psychiatric review technique form dated
October 14, 2004. He found that the plaintiff met the
diagnostic criteria for affective disorders and personality
disorders. (Tr. 136). Specifically, he noted that the plaintiff
had an adjustment disorder with depression and anxiety
(Tr. 139), a personality disorder, moderately severe speech
and language delays (Tr. 143), and moderate difficulties
in maintaining social functioning (Tr. 146). In addition,
the review reported one or two episodes of deterioration,
each of extended duration. (*Id.*). Notwithstanding these
findings, Dr. Charles reported that the evidence did not
establish the presence of "C" criteria, which among other
factors would reflect a chronic affective disorder "of
at least two years' duration that has caused more than
a minimal limitation of ability to do any basic work
activity." (Tr. 147).

### 2. Speech and Language Medical Consultant

On October 8, 2004 the state disability analyst tasked
with reviewing Baldwin's claim for benefits sent an
electronic request for medical advice to a speech and
language medical consultant, identified in the record
only as "Liddie". (Tr. 150). The consultant was asked
to determine whether Baldwin's speech and language
impairment met or equaled the Listings [16], and if not, to
forward the case to a psychological medical consultant for
evaluation. (*Id.*).

[16]     "The Listings" refer to a list of impairments in
         20 C.F.R. Part 404, Subpart P, Appendix 1. "The
         third inquiry [in the disability analysis] is whether,
         based solely on medical evidence, the claimant
         has an impairment which is listed in Appendix 1
         of the regulations. If the claimant has such an
         impairment, the [Commissioner] will consider him
         disabled without considering vocational factors such
         as age, education, and work experience." *Rosa v.*

*Callahan,* 168 F.3d 72, 77 (2d Cir.1999). If claimant
does not have a listed impairment, the Commissioner
will move to the fourth step of the mandated five-step
analysis to determine disability. *Id.*

The consultant provided an evaluation on October 13,
2004. (*Id* .). After reviewing the plaintiff's September
2004 speech and language scores on the CELF–
4, the consultant reported that the plaintiff had
moderate deficits in comprehension and severely impaired
expressive language skills. (*Id.*). The consultant also
referred to informal reports indicating that Baldwin had
poor vocabulary and grammar skills and also deficits
in his ability to process auditory information. (*Id.*).
However, the consultant noted that the plaintiff was
reported to communicate functionally in social contexts
despite the deficits. (*Id.*). The consultant also found
that plaintiff was able to express himself using complete
sentences, provide biographical information, describe
his experiences, request information and clarifications,
engage in conversation and tell jokes. (*Id.*). He was also
reported to have adequate pragmatic language skills. (*Id.*).
In addition, his articulation skills were within normal
limits and his speech was 95% intelligible. (*Id.*). Based on
these findings, the non-examining consultant concluded
that plaintiff's communication impairment did not meet/
equal listing 2.09. [17] (*Id.*).

[17]     Listing 2.09 refers to "[l]oss of speech due to any
         cause, with inability to produce by any means speech
         that can be heard, understood or sustained". 20 CFR
         Pt. 404, Subpt. P, App. 1.

### 3. State Disability Analyst

On October 14, 2004, Mr. Weinstein, the state disability
analyst [18] reviewing plaintiff's claim, analyzed the medical
evidence on file and completed a physical Residual
Functional Capacity (RFC) Assessment. [19] He diagnosed
the plaintiff as suffering from asthma and allergies. (Tr.
151, 155). He reported, however, that plaintiff had no
exertional (Tr. 152), postural (Tr. 153), manipulative (Tr.
154), visual (Tr. 154) or communicative limitations (Tr.
155).

[18]     The ALJ's decision referred to Mr. Weinstein as
         a "State agency vocational specialist," (Tr. 17)
         although there is no indication in the record that
         Mr. Weinstein possessed vocational expertise. Mr.

Weinstein listed his title as "Disability Analyst II." (Tr. 135).

19    The first page of the physical RFC improperly indicates that it was completed on October 17, 2004. (Tr. 151). However, since Mr. Weinstein's October 14 report of contact form references the completed physical RFC (Tr. 135), the better reading of the somewhat ambiguous handwritten date on the physical RFC is October 14. (Tr. 158). The October 14 report of contact is unlikely to have referenced a document that was not completed until October 17.

**\*11** Also on October 14, Mr. Weinstein completed a report of contact form that analyzed Baldwin's claim for benefits, including a discussion of his physical and psychiatric RFCs. He found that the plaintiff's physical RFC showed that he had no exertional limitations. (Tr. 135). Baldwin's psychiatric RFC was limited to understanding, remembering and carrying out simple instructions. (*Id.*). Plaintiff's concentration was classified as adequate. (*Id.*). The disability analyst concluded that since the plaintiff had no past relevant work, he could perform the following jobs, which he characterized as simple and low-stress: "Odd piece checker (Knitting), Bunch trimmer, mold (Tobacco), Wood inspector (Paper and Pulp)." (*Id.*). Therefore, Mr. Weinstein reported that plaintiff's claim for benefits had been denied. (*Id.*).

### III. *The Hearing Before the ALJ*

#### A. *Plaintiff's Testimony*

Plaintiff testified that he has a high school diploma from Winston Preparatory High School. (Tr. 195). He reported that he was in special education at school because he has a language and speech disability (*Id.*). He also testified that he studies fashion-model and logo-design photography as a freshman in the School of Visual Arts. (Tr. 194, 195). He has a camera and knows how to use a digital one. (Tr. 199). He also has a computer and knows how to print out photos on it. (*Id.*). He can also follow steps to download and manipulate photos from his digital camera using his computer. (Tr. 223, 224). He knows how to read and write. (Tr. 196). He is an avid collector of comic books and likes reading them. (*Id.*). He can also follow instructions on cookbooks because they are simple and go straight to the point. (Tr. 224, 225). However, he is not good at reading novels and "complicated stuff". (Tr. 224). He testified that he could not understand some words and that sometimes he got a headache trying to understand the real meaning of some words. (Tr. 222). He likes playing golf and softball.

(Tr. 197). Finally, he testified that he could count his money and that he could tell when people were gypping him. (Tr. 223).

#### B. *Testimony by Plaintiff's Mother*

Baldwin's mother testified at the hearing that her son suffers from speech and language delay. (Tr. 198). In her opinion the receptive delay was more severe, as he has more difficulty understanding what he is told than in expressing himself. (*Id.*). She also pointed out that plaintiff's chronological age does not match his mental age. (*Id.*). In addition, according to his mother, Baldwin was very easily frustrated (Tr. 229), has great difficulty focusing (Tr. 222) and cannot manage aspects of daily living, such as managing money and taking care of bills. (Tr. 219). When asked by the ALJ if she thought that the plaintiff could perform simple, repetitive jobs, she agreed that her son could sit in a room Xeroxing. (Tr. 221). However, she testified that her goal was to find something where plaintiff would learn skills and would be able to take care of himself, as her money was being used to try to improve her son's condition. (Tr. 221–22). Finally, she stated that her son needed counseling, but she could not provide it. (Tr. 228).

#### C. *Testimony by Non–Examining Consultant*

**\*12** At the hearing, the ALJ called a medical consultant to testify about his impression of plaintiff's status. Dr. Allan Rothenberg, a pediatrics specialist, testified based on his review of the record and observation of the testimony at the hearing. (Tr. 201, 209). Dr. Rothenberg has no formal training in speech and language pathology, although he treats children with speech and language problems and is a consultant to an early-intervention program. (Tr. 209).

When asked by the ALJ whether Baldwin met or equaled a listing in the SSA regulations, Dr. Rothenberg testified that, prior to age 18, he would have met a listing.[20] (Tr. 202). However, in his opinion Baldwin's condition did not meet or equal the requirements of any listing that applies to persons over age 18. (Tr. 203).

20    Specifically, he would have met listing 112.11, which defines standards for Attention Deficit Hyperactivity Disorder. Dr. Rothenberg concluded that Baldwin exhibited all three of the symptoms listed in 112.11(A) as well as 112.02(B)(2)(a) (marked

impairment in age-appropriate cognitive functioning) and 112.02(B) (2)(d) (marked difficulties with concentration, persistence and pace), thus satisfying the requirement of 112.11(B). (Tr. 202).

To substantiate his opinion, Dr. Rothenberg cited a number of documents in the record. He first referred to the October 14, 2004 Psychiatric Review Technique Form completed by Dr. E. Charles. (*Id.*). He noted that Dr. Charles had characterized the plaintiff's functioning as "mildly limiting, moderately limiting, not markedly or extremely limiting". (Tr. 203). From that, Dr. Rothenberg drew the conclusion that the psychiatrist thinks that plaintiff can work. (*Id.*). He also noted that on page 15 of Dr. Charles' form, he cited the opinion of a speech and language therapist that the plaintiff had adequate pragmatic skills. (*Id.*). [21] Dr. Rothenberg noted that the plaintiff's participation at the hearing also indicated that he was able to converse. (*Id.*).

[21]    The fifteenth page of Dr. Charles' report is actually the report of the speech and language medical consultant referred to in the record only as "Liddie." (Tr. 150).

He then referred to the report of Mr. Weinstein, whom he identified as a vocational expert, despite the fact that his title is "Disability Analyst II" and the record does not contain evidence of any vocational expertise. [22] Dr. Rothenberg stated that in Mr. Weinstein's opinion the plaintiff could "hold a job." (*Id.*)

[22]    Mr. Weinstein's role is discussed *supra* pp. 30–31.

Dr. Rothenberg also cited the October 12, 2004 Mental Residual Functional Capacity Assessment completed by Dr. Charles. He pointed out that Dr. Charles' responses indicated that plaintiff suffers from mild to moderate or moderate limitations. (*Id.*).

As for Dr. Algaze's August 24, 2004 psychiatric evaluation of the plaintiff, [23] Dr. Rothenberg repeated the diagnosis that plaintiff suffers from adjustment reaction to illness with depression and anxiety, and a mental and personality disorder. Dr. Rothenberg expressed surprise that Dr. Algaze recommended ruling out borderline mental retardation, since, according to Dr. Rothenberg, no one who talked with the plaintiff for a few minutes could think that he was borderline mentally retarded. (Tr. 205–06).

[23]    Dr. Rothenberg referred to this report as being part of Exhibit 13F, but in the record the Commissioner provided to the court it appears as Exhibit 6F. (Tr. 125–26).

Dr. Rothenberg then addressed Susin Gladstone's May 5, 2005 progress report, stating—inaccurately—that it reported that plaintiff had demonstrated "excellent improvement" [24] in the past year due to the "efforts of highly-specialized teachers, a great deal of one-on-one instruction and behavior modification". (Tr. 206). He also referred to Ms. Gladstone's conclusion that plaintiff's auditory memory and processing skills were profoundly delayed. (*Id.*).

[24]    In fact, Ms. Gladstone's report did not characterize Baldwin's improvement as excellent. She described his advances in the past year as the "most observable progress" he had made compared to prior years, and then qualified the observation by noting that he "continues to display severe delays in all areas of development" and suffers from "marked attention deficits". (Tr. 172–73).

**\*13** Dr. Rothenberg also cited Michele Shackelford's January 2006 neuropsychological evaluation. (*Id.*). He testified that it was interesting that on a test that evaluated verbal and language-based skills and abilities, plaintiff scored in the 37th percentile in the subcategory of comprehension, which Dr. Rothenberg classified as "not so bad." (*Id.*). He also cited Dr. Shackelford's findings that Baldwin had low-average to average scores on various measures of reading ability, not significantly below-average scores. (*Id.*)

Plaintiff's counsel then questioned Dr. Rothenberg. He first directed Dr. Rothenberg's attention to the fact that plaintiff's core language score was below the first tenth of a percentile on Ms. Singer's September 28, 2004 Speech and Language Evaluation Report. (Tr. 207–08). Although Dr. Rothenberg admitted that a score below the first tenth of a percentile is an extraordinary low score on any standardized test, he testified that while he did not see the plaintiff in 2004, the test results were unrepresentative of the plaintiff's performance at the hearing. (Tr. 208–09).

Plaintiff's counsel also asked Dr. Rothenberg what happens to children who meet the listing for attention deficit hypertensive disorder (ADHD) as a child when they reach age 18. (Tr. 209–10). Dr. Rothenberg said that the results vary as "[s]ome [children] do extremely well,

some do well and some don't do so well as they go into young adulthood". (Tr. 210). He then testified that most of the patients sublimate, which appeared to be true of the plaintiff, since his learning disabilities would be minimized in the area of photography. (Tr. 211). When the ALJ interjected to ask whether the plaintiff is capable of doing any kind of work, including simple, repetitive tasks, Dr. Rothenberg stated that the plaintiff can perform work. (*Id.*).

Plaintiff's counsel next directed Dr. Rothenberg's attention to Susin Gladstone's May 12, 2004 progress report. (Tr. 211). The ALJ interrupted at that point to inquire as to Ms. Gladstone's qualifications, and suggested that the report was "a little antiquated" because the examination had been performed in May 2004. (Tr. 212–13). He also read aloud Ms. Gladstone's findings that Baldwin had significant receptive and expressive language disabilities related to the content of his speech and that 95% of his speech is intelligible to unfamiliar listeners. The ALJ opined that that was a "very high percentage." (Tr. 213–14).

Baldwin's attorney proceeded to direct attention to the section of Ms. Gladstone's report stating that Baldwin was unable to name more than five states and confused places and names. (Tr. 214). At this point the ALJ intervened again to state that he himself did not know the states that border Oklahoma and that he did not know that he could name the states that border New York. (Tr. 215). Dr. Rothenberg then replied, without any evident justification, that he thought that Baldwin "knows the number," apparently referring to Baldwin's ability to name the states bordering New York. (*Id.*). The ALJ then noted that his impression from listening to the plaintiff was that—at least in terms of visual arts—he was capable of doing more than Xeroxing papers in an office. (Tr. 215–16).

**\*14** Finally, the ALJ questioned whether the plaintiff could take care of himself, and Dr. Rothenberg replied that, according tot he record, the plaintiff could do so. (Tr. 218).

### D. *The ALJ's Decision*

In a written decision on November 21, 2006, ALJ Nisnewitz declared Baldwin ineligible for SSI benefits based on his finding that Baldwin did not have a disability within the meaning of the Social Security Act. In his

decision, the ALJ applied the five-step evaluation process required under 20 C.F.R. §§ 404.1520(a) and 416.920(a). (*See* Tr. 14–15). He first found that plaintiff had not engaged in substantial gainful activity since July 8, 2004, the alleged onset date of his disability. (Tr. 15). He next found that the plaintiff suffered from two severe impairments as defined in 20 CFR §§ 404.1520(c) and 416.920(c): an adjustment disorder with depression and anxiety and a history of speech developmental disorder, although neither met or medically equaled the criteria for *per se* disabling conditions as listed in Appendix 1, subpart P. (Tr. 15–16). [25] As for the impact of these conditions, the ALJ found that the plaintiff had no physical limitations and had a mental residual functional capacity to perform at least simple, routine, repetitive unskilled work activity with normal supervision. (Tr. 16).

[25]   If a claimant has a "listed" impairment, he will be considered disabled *per se* without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider whether the plaintiff still has the capacity to perform work. *See, e.g., Bush v. Shalala,* 94 F.3d 40, 45 (2d Cir.1996)

The ALJ clarified that plaintiff had no past relevant work, as defined in 20 C.F.R. §§ 404.1565 and 416.965, since he has been a student and just graduated from high school in June 2006. (Tr. 19). [26] The ALJ also determined that since the plaintiff was 18 years old on the alleged disability onset date, he was defined as a "younger individual age 18–44" under 20 C.F.R. §§ 404.1563, 416.963. (*Id.*). The ALJ also found that plaintiff had at least a high-school education and was able to communicate in English, as discussed in 20 C.F.R. §§ 404.1564 and 416.964. (*Id.*).

[26]   He further found that transferability of skills was not an issue in this case under 20 C.F.R. §§ 404.1568 and 416.968, as plaintiff did not have any past relevant work. (*Id.*).

As for alternative work, the ALJ found that although Baldwin's ability to perform work at all exertional levels has been compromised by non-exertional limitations, these limitations had little or no effect on the occupational base of unskilled work at all exertional levels. (Tr. 20). According to the ALJ, a finding of "not disabled" was appropriate under the framework of section 204.00 of the Medical–Vocational Guidelines. [27] (*Id.*). Therefore,

considering plaintiff's age, education, work experience and residual functional capacity, the ALJ concluded that a significant number of jobs existed in the national and local economies that Baldwin could perform. (Tr. 19). This led to the ALJ's conclusion that the plaintiff was not under a "disability" as defined by the Act at any time through the date of the decision. (Tr. 20).

27  The Medical–Vocational Guidelines, commonly referred to as "the Grids," take into account the claimant's residual functional capacity in conjunction with his age, education and work experience. Based on these factors, the Grids indicate whether the claimant can engage in any other substantial gainful work that exists in the economy. *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y.1996).

In support of these conclusions, ALJ Nisnewitz first summarized the plaintiff's hearing testimony about his educational history, hobbies, and non-exertional limitations. (Tr. 16). He also referred to the testimony of Baldwin's mother about his limitations. (*Id.*). The ALJ also referred to his own observation at the hearing that he was able to hear and understand the plaintiff well. (*Id.*).

**\*15** He then discussed the plaintiff's medical evidence, focusing on those records cited by Dr. Rothenberg during his hearing testimony. (*See* Tr. 17–19). The ALJ stated that Dr. Rothenberg's testimony "is the opinion which is given significant weight" because the plaintiff "is indicated to have improved significantly since much of the evidence of record was recorded." (Tr. 19).

During the course of reviewing the plaintiff's medical records, the ALJ noted instances in which Dr. Rothenberg disagreed with evidence in the record. For instance, he pointed out that Dr. Rothenberg was of the opinion that the plaintiff's extraordinarily low score on the September 28, 2004 CELF–4 test administered by Ms. Singer did not represent the plaintiff's abilities as demonstrated at the hearing. (Tr. 18). The ALJ also noted Dr. Rothenberg's disagreement with Dr. Algaze's suggestion of ruling out borderline mental retardation as a possible diagnosis for the plaintiff. (*Id* .)

The ALJ concluded his review of the medical evidence by stating that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but ... the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible". (Tr. 18–19). He found that although Baldwin "has some mild to moderate limitations in activities of daily living, social functioning and concentration, persistence or pace", nevertheless "he is not precluded from sustaining at least simple, repetitive unskilled work under normal supervision and has no physical limitations". (Tr. 19). The ALJ stated that the plaintiff can certainly perform unskilled work and may have the ambition to perform skilled work (*id.*), a view he also attributed to Dr. Rothenberg. (Tr. 18).

### E. *The Appeals Council Decision*

Plaintiff sought review of the ALJ's decision by the Appeals Council. (Tr. 9) The Appeals Council denied plaintiff's request for review by notice dated June 1, 2007, making the ALJ'S decision the final one on plaintiff's application for benefits. (Tr. 4–6).

### IV. *The Parties' Motions*

Baldwin filed suit on August 2, 2007 challenging the Commissioner's decision as not supported by substantial evidence on the record and as being contrary to the law. The Commissioner responded by filing a motion for judgment on the pleadings, arguing that his determination that plaintiff was not disabled is supported by substantial evidence. (Def.'s Mem. 14–19). Specifically, the Commissioner relies on Dr. Rothenberg's testimony and the asserted failure of Baldwin's medical records to corroborate his alleged mental limitations. He argues that the record, including those portions supplied by the plaintiff's treating mental-health sources, supports the conclusion that plaintiff could perform simple, routine, repetitive unskilled work. In particular, the Commissioner states that Dr. Charles concluded that plaintiff had no significant limitations in understanding, remembering and carrying out simple instructions, performing activities within a schedule, making simple work-related decisions, responding appropriately to criticism from supervisors and getting along with co-workers and peers, and had moderate limitations only with respect to responding appropriately to changes in the work setting. (Def.'s Mem. 16).

**\*16** The Commissioner further discusses plaintiff's mental functioning, noting that Baldwin had scored in the average to high-average range on an IQ test, graduated from high school, begun college and was capable of taking and printing digital photos. (Def .'s Mem. 15).

The Commissioner also cites Ms. Gladstone's finding that plaintiff demonstrated normal articulation skills and that his speech was 95 percent intelligible (Def.'s Mem. 15), and Ms. Singer's assessment of the plaintiff's intelligibility as good. (Def.'s Mem. 16). The Commissioner also notes that the professionals who evaluated plaintiff opined that with proper vocational training, plaintiff could be gainfully employed, mentioning in particular the findings of Ms. Gladstone, Mr. Consolini and Dr. Shackelford. (Def.'s Mem. 16–17).

The Commissioner refers as well to the hearing testimony of plaintiff's mother that the plaintiff is capable of performing work which entails simple, repetitive tasks. (Def.'s Mem. 17). He also argues that plaintiff's testimony that he enjoyed taking pictures and printing them on his computer was another indication of his ability to perform at least simple, unskilled work. (*Id.*).

Plaintiff has also moved for judgment on the pleadings, seeking a remand of the matter for further administrative proceedings. In support of his motion, the plaintiff argues that the Commissioner failed to carry his burden at step five of the sequential evaluation by not introducing the testimony of a vocational expert in light of the fact that plaintiff's non-exertional limitations significantly limit his potential range of employment. (Pl.'s Mem. 20–23, citing *inter alia Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986)).

To establish the significance of his non-exertional limitations, Baldwin notes Dr. Rothenberg's conclusion that he would meet a listing if he were under age 18. He also refers to the findings of Ms. Gladstone, as well as to his extraordinary low scores on standardized speech and language testing. (Pl.'s Mem. 20–21). He further states that although Ms. Singer found him to have adequate pragmatic skills, she nonetheless determined that his expressive and receptive language skills scores were severely and moderately limited. (Pl.'s Mem. 21). To counter Dr. Rothenberg's disagreement with Ms. Singer's findings, the plaintiff points out that Dr. Rothenberg based his testimony only on his observation of the plaintiff at the hearing and that he has no background in speech and language pathology. (*Id.*). Plaintiff also disputes the suggestion that the intelligibility of his speech undermines the significance of his non-exertional limitations, noting that despite his speech being intelligible, he is still unable to express himself since "intelligibility measures the

quality of the sound of speech, not the actual content of what is being communicated". (Pl.'s Mem. 22). Finally, plaintiff concludes that the Commissioner could not sustain his step five burden by reference to the medical vocational rules where the plaintiff's psychiatric review form indicate that he suffers from "moderate" limitations in two of the four areas considered. (Pl.'s Mem. 23, citing *Zwick v. Apfel,* 1998 WL 426800, *7–9 (S.D.N.Y., July 27, 1998)).

**\*17** In his reply memorandum, the Commissioner reiterates that there was substantial evidence for the ALJ's conclusion that the plaintiff does not suffer from significant non-exertional limitations, making the ALJ's reference to the medical-vocational guidelines proper. He emphasizes that the ALJ, as the trier of fact, has the authority to weigh the evidence and that he was not obligated to read the evidence in the manner suggested by the plaintiff. (Def.'s Reply Mem. 3–6). The Commissioner also argues that whether the plaintiff would meet a listing for a childhood disability is irrelevant to determining whether the plaintiff suffers from a disability as an adult. (Def.'s Reply Mem. 6).

In Baldwin's reply memorandum, he reiterates that neither the ALJ, nor the consulting psychiatrist, nor the pediatrician who testified as a supposed medical expert at the hearing, possessed the training and knowledge required to diagnose, treat, or assess speech and language disorders. (Pl.'s Reply Mem. 2). The plaintiff further states that none of the above-mentioned sources were competent to displace the report of Ms. Singer, a speech and language pathologist, who diagnosed plaintiff with moderate receptive and severe expressive delays in September 2004. (*Id.*).

Plaintiff also argues that the Commissioner erred in relying on the predictions of some sources that he had the potential to be gainfully employed upon completion of vocational rehabilitation. Since that vocational rehabilitation has yet to be completed, plaintiff says, his future potential improvement does not undermine his status as a currently disabled individual. (Pl.'s Reply Mem. 3).

Plaintiff also targets the qualifications of Dr. Rothenberg, expressing incredulity at how he could function as both an independent medical expert and an agent of the SSA. He also notes once again that Dr. Rothenberg's experience as

a pediatrician did not make him an expert in any relevant field. (Pl.'s Reply Mem. 3–4).

Finally, according to the plaintiff, "even accepting the ALJ's constricted formulation of [Baldwin's] residual functional capacity, with acknowledged 'moderate' limitations in social functioning, it must nonetheless be found that the ALJ's own finding in turn necessarily requires a finding that [he] has 'significant' non-exertional limitations that would preclude the Commissioner's reliance on the medical vocational rules and require the testimony of a vocational expert". (Pl.'s Reply Mem. 4).

### DISCUSSION

I. *Standard of Review*

When a plaintiff challenges the SSA's denial of disability insurance benefits, the court must set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998) (citing *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences and conclusions of law to be drawn from the facts. *See, e.g., Carballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 214 (S.D.N.Y.1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight. *See, e.g., Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999); *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

**\*18** As implied by the substantial-evidence standard, it is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the plaintiff. *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983). While the ALJ need not resolve every conflict in the record, *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984); *accord Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's opinion).

Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand a challenge if the ALJ committed legal error. *Balsamo,* 142 F.3d at 79. Of particular importance, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ has an affirmative obligation to fully develop the administrative record. *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citing *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982)). The ALJ bears this duty even when the claimant is represented by counsel. *Id.* Toward this end, the ALJ must make every reasonable effort to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). More specifically, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine [plaintiff's] residual functional capacity." *Casino–Ortiz v. Astrue,* 2007 WL 2745704, *7 (S.D.N.Y. Sept.21, 2007) (citing 20 C.F.R. § 404.1513(e) (1)-(3)). Therefore, the ALJ must seek additional evidence or clarification when the "report from [plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). In short, if a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information to fill any clear gaps from the physician before dismissing the doctor's opinion. *See, e.g., Rosa,* 168 F.3d at 79 (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998) ("even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information ... *sua sponte.*" )).

In addition, the ALJ must adequately explain his analysis and reasoning in making the findings on which his

ultimate decision rests, and must address all pertinent evidence. *See, e.g., Ferraris,* 728 F.2d at 586–87; *Allen ex rel. Allen v. Barnhart,* 2006 WL 2255113, *10 (S.D.N.Y. Aug.4, 2006)* (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). " 'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.' " *Pacheco v. Barnhart,* 2004 WL 1345030, *4 (E.D.N.Y. June 14, 2004)* (quoting *Rivera v. Sullivan,* 771 F.Supp. 1339, 1354 (S.D.N.Y.1991)). Courts in this Circuit have long held that an ALJ's " 'failure to acknowledge relevant evidence or explain its implicit rejection is plain error.' " *Kulesza v. Barnhart,* 232 F.Supp.2d 44, 57 (W.D.N.Y.2002) (quoting *Pagan v. Chater,* 923 F.Supp. 547, 556 (S.D.N.Y.1996)).

**\*19** The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings, as expressly stated in sentence four of 42 U.S.C. § 405(g): "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Butts v. Barnhart,* 388 F.3d 377, 382 (2d Cir.2004). If " 'there are gaps in the administrative record or the ALJ has applied an improper legal standard,' " the court will remand the case for further development of the evidence or for more specific findings. *Rosa,* 168 F.3d at 82–83 (quoting *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996)). " '[W]hen further findings would so plainly help to assure the proper disposition of the claim, ... remand is particularly appropriate.' " *Butts,* 388 F.3d at 385 (quoting *Rosa,* 168 F.3d at 83). If, however, the record provides " 'persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' " the court may reverse and remand solely for the calculation and payment of benefits. *Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir.1999) (quoting *Arroyo v. Callahan,* 973 F.Supp. 397, 400 (S.D.N.Y.1997)); *see e.g., Carroll,* 705 F.2d at 644 (where "reversal based solely on the [Commissioner's] failure to sustain his burden of adducing evidence of [plaintiff's] capability of gainful employment and the [Commissioner's] finding that [plaintiff] can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by remanding the case for a rehearing[.]").

Therefore, if the ALJ failed in his duty to fully develop the record or committed other legal error, a reviewing court

> should reverse the Commissioner's decision and remand the appeal from the Commissioner's denial of benefits for further development of the evidence. If, on the other hand, the [reviewing] court determines there is substantial evidence of disability in the administrative record, it may decide to reverse the Commissioner's decision, make a determination of disability and remand solely for the calculation of benefits. Such a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose.

*Rivera v. Barnhart,* 379 F.Supp.2d 599, 604 (S.D.N.Y.2005).

## II. *Proof of Disability*

For purposes of Social Security disability insurance benefits, one is "disabled" within the meaning of the Act, and thus entitled to benefits, when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." [28] *Carroll,* 705 F.2d at 641–42 (quoting 42 U.S.C. § 423(d)(1)(A)). The Act additionally requires that the impairment be "of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Butts,* 388 F.3d at 383 (quoting 42 U.S.C. § 423(d)(2)(A)). Furthermore, if plaintiff can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that openings for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2) (A).

[28]    Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or

intended) for pay or profit." 20 C.F .R. §§ 404.1510, 416.910.

**\*20** In evaluating disability claims, the Commissioner is required to apply a five-step process set forth in 20 C.F.R. §§ 404.1520(a)(4) (i)-(v), 416.920(a)(4)(i)-(v). This Circuit has described this sequential process as follows:

> *First,* the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers from such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. *Finally,* if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform.

*Bush,* 94 F.3d at 44–45 (emphasis in original) (quoting *Rivera v. Schweiker,* 717 F.2d 719, 722–23 (2d Cir.1983)).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, and thus must demonstrate the existence of jobs in the economy that plaintiff can perform. *See, e.g., Rosa,* 168 F.3d at 77; *Bapp,* 802 F.2d at 604. Normally, in meeting his burden on this fifth step, the Commissioner can rely on the Medical–Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grids." [29] *Zorilla,* 915 F.Supp. at 667. However, if the plaintiff suffers from significant non-exertional limitations, [30] exclusive reliance on the Grids is inappropriate. *See Butts,* 388 F.3d at 383 (citing *Rosa,* 168 F.3d at 78); *Moulding v. Astrue,* 2009 WL 3241397, \*12 (S.D.N.Y. Oct.8, 2009) (citing *Bapp,* 802 F.2d at 605).

[29] The Grids take into account the claimant's residual functional capacity in conjunction with his age,

education and work experience. Based on these factors, the Grids indicate whether the claimant can engage in any other substantial gainful work that exists in the economy. *Zorilla,* 915 F.Supp. at 667. The Grids classify work into five categories based on the exertional requirements of the different jobs. Specifically, it describes work as sedentary, light, medium, heavy or very heavy, based on the job requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* at 667 n. 2.

[30] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling). *Rosa,* 168 F.3d at 78 n. 2 (citing *Zorilla,* 915 F.Supp. at 667 n. 3). "[L]imitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." *Samuels v. Barnhart,* 2003 WL 21108321, \*11 n. 14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); *see also* 20 C.F.R. §§ 404.1569a(c)(1)(i)-(vi).

When employing this five-step analysis, the Commissioner must consider: 1) objective medical facts and clinical findings; 2) diagnoses and medical opinions of examining physicians; 3) plaintiff's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him; and 4) plaintiff's age, education and work history. *Carroll,* 705 F.2d at 642 (citing *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980)).

## III. *Assessment of the Record*

Applying the required five-step framework to plaintiff, the ALJ found that 1) he was not performing substantial gainful activity, 2) he has a severe medical impairment, 3) his impairment does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 4) he has no past relevant work because, as a recent high-school graduate, he has never performed substantial gainful activity, and 5) he retained the residual functioning capacity to perform at least simple, routine, repetitive unskilled work activity with normal supervision. The ALJ concluded that although the plaintiff's ability to work at all exertional levels was compromised by non-exertional limitations, those limitations had little or no effect on the occupational base of unskilled work

at all exertional levels, under the Medical–Vocational guidelines rule 204.00.

**\*21** We first consider the problems with the ALJ's finding that the plaintiff's non-exertional limitations had minimal impact on his ability to perform unskilled work, specifically his rejection of findings by plaintiff's treating and examining sources and his failure to consider the incompleteness of the record before him. We next consider the validity of the ALJ's reliance on the Medical–Vocational guidelines to demonstrate the existence of jobs in the economy that plaintiff would be able to perform. Finally, we consider the appropriate remedy.

### A. *The ALJ's Conclusion that the Plaintiff's Non–Exertional Limitations Did Not Significantly Impact His Ability to Perform Non–Skilled Work*

The key to the ALJ's determination of the plaintiff's case was his finding that the plaintiff's non-exertional limitations had zero or no effect on his ability to perform unskilled work. To reach that result, the ALJ had to reject the opinions of the plaintiff's treating speech and language therapist and psychotherapist and his examining speech and language pathologist and psychologists, who found in substance that the plaintiff suffers from significant speech and language difficulties as well as problems with anger, frustration and concentration. At least one treating source also opined that these limitations prohibited him obtaining employment. The plaintiff argues that the Commissioner improperly weighed these opinions. We agree.

### 1. *The ALJ's Assessment of Ms. Gladstone's Findings*

The ALJ failed to properly analyze Ms. Gladstone's findings, both by neglecting to clarify her qualifications to determine whether the treating-physician rule should be applied to her findings and by dismissing her reports as dated. Based on her four-year treatment relationship with Baldwin, Ms. Gladstone found him to exhibit significant difficulties in all areas, including cognitive, perceptual, speech, language and social emotional deficits. If accepted, these findings would indicate that plaintiff suffers from significant non-exertional limitations on his ability to engage in gainful employment.

The ALJ's decision mentions Ms. Gladstone's reports several times, but mis-characterizes or distorts her findings and fails properly to assess their weight. Thus, he refers

to Dr. Rothenberg's exaggeration of the progress that Ms. Gladstone had noted in the plaintiff's condition, which Dr. Rothenberg inaccurately described as "excellent". He also recounts Ms. Gladstone's conclusion that 95 percent of the plaintiff's speech is intelligible to others. The ALJ neglected, however, to cite Ms. Gladstone's observations that despite the plaintiff's progress "he continues to display severe delays in all areas of development," and that he was challenged by single-step instructions and confused by materials presented without visual cues. (Tr. 173). Moreover, although the ALJ mentioned her observation that Baldwin could not name five states, he did not offer any explicit evaluation of the significance of such cognitive deficit.

**\*22** Apart from ignoring the thrust and potential significance of Ms. Gladstone's reports, the ALJ neglected to clarify her credentials and likewise failed to address whether the so-called treating-physician rule applied to her findings. The treating-physician rule determines the weight that is to be given to reports from "acceptable medical sources" who have treated claimants. *20 C.F.R. §§ 404.1527(a)(2)*, *416.927(a)(2)*. The SSA regulations identify speech-language pathologists who are licensed by the State professional licensing agency, those that are fully certified by the State education agency in their state of practice, and those who hold a Certificate of Clinical Competence from the American Speech–Language–Hearing Association as among acceptable medical sources to establish a speech or language impairment. *20 C.F.R. §§ 404.1513(a)(5)*, *416.913(a)(5)*. If a qualified speech-language pathologist treated a claimant, the pathologist's report should be evaluated under the treating-physician rule. *See 20 C.F.R. §§ 404.1527(d)(2)*, *416.927(d)(2)*.

The rule states that a claimant's " 'treating source's opinion on the issues(s) of the *nature and severity* of [a plaintiff's] *impairment(s)*' will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' " in the record. *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (citing *20 C.F.R. § 404.1527(d)(2)*) (emphasis in original); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); *Rosa,* 168 F.3d at 78–79 (stating that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.). Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, *Schisler v.*

*Sullivan,* 3 F.3d 563, 567–68 (2d Cir.1993), the opinion of the treating physician is not afforded controlling weight if it is not consistent with other substantial evidence in the record, such as the opinions of other medical experts. *Halloran,* 362 F.3d at 32 (the "treating physician's opinion is not controlling when contradicted 'by other substantial evidence in the record.' " (quoting *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002))); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d) (2).

Even if the treating physician's opinion conflicts with other medical evidence, the ALJ must still consider various "factors" to determine how much weight to give that doctor's opinion. Among those considerations are: 1) the frequency of examination and length, nature and extent of the treatment relationship; 2) evidence in support of the treating physician's opinion; 3) the consistency of the opinion with the record as a whole; 4) whether the opinion is from a specialist; and 5) other factors brought to the SSA's attention that support or contradict the opinion. *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)); *Fox v. Astrue,* 2008 WL 828078, *8 (N.D.N.Y. Mar.26, 2008). Additionally, the regulations direct the Commissioner to " 'give good reasons in his notice of determination or decision for the weight he give[s] [plaintiff's] treating source's opinion.' " *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). Failure to provide explicit "good reasons" for not crediting a treating source's opinion is a ground for remand. *Snell,* 177 F.3d at 133 (citing *Schaal,* 134 F.3d at 505).

**\*23** During Baldwin's hearing the ALJ expressed confusion about Ms. Gladstone's qualifications, questioning whether she was a state-licensed speech pathologist. (Tr. 212–13). Although at the hearing the ALJ suggested he would accept the representation of Baldwin's mother that Ms. Gladstone was a state-licensed speech pathologist (*id.*), in his report he referred to Ms. Gladstone only as a "Learning specialist/speech and language therapist." (Tr. 18). Beyond the ALJ's statement that he was willing to assume that Ms. Gladstone was licensed, there is no evidence in the record that he attempted to determine whether Ms. Gladstone was in fact a licensed or certified speech pathologist.

If the ALJ intended to consider Ms. Gladstone as a qualified treating medical source—as implied by his statement at the hearing—his decision improperly applied the treating-physician rule to her findings by failing to

provide "good reasons" for refusing to afford her opinions controlling weight. Moreover, his decision omitted any discussion of how the above-listed factors influenced the weight he accorded to her opinion. The ALJ's failure to explain his consideration of a treating source's opinion is itself ground for remand. *Snell,* 177 F.3d at 133 (citing *Schaal,* 134 F.3d at 505).

If, on the other hand, the ALJ decided that he was not willing to assume that Ms. Gladstone was a qualified treating source—contrary to his statement at the hearing—his failure to contact Ms. Gladstone to determine whether she satisfied the requirements of an "acceptable medical source" was error. By neglecting to determine whether Ms. Gladstone was a licensed or certified speech pathologist, he failed to meet his responsibility to resolve ambiguities or evidentiary gaps in the record. 20 C.F.R. §§ 404.1512(e), 416.912(e) (ALJ must seek "additional evidence or clarification" when "the report from your medical source contains a conflict or ambiguity that must be resolved" or "the report does not contain all the necessary information"); *see also Rosa,* 168 F.3d at 79 (discussing ALJ's obligation to develop record).

Moreover, even if Ms. Gladstone's reports did not qualify as acceptable medical evidence, triggering the requirement that the ALJ give her opinions as a treating source controlling weight absent "good reasons" for not doing so, her reports would qualify as one of the "other sources" of information that the ALJ may consider to determine the plaintiff's disability under 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). The SSA has ruled that opinions from sources who do not qualify as "acceptable medical sources," including therapists, are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06–03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006); *see also Allen v. Astrue,* 2008 WL 660510, at *9 (N.D.N.Y. Mar.10, 2008) (remanding in part because the ALJ did not evaluate treating therapist's opinion). In appropriate circumstances, the opinions of non-acceptable medical sources may even be given more weight than those of treating physicians. SSR 06–03p, 2006 WL 2329929, at *5.

**\*24** Even if Ms. Gladstone only qualifies as an "other source[ ]" of information, the ALJ's decision to discount her reports because he considered them to be out-of-

date instead of seeking an updated report also constitutes error. The ALJ stated that he did not give significant weight to the evidence in the record, including Ms. Gladstone's reports. He chose instead to credit the testimony of the consulting non-examining pediatrician Dr. Rothenberg that the plaintiff is capable of performing simple, repetitive tasks as an adult. (Tr. 211). The ALJ's rationale for this decision was that the "claimant is indicated to have improved significantly since much of the evidence of record was recorded." (Tr. 19). [31] During the plaintiff's hearing, the ALJ specifically described one of Ms. Gladstone's reports dated May 12, 2004 as "a little antiquated". (Tr. 213).

[31]    It should be noted that any progress by the plaintiff in the year preceding his hearing before the ALJ would not necessarily require a finding of "not disabled," as the definition of a disability includes "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted ... for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). Plaintiff claims a disability beginning on July 8, 2004, but his hearing did not occur until July 17, 2006. To the extent that the plaintiff was unable to engage in substantial gainful activity for a period running through July 8, 2005, the plaintiff's condition could still meet the definition of a disability despite his subsequent improvement.

In light of the ALJ's obligation to develop the record, his failure to contact Ms. Gladstone to request an updated appraisal of the plaintiff's condition instead of dismissing her reports as "antiquated" was improper. *See Rivera, 379 F.Supp.2d at 608* (remanding based in part on ALJ's failure to request updated statements from claimant's treating physicians). On remand, the ALJ should contact Ms. Gladstone to clarify her qualifications, seek an updated report if necessary, and evaluate her opinion in light of the standards discussed above.

### 2. The ALJ's Assessment of Mr. Consolini's Findings

The ALJ's decision also improperly failed to consider the reports of Mr. Consolini, a psychotherapist who treated the plaintiff weekly from January to October 2003 and twice-weekly from November 2003 through at least August 2004. Mr. Consolini acknowledged that Baldwin had made progress in his academic and personal adjustment, but noted that he continued to suffer from difficult-to-control anger, a limited tolerance for

frustration and difficulties concentrating. Mr. Consolini noted that plaintiff's psychological problems had rendered him unable to gain employment or support himself. The ALJ did not mention Mr. Consolini's reports in his decision, except to note that on page 15 of the August 14, 2004 Psychiatric Review Technique form filled in by Dr. Charles, he quoted Mr. Consolini's view that the plaintiff is expected to finish high school and become gainfully employed. [32] (Tr. 17).

[32]    As noted *supra* p. 34, the fifteenth page of Dr. Charles' report is actually the report of the Speech and Language Medical Consultant referred to in the record only as "Liddie." (Tr. 150).

Courts have long held that an ALJ's " 'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Kuleszo,* 232 F.Supp.2d at 57 (citing *Pagan,* 923 F.Supp. at 556). As a psychotherapist, Mr. Consolini is admittedly not an acceptable medical source to establish the plaintiff's disability under 20 C.F.R. §§ 404.1513(a), 416.913(a), but he qualifies as one of the "other sources" on which the ALJ can base his decision under C.F.R. §§ 404.1513(d), 416.913(d). *See Mejia v. Barnhart,* 261 F.Supp.2d 142, 148 (E.D.N.Y.2003). Given Mr. Consolini's regular contact with Baldwin, his view plainly would be relevant to the plaintiff's ability to perform even unskilled work. The ALJ's oblique reference to one of Mr. Consolini's reports in his decision—by mentioning an appendix to a non-examining consultant's report which consists of another non-examining consultant's citation of Mr. Consolini's findings—is insufficient to meet his burden of acknowledging relevant evidence, as it does not indicate that the ALJ himself reviewed Mr. Consolini's report, nor does it take into account Mr. Consolini's views on the plaintiff's current condition. The quoted portion of Mr. Consolini's report is arguably not even an accurate representation of the psychotherapist's views, as it omits his opinion that the plaintiff "remains unable to support himself" and "has been ... unable to gain employment due to his psychological problems." It also fails to mention Mr. Consolini's findings that the plaintiff continues to suffer difficulties controlling his anger and frustration and has trouble concentrating. (Tr. 115).

**\*25** Moreover, to the extent that the ALJ rejected the bulk of the medical record (presumably including Mr. Consolini's findings) as out-of-date, the analysis above regarding the ALJ's treatment of Ms. Gladstone's reports

applies with equal force. To discount Mr. Consolini's reports as outdated instead of requesting an updated report violated the ALJ's obligation to develop the record. *See Rivera,* 379 F.Supp.2d at 607. On remand, the ALJ should seek an updated report from Mr. Consolini if necessary and address his views on how the plaintiff's limitations might affect his ability to perform unskilled work. [33]

[33]  The ALJ also completely neglected to refer to Baldwin's Lindamood–Bell test results. Although only constituting "other sources" of information about the plaintiff's impairment, based on the analysis provided above the ALJ should also address these reports on remand.

*3. The ALJ's Assessment of Ms. Singer's Findings*

The ALJ's rejection of Ms. Singer's findings in favor of the conclusion of a non-examining source was also improper. The ALJ's only reference to Ms. Singer's findings is his notation that at the hearing the plaintiff's attorney had highlighted her report that plaintiff tested in the 0.1 percentile on a test of receptive word classes. The ALJ then noted that Dr. Rothenberg had considered the score to be unrepresentative of the plaintiff's abilities demonstrated at the hearing. (Tr. 18). At the hearing, the ALJ also expressed concern about relying on Ms. Singer's report because she had evaluated the plaintiff in 2004 "when he was 18. He's now 20." (Tr. 208). [34]

[34]  Dr. Rothenberg echoed the ALJ's concern about relying on Ms. Singer's report at the hearing by stating that he did not see the plaintiff in 2004 and so cannot speak to Ms. Singer's results, but that he found them to be "impossible" in light of the plaintiff's performance at the hearing. (Tr. 209).

The ALJ's un-explained decision to credit the opinion of Dr. Rothenberg, a non-examining source, over the findings of Ms. Singer, which were drawn from her examination of the plaintiff, is improper. According to the SSA regulations, generally an ALJ must give "more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Echevarria v. Apfel,* 46 F.Supp.2d 282, 292 (S.D.N.Y.1999); *Filocomo v. Chater,* 944 F.Supp. 165, 170 n. 4 (E.D.N.Y.1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.")

Furthermore, when determining the weight to be given to non-examining sources, an ALJ must apply the factors discussed above in reference to treating sources: 1) the length of the relationship between the source and the claimant, 2) the nature and extent of the relationship, 3) the supportability of the source's opinion, 4) the consistency of the source's opinion with the record as a whole, and 5) the specialization of the source. *See* 20 C.F.R. §§404.1527(d)(2) & (f), 416.927(d)(2) & (f). *See also Echevarria,* 46 F.Supp.2d at 292.

Here, the ALJ did not discuss these factors in explaining why Dr. Rothenberg's opinion as a non-examining source should be credited over the opinion of an examining source. Indeed, Dr. Rothenberg did not meet or examine the plaintiff prior to the hearing, but rather based his opinion on the plaintiff's medical file and a mere five transcript pages worth of the plaintiff's testimony at his hearing. (*See* Tr. 194–97, 199). Moreover, Dr. Rothenberg possesses no documented specialization in speech or language therapy. (Tr. 209). The ALJ's failure to explain how the above-listed factors justify affording more weight to Dr. Rothenberg's opinion than Ms. Singer's was therefore improper. *See Burgess v. Astrue,* 537 F.3d 117, 130–32 (2d Cir.2008) (remanding due to ALJ's failure to give good reasons for adopting non-examining expert's views at hearing over those of treating physician); *Pfeiffer v. Astrue,* 576 F.Supp.2d 956, 961 (W.D.Wis.2008) (remanding in part because of ALJ's failure to indicate he applied relevant factors in deciding to give more weight to non-examining consultant than examining consultant). [35] On remand, the ALJ must obtain an update of Ms. Singer's report, if necessary, and then explicitly assess the relative weight given to her findings and the opinion of Dr. Rothenberg. [36]

[35]  Again, to the extent that the ALJ dismissed Ms. Singer's reports on the ground that they were out-of-date, as suggested by his comment at the hearing, this was error because the ALJ neglected his duty to properly develop the record.

[36]  Although the ALJ's discussion of the weight he afforded to Dr. Shackelford's consulting source report similarly could be enhanced on remand, since the ALJ's description of Ms. Shackelford's findings was somewhat more robust than his treatment of the rest of the record, we do not specifically target any lapses with regard to her report.

Likewise, on remand the ALJ could expand upon his treatment of Baldwin's IEP, but given that he acknowledged its existence and primary findings in his decision we do not specifically take issue with his consideration of it.

### 4. The ALJ's Assessment of Dr. Algaze's Findings

**\*26** The ALJ's failure to address the bulk of Dr. Algaze's findings was also improper. Dr. Algaze examined Baldwin and found that he has difficulty relating to others, suffers from mild-to-moderate receptive and expressive language skills deficits and exhibits low-average intelligence. He diagnosed the plaintiff with an adjustment reaction to illness with depression and anxiety, and speech-development and personality disorders, and he suggested ruling out borderline mental retardation. Dr. Algaze offered a guarded prognosis for Baldwin, strongly suggesting that he seek psychiatric treatment as well as vocational rehabilitation and psychological testing. (Tr. 125–26).

The ALJ did not discuss Dr. Algaze's report other than to state that Dr. Rothenberg disagreed with the need to rule out borderline mental retardation based on IQ test results in the record from another source. (Tr. 18). The ALJ did not address the bulk of Dr. Algaze's findings, including his conclusions regarding the plaintiff's difficulties interacting with others.

As a psychiatrist, Dr. Algaze qualifies as an acceptable medical source under the SSA regulations. *White v. Comm'r of Soc. Sec.,* 302 F.Supp.2d 170, 176 (W.D.N.Y.2004) (citing 20 C.F.R. § 416.913(a)). The regulations obligate the SSA to consider medical opinions about the nature and severity of a claimant's impairments. 20 C.F.R. §§ 404.1527(b), 416.927(b) ("[W]e will always consider the medical opinions in your case record.") Moreover, as evidence bearing on the potential difficulties plaintiff may encounter in performing even unskilled work, Dr. Algaze's report constitutes relevant evidence, which the ALJ must acknowledge and either accept or explain why he does not do so. *Kuleszo,* 232 F.Supp.2d at 57 (citing *Pagan,* 923 F.Supp. at 556).[37] On remand, the ALJ must address Dr. Algaze's findings.

[37] Again, any concerns about the timeliness of Dr. Algaze's findings must be addressed by seeking an updated report as opposed to rejecting his report out-of-hand, given the ALJ's obligation to develop the record.

### 5. The ALJ's Assessment of the School Psychologists' Findings

Baldwin was also examined by two school psychologists, who determined that he experienced anxiety, difficulties relating to others and language deficiencies. The ALJ failed to refer to either of these reports in his decision, and this omission was improper.

Under SSA regulations, licensed or certified psychologists constitute acceptable medical sources to determine whether a claimant has a medically determinable impairment. This includes school psychologists for purposes of determining, *inter alia,* learning disabilities and borderline intellectual functioning. 20 CFR §§ 404.1513(a)(2), 416.913(a)(2). The ALJ is obligated to address medical opinions and relevant evidence, such as the psychologists' views about the impact and severity of Baldwin's non-exertional limitations. 20 C.F.R. §§ 404.1527(b), 416.927(b); *Kuleszo,* 232 F.Supp.2d at 57 (citing *Pagan,* 923 F.Supp. at 556). This obligation is not diminished by the fact that the testifying "expert" pediatrician did not refer to the psychologists' reports during his testimony at the plaintiff's hearing. On remand, the ALJ must address the school psychologists' reports.

### B. The ALJ's Reliance on the Medical–Vocational Guidelines

**\*27** If a plaintiff shows that his impairment renders him unable to perform his past work—as the SSA conceded here—the burden then shifts to the Commissioner to show that there is other gainful work in the national economy that the plaintiff could perform. *See Carroll,* 705 F.2d at 642 (citing *Berry,* 675 F.2d at 467); *Campbell v. Sec'y of Health and Human Servs.,* 665 F.2d 48, 51 (2d Cir.1981), *rev'd on other grounds sub nom. Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Typically the Commissioner can sustain this burden by referencing the Medical–Vocational Guidelines, *Zorilla,* 915 F.Supp. at 667, but sole reliance on the Guidelines is improper when the plaintiff suffers from non-exertional limitations that significantly limit his employment opportunities. *See Butts,* 388 F.3d at 383 (citing *Rosa,* 168 F.3d at 78; *Moulding,* 2009 WL 3241397, at \*12 (citing *Bapp,* 802 F.2d at 605). A plaintiff's range of potential employment is significantly limited when he suffers from the "additional loss of work capacity beyond a negligible one or, in other

words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp,* 802 F.2d at 606.

Baldwin argues that the ALJ's reliance on the Guidelines to sustain his step-five burden in his case was improper in light of the psychiatric review technique form completed by Dr. Charles, indicating that the plaintiff suffers from a moderate degree of limitation in maintaining social functioning and has had one or two repeated episodes of deterioration, each of extended duration. (Pl.'s Mem. 22–23). The plaintiff argues that under applicable caselaw, including *Zwick,* 1998 WL 426800, such limitations preclude sole reliance on the Guidelines.[38] We agree.

[38]     As we consider caselaw, including that cited by the plaintiff, to determine the issue, we need not resolve the dispute between the parties as to the proper weight to accord to the partially redacted Appeals Council decision appended to the plaintiff's memorandum.

In *Zwick,* the plaintiff's consulting physician determined that the plaintiff suffered from a personality disorder which resulted in "moderate limitations of [activities of daily living] and in maintaining social functioning." 1998 WL 426800, at * 8. The court concluded that such "non-exertional impairments cannot be said to result in only a 'negligible' loss of work capacity." *Id.* (quoting *Bapp,* 802 F.2d at 606). The court determined that the plaintiff's moderate limitations required the ALJ to find that the plaintiff's range of potential employment was significantly limited, thus precluding sole reliance on the Grids. *Id.* at *9; *see also Moulding,* 2009 WL 3241397, at *12 (remanding because ALJ failed to consult vocational expert after acknowledging claimant's lack of concentration, attention and memory and inability to tolerate stress precluded her from performing past jobs); *Shipman v. Astrue,* 2008 WL 216615, * 10 (S.D.N.Y. Jan.23, 2008) (remanding when ALJ failed to introduce vocational expert testimony in light of evidence that claimant suffered from moderate and/or marked non-exertional limitations in "understanding and following instructions, working with others, finishing a work week, and avoiding major episodes"). Cf. *DiBlasi v. Comm'r of Soc. Sec.,* 660 F.Supp.2d 401, 2009 WL 2584827, *6 (N.D.N.Y.2009) (affirming Commissioner's denial of benefits, in part based on vocational expert testimony that despite claimant's moderate difficulties in social functioning, concentration, persistence, and pace, he could perform jobs that existed in the national economy).

*28 In Baldwin's case, a consulting physician found that his social functioning ability was moderately limited, and that he had suffered one or two repeated episodes of deterioration, each of extended duration. (Tr. 146). Moreover, the mental RFC completed by the same physician found the plaintiff to suffer from moderate limitations in numerous areas that bear on activities of daily living and social functioning. (Tr. 131–32). These findings are supported by substantial evidence in the record from the plaintiff's treating and examining sources. Therefore, as in *Zwick,* we consider the ALJ's conclusion that the plaintiff's non-exertional limitations did not significantly impact his employment prospects to be erroneous. On remand, the ALJ should be required to introduce evidence from a vocational expert[39] or equivalent evidence about the presence of jobs in the national economy open to the plaintiff despite his non-exertional limitations.

[39]     We emphasize that although Mr. Weinstein, the state disability analyst who initially reviewed Baldwin's claims for benefits, has at times been referred to as a vocational expert, there is no indication of such expertise in the record. Moreover, the Commissioner's memoranda do not argue that Mr. Weinstein's opinion rendered in the process of denying the plaintiff's claims satisfies the requirement of introducing testimony from a vocational expert or its equivalent.

We also note that the ALJ's ultimate conclusion about the availability of jobs despite the plaintiff's non-exertional limitations was premised on legal errors in the consideration of the medical record, as discussed above. On remand, when assessing the evidence at stage five, the ALJ should take into account his re-evaluation of the medical record in light of the proper legal standards and a more fully developed record in evaluating the severity of the impact of plaintiff's non-exertional limitations on the range of employment options available to him.

### C. *Nature of the Remedy*

For reasons noted, the Commissioner's decision cannot stand. The question remains, however, whether the case should be remanded for further consideration or simply for calculation of benefits. The plaintiff's motion papers could be read to seek a remand solely for the calculation of benefits.[40] If so, we disagree.

40    The plaintiff's complaint sought a judgment reversing the Commissioner's decision and granting the plaintiff's claim for disability benefits. (Compl. at p. 4). We interpret this request as one to remand the case merely for a calculation of benefits. The plaintiff's memorandum in support of his motion for judgment on the pleadings sought to have the case remanded to the Commissioner for "additional proceedings" (Pl.'s Mem. 24), which could be read, in light of the plaintiff's complaint, as requesting a remand to calculate benefits.

As noted, upon a finding that an administrative record is incomplete or that an ALJ has applied improper legal standard, courts generally remand the matter to the Commissioner for further consideration. *Curry v. Apfel,* 209 F.3d 117, 124 (citing *Rosa,* 168 F.3d at 82–83) ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded for further development of the evidence"), *superseded by statute on other grounds,* 20 C.F.R. § 404.1560(c)(2). In addition, where the ALJ failed to develop the record sufficiently to make appropriate disability determinations, remand for further findings that would plainly help to assure the proper disposition of plaintiff's claim is particularly appropriate. *Butts,* 388 F.3d at 386–87 (citing Rosa, 168 F.3d at 83).

In this case, there are gaps in the administrative record, and the ALJ has, in various respects, applied improper legal standards. We cannot say, however, that the evidentiary record at present dictates a finding of disability. A remand is therefore particularly appropriate because it would allow the ALJ to more fully develop the record as necessary, re-weigh the evidence from the plaintiff's treating and examining sources, and introduce evidence from a vocational expert on jobs available to the plaintiff despite his non-exertional limitations. *See*

*Butts,* 388 F.3d at 387 (where a remand was appropriate because the ALJ failed to call a vocational expert, and thus, the record is incomplete and "further findings" are appropriate "to assure the proper disposition of [the] claim."); *Schaal,* 134 F.3d at 505 (remanding for ALJ to develop record as necessary and re-weigh evidence).

## CONCLUSION

**\*29** For the reasons noted, we recommend that plaintiff's motion be granted in part, that the Commissioner's motion be denied, and that this case be remanded to the Commissioner for further proceedings.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard J. Holwell, Room 1950, 500 Pearl Street, New York, New York 10007–1312 and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007–1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 4931363, 148 Soc.Sec.Rep.Serv. 455

---

End of Document    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

SSR 96-9P (S.S.A.), 1996 WL 374185

Social Security Ruling

POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING
CAPABILITY TO DO OTHER WORK--IMPLICATIONS OF A RESIDUAL
FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK

SSR 96-9p
July 2, 1996

**\*1  PURPOSE:** To explain the Social Security Administration's policies regarding the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work. In particular, to emphasize that:

1. An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare.

2. However, a finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled." If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.

**CITATIONS (AUTHORITY):** Sections 223(d) and 1614(a) of the Social Security Act (the Act), as amended; Regulations No. 4, sections 404.1513(c), 404.1520, 404.1520a, 404.1545, 404.1546, 404.1560, 404.1561, 404.1562, 404.1563 through 404.1567, 404.1569, 404.1569a; appendix 1 of subpart P, section 12.00; appendix 2 of subpart P, sections 200.00 and 201.00; Regulations No. 16, sections 416.913(c), 416.920, 416.920a, 416.945, 416.946, 416.960, 416.961, 416.962, 416.963 through 416.967, 416.969 and 416.969a.

**INTRODUCTION:** Under the sequential evaluation process, once it has been determined that an individual is not engaging in substantial gainful activity and has a "severe" medically determinable impairment(s) which, though not meeting or equaling the criteria of any listing, prevents the individual from performing past relevant work (PRW), it must be determined whether the individual can do any other work, considering the individual's RFC, age, education, and work experience.

RFC is what an individual can still do despite his or her functional limitations and restrictions caused by his or her medically determinable physical or mental impairments. It is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to perform work-related physical and mental activities. RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements"--i.e., opinions about what the individual can still do despite a severe impairment(s)--submitted by an individual's treating source(s) or other acceptable medical source. [1]

**\*2**  RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule. It is not the least an individual can do, but the most,

based on all of the information in the case record. The RFC assessment considers only those limitations and restrictions that are caused by an individual's physical or mental impairments. It does not consider limitations or restrictions due to age or body habitus, since the Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). (See SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims.")

Initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. This RFC assessment is first used for a function-by-function comparison with the functional demands of an individual's PRW as he or she actually performed it and then, if necessary, as the work is generally performed in the national economy. [2]

However, at the last step of the sequential evaluation process, the RFC assessment is used to determine an individual's "maximum sustained work capability" and, where solely non-exertional impairments are not involved, must be expressed in terms of the exertional classifications of work: sedentary, light, medium, heavy, and very heavy work. The rules of appendix 2 of subpart P of Regulations No. 4 take administrative notice of the existence of numerous unskilled occupations within each of these exertional levels. The rules are then used to direct decisions about whether an individual is disabled or, when the individual is unable to perform the full range of work contemplated by an exertional level(s), as a framework for decisionmaking considering the individual's RFC, age, education, and work experience.

The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, [3] the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions. On the other hand, since the rules in Table No. 1 of appendix 2, "Residual Functional Capacity: Maximum Sustained Work Capability Limited to Sedentary Work as a Result of Severe Medically Determinable Impairment(s)," direct a decision of "disabled" for individuals age 50 and over who are limited to a full range of sedentary work, unless the individual has transferable skills or education that provides for direct entry into skilled sedentary work, the impact of an RFC for less than the full range of sedentary work in such individuals is less critical.

**\*3 POLICY INTERPRETATION:** Under the regulations, "sedentary work" represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations. For the majority of individuals who are age 50 or older and who are limited to the full range of sedentary work by their medical impairments, the rules and guidelines in appendix 2 require a conclusion of "disabled."

Nevertheless, the rules in Table No. 1 in appendix 2 take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy. [4] Therefore, even though "sedentary work" represents a significantly restricted range of work, this range in itself is not so prohibitively restricted as to negate work capability for substantial gainful activity in all individuals.

Moreover, since each occupation administratively noticed by Table No. 1 represents numerous jobs, the ability to do even a *limited* range of sedentary work does not in itself establish disability in all individuals, although a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded (see *Using the Rules in Table No. 1 as a Framework: "Erosion" of the Occupational Base* below). In deciding whether an individual who is limited to a partial range of sedentary work is able to make an adjustment to work other than any PRW, the adjudicator is required to make an individualized determination, considering age, education, and work experience, including any skills the individual may have that are transferable to other work, or education that provides for direct entry into skilled work, under the rules and guidelines in the regulations.

*Sedentary Work*

The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one- third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

*The Occupational Base for Sedentary Work*

The term "occupational base" means the approximate number of occupations that an individual has the RFC to perform considering all exertional and nonexertional limitations and restrictions. (See SSR 83-10, "Titles II and XVI: Determining Capability to Do Other Work--The Medical- Vocational Rules of Appendix 2" (C.E. 1981-1985, p. 516).) A full range of sedentary work includes all or substantially all of the approximately 200 [5] unskilled sedentary occupations administratively noticed in Table No. 1.

 **\*4**  Thus, the RFC addressed by a particular rule in Table No. 1 establishes an occupational base that at a minimum includes the full range of unskilled sedentary occupations administratively noticed. The base may be broadened by the addition of specific skilled or semiskilled occupations that an individual with an RFC limited to sedentary work can perform by reason of his or her education or work experience. However, if the individual has no transferable skills or no education or training that provides for direct entry into skilled work, the occupational base represented by the rules in Table No. 1 comprises only the sedentary unskilled occupations in the national economy that such an individual can perform.

The rules in Table No. 1 direct conclusions as to disability where the findings of fact coincide with all of the criteria of a particular rule; i.e., RFC (a maximum sustained work capability for sedentary work) and the vocational factors of age, education, and work experience. In order for a rule in Table No. 1 to direct a conclusion of "not disabled," the individual must be able to perform the full range of work administratively noticed by a rule. This means that the individual must be able to perform substantially all of the strength demands defining the sedentary level of exertion, as well as the physical and mental nonexertional demands that are also required for the performance of substantially all of the unskilled work considered at the sedentary level. Therefore, in order for a rule to direct a conclusion of "not disabled," an individual must also have no impairment that restricts the nonexertional capabilities to a level below those needed to perform unskilled work, in this case, at the sedentary level.

*Using the Rules in Table No. 1 as a Framework: "Erosion" of the Occupational Base*

Where any one of the findings of fact does not coincide with the corresponding criterion of a rule in Table No. 1 (except in those cases where the concept of borderline age applies) [6], the rule does not direct a decision. In cases such as the following, the medical-vocational rules must be used as a framework for considering the extent of any erosion of the sedentary occupational base:

* Any one of an individual's exertional capacities is determined to be less than that required to perform a full range of sedentary work; or

* Based on an individual's exertional capacities, a rule in Table No. 1 would direct a decision of "not disabled," but the individual also has a nonexertional limitation(s) that narrows the potential range of sedentary work to which he or she

might be able to adjust (i.e., the individual has the exertional capacity to do the full range of sedentary work, but the sedentary occupational base is reduced because of at least one nonexertional limitation).

When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work: the occupational base will be "eroded" by the additional limitations or restrictions. However, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

 **\*5**  Whether the individual will be able to make an adjustment to other work requires adjudicative judgment regarding factors such as the type and extent of the individual's limitations or restrictions and the extent of the erosion of the occupational base; i.e., the impact of the limitations or restrictions on the number of sedentary unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education, and work experience, including any transferable skills or education providing for direct entry into skilled work. Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country.

### *Exertional and Nonexertional Limitations and Restrictions*

Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining ability to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. An exertional limitation is an *impairment-caused* limitation of any one of these activities.

Nonexertional capacity considers any work-related limitations and restrictions that are not exertional. Therefore, a nonexertional limitation is an *impairment-caused* limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional.

Thus, it is the *nature of an individual's limitations and restrictions,* not certain impairments or symptoms, that determines whether the individual will be found to have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions. For example, even though mental impairments often affect nonexertional functions, they may also limit exertional capacity affecting one of the seven strength demands; e.g., from fatigue or hysterical paralysis. Likewise, symptoms, including pain, are not intrinsically exertional or nonexertional; when a symptom causes a limitation in one of the seven strength demands, the limitation must be considered exertional. (See SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims.")

### Guidelines for Evaluating the Ability to Do Less Than a Full Range of Sedentary Work

The following sections provide adjudicative guidance as to the impact of various RFC limitations and restrictions on the unskilled sedentary occupational base. The RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment. The individual's maximum remaining capacities to perform sustained work on a regular and continuing basis (what he or she can still do 8 hours a day, for 5 days a week, or an equivalent work schedule) must be stated.

**\*6** An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource. The RFC assessment must be sufficiently complete to allow an adjudicator to make an informed judgment regarding these issues.

*Exertional Limitations and Restrictions*

**Lifting/carrying and pushing/pulling:** If an individual is unable to lift 10 pounds or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday, the unskilled sedentary occupational base will be eroded. The extent of erosion will depend on the extent of the limitations. For example, if it can be determined that the individual has an ability to lift or carry slightly less than 10 pounds, with no other limitations or restrictions in the ability to perform the requirements of sedentary work, the unskilled sedentary occupational base would not be significantly eroded; however, an inability to lift or carry more than 1 or 2 pounds would erode the unskilled sedentary occupational base significantly. For individuals with limitations in lifting or carrying weights between these amounts, consultation with a vocational resource may be appropriate.

Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base.

**Standing and walking:** The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. For individuals able to stand and walk in between the slightly less than 2 hours and only a few minutes, it may be appropriate to consult a vocational resource.

**Sitting:** In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded. The extent of the limitation should be considered in determining whether the individual has the ability to make an adjustment to other work. See *Alternate sitting and standing* below.

The fact that an individual cannot do the sitting required to perform the full range of sedentary work does not necessarily mean that he or she cannot perform other work at a higher exertional level. In unusual cases, some individuals will be able to stand and walk longer than they are able to sit. If an individual is able to stand and walk for approximately 6 hours in an 8-hour workday (and meets the other requirements for light work), there may be a significant number of light jobs in the national economy that he or she can do even if there are not a significant number of sedentary jobs.

**\*7 Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

**Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and

describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. [7] For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

***Nonexertional Limitations and Restrictions***

**Postural limitations:** Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work. In the SCO, "balancing" means maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces. If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself, result in a significant erosion of the unskilled sedentary occupational base. However, if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base. It is important to state in the RFC assessment what is meant by limited balancing in order to determine the remaining occupational base. Consultation with a vocational resource may be appropriate in some cases.

 **\*8** An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.

**Manipulative limitations:** Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base. For example, example 1 in section 201.00(h) of appendix 2, describes an individual who has an impairment that prevents the performance of any sedentary occupations that require bilateral manual dexterity (i.e., "limits the individual to sedentary jobs which do not require bilateral manual dexterity"). When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

The ability to feel the size, shape, temperature, or texture of an object by the fingertips is a function required in very few jobs and impairment of this ability would not, by itself, significantly erode the unskilled sedentary occupational base.

**Visual limitations or restrictions:** Most sedentary unskilled occupations require working with small objects. If a visual limitation prevents an individual from seeing the small objects involved in most sedentary unskilled work, or if an individual is not able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles, there will be a significant erosion of the sedentary occupational base. These cases may require the use of vocational resources.

**Communicative limitations:** Basic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient. If the individual retains these basic communication abilities, the unskilled sedentary occupational base would not be significantly eroded in these areas.

**Environmental restrictions:** An "environmental restriction" is an impairment-caused need to avoid an environmental condition in a workplace. Definitions for various workplace environmental conditions are found in the SCO; e.g., "extreme cold" is exposure to nonweather-related cold temperatures.

 **\*9**  In general, few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards. The "hazards" defined in the SCO are considered unusual in unskilled sedentary work. They include: moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals. Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base.

Since all work environments entail some level of noise, restrictions on the ability to work in a noisy workplace must be evaluated on an individual basis. The unskilled sedentary occupational base may or may not be significantly eroded depending on the facts in the case record. In such cases, it may be especially useful to consult a vocational resource.

Restrictions to avoid exposure to odors or dust must also be evaluated on an individual basis. The RFC assessment must specify which environments are restricted and state the extent of the restriction; e.g., whether only excessive or even small amounts of dust must be avoided.

**Mental limitations or restrictions:** A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability. These mental activities are generally required by competitive, remunerative, unskilled work:
\* Understanding, remembering, and carrying out simple instructions.

\* Making judgments that are commensurate with the functions of unskilled work--i.e., simple work- related decisions.

\* Responding appropriately to supervision, co- workers and usual work situations.

\* Dealing with changes in a routine work setting.

A less than substantial loss of ability to perform any of the above basic work activities may or may not significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education,

and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

### Use of Vocational Resources

When the extent of erosion of the unskilled sedentary occupational base is not clear, the adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the **Occupational Outlook Handbook,** or **County Business Patterns.**

In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. [8] The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.

**\*10 EFFECTIVE DATE:** This Ruling is effective on the date of its publication in the *Federal Register.*

**CROSS-REFERENCES:** SSR 86-8 **"Titles II and XVI: The Sequential Evaluation Process" (C.E. 1986, p. 78),** SSR 83-10, **"Titles II and XVI: Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2" (C.E. 1981-1985, p. 516),** SSR 83-12, **"Titles II and XVI: Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work" (C.E. 1981-1985, p. 529),** SSR 83-14, **"Titles II and XVI: Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments" (C.E. 1981-1985, p. 535),** SSR 85-15, **"Titles II and XVI: Capability to Do Other Work--The Medical- Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments" (C.E. 1981-1985, p. 543),** SSR 96- 8p, **"Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims;" Program Operations Manual System, sections DI 24510.001, DI 24510.005, DI 24510.010, DI 24510.050, DI 24515.061, DI 25001.001, DI 25010.001, DI 25020.005, DI 25020.010, DI 25020.015, DI 25025.001 and DI 28005.015; and Hearings, Appeals, and Litigation Law Manual, sections I-2-548 and I-2-550.**

[1] For a detailed discussion of the difference between the RFC assessment, which is an administrative finding of fact, and the opinion evidence called the "medical source statement" or "MSS," see SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner."

[2] RFC may be expressed in terms of an exertional category, such as "light," if it becomes necessary to assess whether an individual is able to perform past relevant work as it is generally performed in the national economy. However, without the initial function-by-function accounting of the individual's capacities, it may not be possible to determine whether the individual is able to perform past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to perform the full range of work at a given exertional level. See SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims."

[3] However, "younger individuals" age 45-49 who are unable to communicate in English or who are illiterate in English and who are limited to even a *full* range of sedentary work must be found disabled under rule 201.17 in Table No. 1.

[4] An "occupation" refers to a grouping of numerous individual "jobs" with similar duties. Within occupations (e.g., "carpenter") there may be variations among jobs performed for different employers (e.g., "rough carpenter").

[5] The regulations specify that this is an approximation. The revised fourth edition of the **Dictionary of Occupational Titles** and its companion volumes (the DOT, 1991) lists 137 separate occupations. However, the introduction to Volume I explains that the fourth edition of the DOT (1977) "substantially modified or combined with related definitions" several thousand definitions from the third edition. In 1992, we published a notice in the *Federal Register* explaining that an analysis of the revised fourth edition of the DOT and available data for the then upcoming volume of the **Selected Characteristics of Occupations Defined**

**in the Revised Dictionary of Occupational Titles** (SCO) showed "that the range of work of which the medical-vocational rules take administrative notice continues to represent more occupations than would be required to represent significant numbers," and that "we have received no significant data or other evidence to indicate that * * * the unskilled occupational base * * * has changed substantially." (See 57 FR 43005, September 17, 1992.) In February 1996, contact with the North Carolina Occupational Analysis Field Center, the organization that compiles the data the Department of Labor uses in the SCO, confirmed that there are no precise updated data but that the regulatory estimate of approximately 200 sedentary unskilled occupations is still valid, because some of the 137 occupations in the current edition of the DOT comprise more than one of the separate occupations of which we take administrative notice.

6    See 20 CFR 404.1563(a) and 416.963(a) and <u>SSR 83-10</u>.

7    Bilateral manual dexterity is needed when sitting but is not generally necessary when performing the standing and walking requirements of sedentary work.

8    At the hearings and appeals levels, vocational experts (VEs) are vocational professionals who provide impartial expert opinion during the hearings and appeals process either by testifying or by providing written responses to interrogatories. A VE may be used before, during, or after a hearing. Whenever a VE is used, the individual has the right to review and respond to the VE evidence prior to the issuance of a decision. The VE's opinion is not binding on an adjudicator, but must be weighed along with all other evidence.

Social Security Administration

Department of Health and Human Services
SSR 96-9P (S.S.A.), 1996 WL 374185

**End of Document**      © 2017 Thomson Reuters. No claim to original U.S. Government Works.